| | |
|---|---|
| JANE DOE,<br><br>       Plaintiff,<br><br>   v.<br><br>CHRISTIAN LARSEN, RIPPLE LABS INC., and DOES 1-10,<br><br>       Defendants. | Case No. 1:25-cv-06020 (MMG) |

# Emergency Motion for Temporary Restraining Order and Preliminary Injunction

# **TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT.................................................................1

A. This Court's Institutional Authority and Why Federal Intervention Is Necessary.....1

B. Two Violations Have Converged to Threaten Constitutional Rights...................2

C. The Evidence Establishes Likelihood of Success on Federal Claims.................3

D. Only This Court Can Vindicate Federal Rights and Protect Federal Enforcement.......4

E. Urgency and the Threat to Federal Enforcement…………………………………5

II. BACKGROUND.............................................................................6

A. Plaintiff's SEC Cooperation and This Court's Enforcement Action....................6

B. Direct Evidence of Retaliatory Motive and Causation..............................7

C. The Coordinated Bond and Evidence of Coordination................................8

D. The Foundation of Perjury...........................................................8

E. Imminent, Irreparable Harm Necessitates Federal Intervention......................9

III. ARGUMENT..............................................................................10

A. LEGAL STANDARD.....................................................................10

  1. Winter Four-Factor Test.........................................................10

  2. Special Considerations for Constitutional Claims...............................11

3. Younger Abstention Is Not Absolute...........................................11

B. YOUNGER ABSTENTION DOES NOT APPLY.................................................12

   1. The California Bond Proceeding Falls Outside Younger's Categorical Scope.......12

   2. Even If Younger Applied, Exceptions Preclude Abstention.......................13

C. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS.....................................23

   1. Securities Whistleblower Retaliation - 15 U.S.C. § 78u-6(h)...................23

   2. Civil Rights Conspiracy - 42 U.S.C. § 1985(3)................................26

   3. Constitutional Violations Under Color of State Law - 42 U.S.C. § 1983.........29

D. PLAINTIFF WILL SUFFER IRREPARABLE HARM............................................32

   1. Constitutional Injury Presumed................................................32

   2. Court-Sanctioned Findings Obtained Without Due Process........................32

   3. Chilling Effect on Federal Cooperation........................................34

   4. No Adequate Remedy at Law……………………………………………35

E. THE BALANCE OF EQUITIES TIPS DECIDEDLY IN PLAINTIFF'S FAVOR…….38

F. THE PUBLIC INTEREST FAVORS INJUNCTION............................................39

IV. CONCLUSION........................................................................41

**TABLE OF AUTHORITIES**

CASES

Berman v. Neo@Ogilvy LLC, 801 F.3d 145 (2d Cir. 2015)..........................11, 32, 38, 39

Boddie v. Connecticut, 401 U.S. 371 (1971)...............................................31

Borsuk v. Appellate Div., 242 Cal. App. 4th 607 (2015)................................15

Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).........................25

Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009)................................30

Cavanaugh v. Geballe, 28 F.4th 428 (2d Cir. 2022)......................................13

Chambers v. NASCO, Inc., 501 U.S. 32 (1991)...............................................6

Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville, 274 F.3d 377 (6th Cir. 2001)..32

Dennis v. Sparks, 449 U.S. 24 (1980)...............................................27, 29

Diamond D Constr. Corp. v. McGowan, 282 F.3d 191 (2d Cir. 2002).................12, 13, 17

Dombrowski v. Pfister, 380 U.S. 479 (1965).........................................14, 17, 18

Elrod v. Burns, 427 U.S. 347 (1976)...............................................11, 32, 41

Falco v. Justices of the Kings Cty. Family Ct., 805 F.3d 425 (2d Cir. 2015).............16

G & V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071 (6th Cir. 1994)….11

Golden v. Kelly, 871 F.3d 605 (2d Cir. 2017)...........................................11

Griffin v. Breckenridge, 403 U.S. 88 (1971)..............................................26, 28

Harper v. Va. Bd. of Elections, 383 U.S. 663 (1966).....................................31

Haywood v. Drown, 556 U.S. 729 (2009)....................................................37

Juidice v. Vail, 430 U.S. 327 (1977)....................................................13

Kirschner v. Klemons, 225 F.3d 227 (2d Cir. 2000)....................................13, 18

Kugler v. Helfant, 421 U.S. 117 (1975)..............................................11, 14, 17

Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982)....................................27, 29, 30

M.L.B. v. S.L.J., 519 U.S. 102 (1996)....................................................13

Mitchum v. Foster, 407 U.S. 225 (1972)..............................................4, 11, 19, 20, 23

Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950)......................30

Murray v. UBS Sec., LLC, 43 F. Supp. 3d 486 (S.D.N.Y. 2014)...........................23

Pennzoil Co. v. Texaco Inc., 481 U.S. 1 (1987)..........................................21

Perez v. Ledesma, 401 U.S. 82 (1971)....................................................18

Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806 (1945).......14, 39

Salinger v. Colting, 607 F.3d 68 (2d Cir. 2010)..........................................11

SEC v. Ripple Labs, Inc., No. 1:20-cv-10832 (S.D.N.Y.)............................1, 7, 35

Sprint Communications, Inc. v. Jacobs, 571 U.S. 69 (2013)............................4, 12

Varian Med. Sys., Inc. v. Delfino, 35 Cal. 4th 180 (2005).................................9

Village of Arlington Heights v. Metro. Haus. Dev. Corp., 429 U.S. 252 (1977)...........28

Winter v. Natural Resources Defense Council, 555 U.S. 7 (2008).......................6, 10

Younger v. Harris, 401 U.S. 37 (1971)................................................4, 11, 12, 14

Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834 (2d Cir. 2013)……………………..25

STATUTES

U.S. Const. art. VI, cl. 2.....................................................17, 21, 31, 36, 37

15 U.S.C. § 78u-6.....................................................1, 7, 10, 17, 21, 23, 32, 36

15 U.S.C. § 78u-6(h)...............................................................1, 23, 41

28 U.S.C. § 1331.......................................................................4

42 U.S.C. § 1983................................................3, 4, 10, 11, 19, 21, 29, 36, 42

42 U.S.C. § 1985................................................3, 10, 21, 26, 36, 42

42 U.S.C. § 1985(3)........................................................................3, 26

Cal. Civ. Proc. Code § 170.3...........................................................9, 16

Cal. Civ. Proc. Code § 170.4(d)......................................................8, 16, 20

Cal. Civ. Proc. Code § 391.3.............................................................2, 9

Cal. Civ. Proc. Code § 916.............................................................8, 16, 20

JANE DOE,

        Plaintiff,

    v.

CHRISTIAN LARSEN, RIPPLE LABS INC., and DOES 1-10,

        Defendants.

Case No. 1:25-cv-06020 (MMG)

## EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION  (AS TO RIPPLE LABS, INC. ONLY) PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 65

TO: DEFENDANT RIPPLE LABS, INC. AND ITS COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on an emergency basis, Plaintiff will move before the Honorable Margaret M. Garnett, United States District Judge, at the Daniel Patrick Moynihan Courthouse, 500 Pearl Street, New York, NY 10007, for a Temporary Restraining Order and Preliminary Injunction under Federal Rule of Civil Procedure 65(b) and Local Civil Rule 6.1(d).

**RELIEF REQUESTED**

1. Temporarily restrain Defendant Ripple Labs, Inc. and all persons acting in concert with it from participating in or causing to proceed the November 3, 2025 bond hearing in Jane Doe v. Christian Larsen et al., San Francisco Superior Court Case No. CGC-23-611166;

2. Enjoin imposition or enforcement of any bond, undertaking, or financial condition in that proceeding that would result in dismissal of Plaintiff's claims; and

3. Set an expedited briefing and hearing schedule on Plaintiff's Motion for Preliminary Injunction.

**LIMITATION OF RELIEF / SERVICE CLARIFICATION**

This emergency motion seeks relief only against Defendant Ripple Labs, Inc., which has been properly served and is subject to this Court's jurisdiction. Plaintiff is pursuing alternative service on Defendant Larsen and will seek relief against him once service is complete.

**GROUNDS FOR RELIEF**

Plaintiff faces imminent, irreparable harm from a November 3, 2025 bond hearing that will require payment of $75,000 she cannot afford; failure to pay within thirty (30) days mandates dismissal with prejudice under Cal. Civ. Proc. Code § 391.3. The California proceeding rests on perjured testimony, void judgments, and actions taken during mandatory jurisdictional stays, constituting bad-faith and harassing conduct under the Younger exceptions (Kugler v. Helfant, 421 U.S. 117 (1975); Dombrowski v. Pfister, 380 U.S. 479 (1965)). Federal intervention is further warranted under Mitchum v. Foster, 407 U.S. 225 (1972), because Plaintiff's claims arise under 42 U.S.C. §§ 1983 and 1985(3) and 15 U.S.C. § 78u-6(h). Absent temporary restraint, Plaintiff's federal whistleblower and civil-rights claims will be permanently extinguished, causing harm that no post-judgment remedy can cure.

**REQUESTED SCHEDULE**

- Opposition due: October 29, 2025

- Hearing on TRO / Preliminary Injunction: October 30, 2025, or as soon as practicable thereafter.

**BASIS FOR THIS MOTION**

This motion is supported by:

- The Declaration of Jane Doe with attached Exhibits A–S;

- The Memorandum of Law in Support of Motion for Preliminary Injunction;

- The Complaint filed in this action; and

- Such further evidence and argument as may be presented at the hearing.

Dated: October 21, 2025

Respectfully submitted,

/s/ Jane Doe
Jane Doe
Address Confidentiality Program
P.O. Box 1100
Albany, NY 12201
Email: jgk246@gmail.com

JANE DOE,

               Plaintiff,

     v.

CHRISTIAN LARSEN, RIPPLE LABS INC., and
DOES 1-10,

               Defendants.

Case No. 1:25-cv-06020 (MMG)

## RULE 65(b)(1)(B) CERTIFICATION OF EFFORTS TO GIVE NOTICE AND REASONS WHY NOTICE SHOULD NOT BE REQUIRED

Pursuant to Federal Rule of Civil Procedure 65(b)(1)(B), Plaintiff certifies as follows:

On October 21, 2025, Plaintiff sent email notice of this emergency motion to counsel of record for Defendant Ripple Labs, Inc.— Jeanne A. Fugate and Damien Marshall of King & Spalding LLP.

Given that the California bond hearing is set for November 3, 2025, and that a bond order would automatically require payment within thirty (30) days on pain of dismissal with prejudice, Plaintiff respectfully submits that immediate and irreparable injury will occur before Defendants can be heard in opposition. Additional advance notice or delay would risk mootness of the requested relief and permanent loss of Plaintiff's federal rights. Accordingly, Plaintiff requests that this Court issue temporary relief or, in the alternative, a rapid Order to Show Cause before November 3, 2025.

Dated: October 21, 2025

Respectfully submitted,

/s/ Jane Doe _____

Jane Doe

Address Confidentiality Program

P.O. Box 1100

Albany, NY 12201

Email: jgk246@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 21, 2025, I served a true and correct copy of the foregoing Emergency Motion for Temporary Restraining Order and Preliminary Injunction, together with this Rule 65(b)(1)(B) Certification, by electronic mail and overnight delivery upon:

Damien Marshall
King & Spalding LLP
1290 Avenue of the Americas
14th Floor
New York, NY 10104
dmarshall@kslaw.com

Dated: October 21, 2025

/s/ Jane Doe
Jane Doe
Address Confidentiality Program
P.O. Box 1100
Albany, NY 12201
Email: jgk246@gmail.com

**TO: ALL PARTIES AND THEIR ATTORNEYS OF RECORD**

PLEASE TAKE NOTICE that on **October 30, 2025, at 10:00 a.m.**, or as soon thereafter as counsel may be heard before Honorable Margaret M. Garnett, United States District Judge, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, NY 10007, Plaintiff Jane Doe will move this Court, pursuant to Federal Rule of Civil Procedure 65, for entry of a preliminary injunction staying all proceedings in *Jane Doe v. Christian Larsen, et al.*, San Francisco Superior Court Case No. CGC-23-611166, and enjoining Defendants from taking any further action in that proceeding pending resolution of this federal action.

**RELIEF REQUESTED**

Plaintiff respectfully requests that this Court enter a preliminary injunction:

**1. STAYING STATE COURT PROCEEDINGS**

Staying all proceedings in *Jane Doe v. Christian Larsen, et al.*, San Francisco Superior Court Case No. CGC-23-611166, including but not limited to:

- The bond hearing currently scheduled for November 3, 2025;

- Any proceedings on Defendants' motion for vexatious litigant bond;

- All discovery proceedings;

- All motion practice;

- All hearings and trial settings.

## 2. ENJOINING DEFENDANTS AND ALTERNATIVE RELIEF

Pending hearing on this Motion, Plaintiff seeks narrowly tailored relief to preserve the status quo and prevent imminent harm. In the alternative to a full preliminary injunction, Plaintiff proposes the following limited measures:

**a. Status-Quo Preservation.**

Temporarily restrain Defendants from enforcing or proceeding with the California bond motions set for November 3, 2025, or taking any step that would cause dismissal of Plaintiff's claims before this Court rules.

**b. Protective-Order Relief.**

Limit use of Plaintiff's confidential medical, financial, or personal data to litigation purposes only, requiring that any such material be filed under seal and not publicly disseminated.

**c. Preservation Order.**

Direct Defendants and their counsel to preserve all communications concerning:

- (i) contacts between Jeanne A. Fugate and Marnin Weinreb regarding Plaintiff, her claims, bond motions, or settlement;
- (ii) contacts with California-court personnel (including Judge Joesph Quinn or clerks) about Plaintiff's cases or scheduling; and
- (iii) contacts with any third parties regarding Plaintiff's Address Confidentiality Program status or residential location.

**d. Limited Disclosure Restraint.**

Prohibit republication of Plaintiff's private documents or family images obtained through litigation discovery, except in sealed court filings.

**e. Tolling Order.**

Stay and toll any payment or bond deadline under Cal. Civ. Proc. Code § 391.3 pending resolution of this motion and the underlying federal claims.

**f. Expedited Hearing.**

Set an evidentiary hearing on this Motion at the earliest practicable date, and in any event before November 3, 2025, given the imminence of the California bond proceeding.

**g. Costs.**

Award Plaintiff her taxable costs and allowable expenses pursuant to 42 U.S.C. § 1988 and this Court's equitable powers.

**h. Further Relief.**

Grant such other and further relief as the Court deems just and proper.

**GROUNDS FOR RELIEF**

This motion is made pursuant to Federal Rule of Civil Procedure 65 and is based upon the following grounds:

**1. LIKELIHOOD OF SUCCESS ON THE MERITS**

Plaintiff has established a strong likelihood of success on three independent federal claims:

**a. Securities Whistleblower Retaliation under 15 U.S.C. § 78u-6(h):** Plaintiff provided documented cooperation to the SEC in November 2020 (Form 1162), contributing to this Court's $1.3 billion enforcement action against Defendants. Defendants admitted their retaliatory motive on January 29, 2021 ("Larsen believes you are partially responsible for the SEC investigation"), and have since engaged in a systematic three-year retaliation campaign culminating in $75,000 bond demands that explicitly cite Plaintiff's federal court access as "vexatious."

**b. Civil Rights Conspiracy under 42 U.S.C. § 1985(3):** Twin bond motions filed twelve days apart share 90% identical language, rest on the same perjured testimony and void judgments, and were coordinated with state court officials who issued five orders during two mandatory jurisdictional stays on the same day one bond motion was filed—demonstrating conspiracy to deprive Plaintiff of constitutional rights based on race, gender, and whistleblower status.

**c. Constitutional Violations under 42 U.S.C. § 1983:** Defendants, acting under color of state law through joint participation with judicial officials, have violated Plaintiff's rights to due process (void judgments, perjured testimony, proceedings without judicial authority), equal protection (discriminatory treatment), and access to courts ($75,000 financial barrier she cannot pay).

## 2. IRREPARABLE HARM

Plaintiff will suffer immediate and irreparable harm absent preliminary injunctive relief:

**a. Imminent Bond Hearing:** A bond hearing is scheduled for November 3, 2025—one week away. If the bond is imposed, Plaintiff has 30 days to pay $50,000-$75,000 she does not have, or

all her claims will be dismissed with prejudice and her appellate rights foreclosed under California Code of Civil Procedure § 391.3.

**b. Constitutional Injury Presumed:** Loss of constitutional rights—including access to courts, due process, and equal protection—constitutes irreparable injury as a matter of law. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

**c. Federal Rights Permanently Foreclosed:** Once state court dismisses Plaintiff's claims with prejudice for inability to pay the bond, her federal whistleblower protections under 15 U.S.C. § 78u-6 and civil rights claims under §§ 1983 and 1985 will be permanently extinguished. Money damages cannot restore lost constitutional rights or opportunities to vindicate federal claims.

**d. Chilling Effect on Federal Cooperation:** If this retaliation campaign succeeds in silencing a documented SEC cooperator whose assistance contributed to this Court's $1.3 billion enforcement action, it will deter future informants from cooperating with federal authorities— undermining securities enforcement, particularly in the complex cryptocurrency sector.

**e. Judicial Findings Obtained Without Due Process:** The void **"findings of innocence"** obtained *without* due process continue to be weaponized against Plaintiff, causing ongoing reputational harm that money cannot remedy.

**3. BALANCE OF EQUITIES FAVORS PLAINTIFF**

**a. Plaintiff's Interests:** Constitutional rights, federal whistleblower protections, physical safety (enrolled in Address Confidentiality Program due to threats) and ability to vindicate federal claims without insurmountable financial barriers.

**b. Defendants' Minimal Interests:** Defendants will suffer minimal harm from a temporary stay. They have litigated these matters for three years; additional months will not prejudice them. If Plaintiff's federal claims fail, state proceedings can resume. Defendants have no legitimate interest in proceeding based on perjured testimony, void judgments, and explicit targeting of federal rights.

**c. Unclean Hands:** Defendants come to equity with unclean hands, having engaged in documented perjury, reliance on void judgments, cyber crimes (5,000+ DDoS attacks, unauthorized computer access), privacy violations, and coordination with state actors to circumvent procedural protections.

**d. Power Disparity:** Plaintiff is a pro se litigant who cannot afford counsel. Defendants are a billionaire and multi-billion dollar corporation represented by King & Spalding LLP with unlimited resources.

## 4. PUBLIC INTEREST FAVORS INJUNCTION

The public interest supports preliminary relief:

**a. Protecting Whistleblowers:** Congress enacted Dodd-Frank whistleblower protections because securities enforcement depends critically on insider cooperation. Allowing retaliation against cooperators undermines federal enforcement and congressional policy.

**b. Cryptocurrency Enforcement:** This Court's enforcement action against Defendants established critical precedents for applying securities laws to digital assets. Protecting

cooperators in this technically complex, rapidly-evolving sector is essential to maintaining effective oversight.

**c. Judicial Integrity:** Preventing attorney perjury, abuse of declaratory relief mechanisms, and wealth-based barriers to justice protects the integrity of the judicial system and ensures equal access to courts.

**d. This Court's Institutional Authority:** Defendants are subject to this Court's ongoing supervision through a permanent injunction in *SEC v. Ripple Labs, Inc.*, No. 1:20-cv-10832 (S.D.N.Y.). Their retaliation against the cooperator who contributed to that enforcement undermines this Court's authority and the effectiveness of its orders.

## 5. URGENCY REQUIRING EXPEDITED CONSIDERATION

This motion presents extraordinary urgency requiring expedited hearing:

**1. IMMINENT DEADLINE:** The November 3, 2025 bond hearing is less than one week away. Once a bond is imposed, Plaintiff has only 30 days to pay or face automatic dismissal with prejudice—permanently foreclosing her federal rights.

**2. NO ADEQUATE STATE REMEDY:** Plaintiff attempted state court relief multiple times and was denied. State courts cannot remedy federal whistleblower violations, § 1983 claims, or §1985 conspiracies. More fundamentally, state proceedings are the instrument of violation, not a neutral forum.

**3. PROCEDURAL BREAKDOWN:** The California Superior Court clerk confirmed in writing on October 16, 2025, that the judge **"has not been assigned yet."** Judge Quinn, a "Law &

Motion" judge without authority to conduct substantive vexatious litigant hearings in unassigned cases, has *issued orders for nine months* and scheduled the November 3 hearing. Procedural safeguards have completely broken down.

**4. INSTITUTIONAL STAKE:** This Court supervised the SEC enforcement that Plaintiff's cooperation enabled. Her retaliation implicates this Court's institutional authority to protect cooperators and enforce its permanent injunction against Defendants.

Accordingly, Plaintiff respectfully requests that this Court schedule a hearing within 48-72 hours or, in the alternative, issue a Temporary Restraining Order pending a preliminary injunction hearing.

**5. BASIS FOR THIS MOTION**

This motion is based upon:

1. The accompanying Memorandum of Law in Support of Motion for Preliminary Injunction;

2. The Declaration of Jane Doe in Support of Motion for Preliminary Injunction, with Exhibits A through X attached thereto;

3. The Complaint filed in this action;

4. All pleadings, papers, records, and files in this action;

5. Such oral argument and evidence as may be presented at the hearing on this motion; and

6. Such other and further matters as may come to the Court's attention.

Dated: October 21, 2025

Respectfully submitted,


/s/ Jane Doe _____

Jane Doe

Address Confidentiality Program

P.O. Box 1100

Albany, NY 12201

Email: jgk246@gmail.com

# MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR

# PRELIMINARY INJUNCTION

## I. PRELIMINARY STATEMENT

### A.  This Court's Institutional Authority and Why Federal Intervention Is Necessary

This motion arises directly from securities enforcement supervised by this Court. In December 2020, the Securities and Exchange Commission filed *SEC v. Ripple Labs, Inc.*, No. 1:20-cv-10832 (S.D.N.Y.), seeking $1.3 billion in penalties against Defendants Christian Larsen and Ripple Labs, Inc. Judge Analisa Torres presided over the case for over four years, entering summary judgment and a permanent injunction on June 26, 2025, that continues to subject Defendants to this Court's supervision. (Ex. D.)

Plaintiff Jane Doe made that enforcement possible. One month before the SEC filed suit, in November 2020, Plaintiff cooperated with SEC investigators through recorded interviews and document uploads via the agency's secure government portal—access provided only to formal cooperating witnesses. On November 20, 2020, the SEC issued Form 1162, formally acknowledging her cooperation and establishing her protected status under 15 U.S.C. § 78u-6(h). (Ex. B.) Plaintiff's cooperation was motivated by civic duty; she has never sought or received any monetary award from the SEC.

Now Defendants are retaliating against Plaintiff for that cooperation—and they admitted it. On January 29, 2021, five weeks after the SEC filed its enforcement action in this Court, Defendants' counsel wrote: "Larsen believes you are partially responsible for the SEC

investigation." (Ex. A.) That admission triggered a three-year retaliation campaign that has escalated into coordinated California state-court bond motions explicitly targeting Plaintiff's federal court access as "vexatious" and demanding $75,000 she cannot pay. The bond motions cite Plaintiff's intent to file in this Court—to vindicate federal whistleblower protections that enabled this Court's enforcement—as evidence warranting financial sanctions. (Ex. P.)

A bond hearing is scheduled for November 3, 2025. If the California court imposes the requested bond, Plaintiff has thirty days to pay $75,000 or face mandatory dismissal of all her claims with prejudice under California Code of Civil Procedure § 391.3, permanently foreclosing her ability to vindicate federal whistleblower protections and constitutional rights. This motion seeks preliminary injunctive relief to stay those proceedings pending adjudication of Plaintiff's federal claims.

**B. Two Violations Have Converged to Threaten Constitutional Rights**

Whether coordinated or coincidental, two separate violations now threaten Plaintiff's constitutional rights and require federal intervention because state courts cannot remedy violations they are facilitating.

First, the California Court of Appeal issued "findings of innocence" regarding disputed allegations without any adversarial process—based solely on affirming a default judgment obtained while Plaintiff was on medical leave and not properly served. These void findings are now being weaponized as "proof" that Plaintiff's claims are frivolous, forming the foundation for $75,000 in bond demands. (Ex. I)

Second, Defendants have engaged in a systematic whistleblower retaliation campaign that explicitly targets Plaintiff's federal court access as "vexatious" and seeks to impose financial barriers she cannot overcome. The retaliation extends beyond courtrooms to include over 5,000 DDoS attacks, unauthorized access to attorney-client communications, public disclosure of confidential PTSD treatment records, and attempts to discover her Address Confidentiality Program location. (Ex. K)

**C. The Evidence Establishes Likelihood of Success on Federal Claims**

The record establishes Plaintiff's strong likelihood of success on three independent federal claims:

**Securities Whistleblower Retaliation (15 U.S.C. § 78u-6(h)):** Protected SEC cooperation through Form 1162, recorded interviews, and document uploads via secure government portal (Ex. B); Defendants' admitted retaliation motive just weeks after the SEC filed enforcement ("Larsen believes you are partially responsible for the SEC investigation") (Ex. A); coordinated $75,000 bond demands that explicitly cite Plaintiff's federal court access as "vexatious" (Exs. P-Q); and material contribution to this Court's $1.3 billion enforcement action.

**Civil Rights Conspiracy (42 U.S.C. § 1985(3)):** Twin bond motions filed twelve days apart sharing 90% identical language (Ex. Q); foundation of attorney perjury, with settlement negotiations of $250,000-$300,000 flatly denied under oath but proven by emails (Exs. F-H); state court coordination, including five orders issued by a judge without authority during dual mandatory jurisdictional stays on the same day one bond motion was filed (Ex. W); and class-

based animus demonstrated through racially and gender-coded language ("foreign," "unstable," "untrustworthy") and explicit targeting of whistleblower status.

**Constitutional Violations (42 U.S.C. § 1983):** Defendants, acting under color of state law through joint participation with judicial officials, have violated Plaintiff's rights to due process (void judgments obtained without service, perjured testimony, proceedings during mandatory stays, proceedings by unassigned judge without authority), equal protection (discriminatory treatment based on race, gender, and whistleblower status), and access to courts ($75,000 financial barrier she cannot pay, explicit citation of federal filing as "vexatious").

**D. Only This Court Can Vindicate Federal Rights and Protect Federal Enforcement**

Federal jurisdiction is proper under 28 U.S.C. § 1331 because Plaintiff asserts three federal claims that state courts lack jurisdiction to adjudicate. More fundamentally, state proceedings are the instrument of violation, not a neutral forum. The California Superior Court clerk confirmed in writing on October 16, 2025, that **"the case has not been assigned yet,"** yet an unassigned "Law & Motion" judge without substantive authority has conducted eight months of proceedings and scheduled the November 3 bond hearing. Plaintiff exhausted state remedies through emergency ex parte applications that were summarily denied. (Ex. S)

*Younger v. Harris* abstention does not apply. The Supreme Court's decision in *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013), limits *Younger* to three narrow categories: criminal prosecutions, certain civil enforcement proceedings akin to criminal prosecution, and proceedings uniquely furthering state courts' judicial functions. California's vexatious-litigant

statute—a private bond mechanism—fits none of these categories. Moreover, three independent exceptions bar abstention: (1) the *Mitchum v. Foster* statutory exception for § 1983 claims, 407 U.S. 225, 242-43 (1972); (2) the bad-faith exception, demonstrated through perjury, void judgments, and coordination with state actors during jurisdictional stays; and (3) the harassment exception, shown by multi-forum retaliation extending to cyber attacks, privacy violations, and physical threats.

This Court has unique institutional interest in protecting the cooperator whose testimony contributed to its enforcement action. As Judge Torres observed in her June 26, 2025 Order, "Ripple's willingness to push the boundaries of the Order evinces a likelihood that it will eventually (if it has not already) cross the line." That prediction has materialized—directed at the cooperator whose assistance made the enforcement possible. If cooperators who aid this Court's enforcement can be silenced through state-court retaliation by defendants subject to this Court's injunctions, federal securities enforcement collapses and this Court's orders lose their effectiveness.

### E. Urgency and the Threat to Federal Enforcement

This Court's intervention is necessary to prevent a chilling precedent: that cooperating with a federal SEC investigation supervised by this Court can be punished through state-court litigation founded on perjury and void judgments. The November 3 bond hearing is less than two weeks away. If the bond is imposed, Plaintiff has only thirty days to pay $75,000 she does not have, or all her claims will be dismissed with prejudice—permanently foreclosing her federal whistleblower protections and constitutional rights. Money damages cannot restore lost

5

opportunities to vindicate federal claims or remedy the systemic chilling effect on future cooperators.

Federal courts possess inherent power "to protect the administration of justice from acts that obstruct or degrade its judicial proceedings." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). The coordinated use of void findings, false declarations, and punitive bond motions to silence a federal witness constitutes precisely the type of obstruction that warrants equitable intervention. Where state-court mechanisms are used to nullify rights created and enforced under federal law, comity yields to this Court's constitutional duty to uphold the supremacy of federal judgments.

The following sections establish that Plaintiff satisfies all four requirements for preliminary injunctive relief under *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008): (1) likelihood of success on the merits; (2) irreparable harm absent relief; (3) balance of equities favoring injunction; and (4) public interest supporting protection of federal whistleblowers and this Court's institutional authority.

## II. BACKGROUND

### A. Plaintiff's SEC Cooperation and This Court's Enforcement Action

### 1. November 2020 SEC cooperation

In November 2020, Plaintiff provided substantial assistance to the SEC's investigation of Defendants Christian Larsen and Ripple Labs, Inc. On November 18-19, 2020, she participated in recorded interviews with SEC investigators, providing critical information about potential securities violations related to Defendants' XRP cryptocurrency operations. The SEC provided

Plaintiff with secure login credentials to upload documents directly to the agency's government portal—a level of access provided only to formal cooperating witnesses. On November 20, 2020, the SEC issued Form 1162, formally acknowledging Plaintiff's cooperation and establishing her protected status under 15 U.S.C. § 78u-6. Plaintiff's cooperation was motivated by civic duty, not financial gain; she has never sought or received any monetary award from the SEC.

## 2. This Court's enforcement action

Just one month after Plaintiff's cooperation, on December 22, 2020, the SEC filed a comprehensive enforcement action against Defendants in this District, seeking $1.3 billion in penalties and disgorgement. *SEC v. Ripple Labs, Inc.*, No. 1:20-cv-10832 (S.D.N.Y.). On June 26, 2025, this Court—through Judge Analisa Torres—entered orders imposing substantial financial penalties and permanently enjoining certain of Defendants' business operations. Notably, Judge Torres observed that "Ripple's willingness to push the boundaries of the Order evinces a likelihood that it will eventually (if it has not already) cross the line." (That likelihood has now materialized—directed at a cooperator whose assistance helped make the enforcement possible.

## B. Direct Evidence of Retaliatory Motive and Causation

On January 29, 2021, defense counsel wrote: "Larsen believes you are partially responsible for the SEC investigation." This admission came just five weeks after the SEC filed its enforcement action in this District. It preceded a three-year retaliation campaign that has escalated from declaratory relief litigation to cyber attacks to coordinated bond demands totaling $75,000.

## C. The Coordinated Bond and Evidence of Coordination

On June 4, 2025, attorney Marnin Weinreb filed a $25,000 bond motion; twelve days later, attorney Jeanne Fugate filed a $50,000 motion. (Exs. O-P.) The motions share 90% identical language, rely on the same void judgments and false testimony, and deploy identical racially and gender-coded terms ("foreign," "unstable," "untrustworthy"). (Ex. Q.) Most significantly, Fugate's motion explicitly cites Plaintiff's intent to file in this Court as "vexatious" conduct.

## D. The Foundation of Perjury

### 1. Fugate's false testimony and documentary contradiction

On August 29, 2024, Ms. Fugate swore under oath that she "never communicated any settlement offer." Her own emails directly contradict that sworn testimony: on September 15 and 30, 2022, she discussed a **"$250,000 to $300,000 settlement payment."** This false testimony supplied the factual basis for the "frivolous claims" narrative used to justify $75,000 in bond demands. The same false testimony was repeated in both Weinreb's and Fugate's bond motions, demonstrating coordination in reliance on known falsehoods. When an attorney at King & Spalding LLP provides materially false sworn testimony and then uses it as the foundation for seeking judicial sanctions, the integrity of the judicial process itself is compromised. (Exs. E-G)

### 2. State Court Coordination and Procedural Irregularities

### Orders during mandatory jurisdictional stays

On June 9, 2025, Plaintiff filed a notice of appeal and a motion to disqualify Judge Quinn, triggering automatic jurisdictional stays under Cal. Civ. Proc. Code §§ 916 and 170.4(d).

*Despite* these self-executing stays, on June 20, 2025, Judge Quinn issued five substantive orders: (1) granting Defendants' motion to compel discovery; (2) imposing $2,500 in sanctions against Plaintiff; (3) setting a briefing schedule for the bond motion; (4) denying Plaintiff's request for stay; and (5) scheduling the bond hearing. (Ex. M) These orders were issued the same day Ms. Fugate filed her $50,000 bond motion. Orders issued during mandatory jurisdictional stays are void. *Varian Med. Sys., Inc. v. Delfino*, 35 Cal. 4th 180, 196 (2005).

**Absence of judicial assignment and authority**

On October 16, 2025, court personnel confirmed in writing that "the case has not been assigned yet." Judge Quinn is designated as a "Law & Motion" judge, not an assigned case judge. Under California superior court rules, Law & Motion judges handle routine procedural matters but lack authority to conduct substantive vexatious litigant proceedings requiring evidentiary determinations and exercise of discretion. The November 3 bond hearing nevertheless remains scheduled before Judge Quinn.

**Administrative coordination**

Plaintiff's disqualification motion was redirected by Ms. Fugate to Judge Quinn rather than to the presiding judge as required by California Code of Civil Procedure § 170.3(c)(4). Judge Quinn subsequently retained private counsel to oppose Plaintiff's disqualification motion.

**D. Imminent, Irreparable Harm Necessitates Federal Intervention**

**1. The November 3, 2025 bond hearing**

A bond hearing is set for November 3, 2025, at 9:00 A.M. (Ex. R) If the court imposes the requested $75,000 bond, Plaintiff will be unable to pay, resulting in the mandatory, with-

prejudice dismissal of all her claims within thirty days under Cal. Code Civ. Proc. § 391.3. Once dismissed, Plaintiff's claims cannot be reinstated, and her ability to vindicate federal whistleblower protections will be permanently extinguished.

**2. Futility of state remedies**

Plaintiff has exhausted state-level remedies, including two emergency ex parte applications filed on October 3, 2025 and October 14, 2025, addressing attorney perjury and procedural irregularities. The state court denied relief, confirming the futility of seeking a remedy from the very tribunal engaged in the misconduct. State courts cannot adjudicate claims under the Dodd-Frank Act's federal whistleblower protections, 15 U.S.C. § 78u-6, nor can they remedy civil-rights conspiracies under 42 U.S.C. § 1985 or constitutional deprivations under § 1983. Fundamentally, the state proceedings are not a neutral forum but rather the instrument through which constitutional violations are being perpetrated. (Ex. S)

# III. ARGUMENT

## A. LEGAL STANDARD

### 1. Winter Four-Factor Test

To obtain preliminary injunctive relief, Plaintiff must establish: (1) likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in her favor; and (4) that an injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

The Second Circuit applies a "sliding scale" to these factors: "when a plaintiff demonstrates a strong likelihood of success on the merits, a preliminary injunction may issue even if the plaintiff shows only a possibility of irreparable harm." *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010). Conversely, when the likelihood of success is modest, the showing of irreparable harm must be more robust. *Golden v. Kelly*, 871 F.3d 605, 620 (2d Cir. 2017).

## 2. Special Considerations for Constitutional Claims

Constitutional claims carry special considerations. Irreparable harm is presumed when constitutional rights are threatened, *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and the public interest favors preventing constitutional violations, *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). Federal courts have particular responsibility to protect whistleblower statutes reflecting Congress's judgment that securities enforcement depends on insider cooperation. *Berman v. Neo@Ogilvy LLC*, 801 F.3d 145, 155 (2d Cir. 2015).

## 3. Younger Abstention Is Not Absolute

*Younger v. Harris*, 401 U.S. 37 (1971), generally counsels federal courts to abstain from enjoining ongoing state proceedings. However, abstention is not absolute. Federal courts must intervene when: (1) state proceedings are brought in bad faith or for purposes of harassment; (2) the challenged state action is flagrantly and patently violative of express constitutional prohibitions; or (3) there is bias or prejudice such that state proceedings cannot provide adequate relief. *Kugler v. Helfant*, 421 U.S. 117, 124 (1975).

Moreover, 42 U.S.C. § 1983 is expressly exempted from *Younger*. In *Mitchum v. Foster*, 407 U.S. 225, 243 (1972), the Supreme Court held that § 1983 is among the limited statutes expressly

authorized by Congress to permit federal injunctions against state proceedings. When a plaintiff asserts § 1983 claims, federal courts have not merely power but duty to vindicate federal constitutional rights, notwithstanding ongoing state proceedings.

## B. YOUNGER ABSTENTION DOES NOT APPLY

### 1. The California Bond Proceeding Falls Outside *Younger*'s Categorical Scope

Federal abstention under *Younger v. Harris*, 401 U.S. 37 (1971), is a narrow, exceptional doctrine. The Supreme Court in *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013), made clear that *Younger* applies only in three limited circumstances: "(1) ongoing state criminal prosecutions; (2) certain civil enforcement proceedings that are akin to criminal prosecutions; and (3) civil proceedings that implicate a state court's ability to perform its judicial functions." *Id.* at 78. Outside those categories, "the federal courts' obligation to hear and decide a case is virtually unflagging." *Id.* at 77.

The California vexatious-litigant bond proceeding at issue here fits none of those categories. It is not a criminal prosecution. It is not a civil enforcement action brought by the state that is akin to a criminal prosecution—no state agency initiated it, and it involves no regulatory enforcement scheme. Nor does it involve the state court's contempt powers or other core judicial functions necessary for the court to perform its role. Rather, it is an ancillary procedural device that allows a private defendant to demand a bond before a plaintiff may continue prosecuting a civil case.

Such proceedings fall outside *Sprint*'s limited *Younger* framework. *See Diamond "D" Constr. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002) ("Federal courts may not abstain unless the

state proceeding falls within the traditional categories of *Younger*; mere parallel civil litigation is insufficient."). Because the California bond proceeding does not fall within any of the three *Sprint* categories, this Court has no obligation to abstain and retains full authority to adjudicate Plaintiff's request for injunctive relief.

**2. Even If *Younger* Applied, the Bad Faith, Harassment, and *Mitchum*Exceptions Independently Preclude Abstention**

The Second Circuit has emphasized that the *Younger* exceptions for bad faith and harassment are "extraordinary and narrow," invoked only when state proceedings are "motivated by a retaliatory, harassing, or otherwise illegitimate purpose." *Diamond D Constr. Corp. v. McGowan*, 282 F.3d 191, 198–99 (2d Cir. 2002); *see also Kirschner v. Klemons*, 225 F.3d 227, 231 (2d Cir. 2000) (bad-faith exception applies only to conduct "amounting to harassment or intimidation"); *Cavanaugh v. Geballe*, 28 F.4th 428, 434 (2d Cir. 2022) (reaffirming rarity of successful abstention exceptions). While ordinary errors or even perjury are typically remediable on appeal, the California bond procedure forecloses timely review by mandating dismissal within thirty days—leaving no adequate state remedy. Federal intervention is therefore not an affront to comity but a necessary response to a structural denial of access to federal rights.

Additionally, even apart from *Younger*'s narrow exceptions, federal courts need not abstain where state proceedings threaten a litigant's physical safety or deny access to courts through wealth-based barriers. *See Juidice v. Vail*, 430 U.S. 327, 336 n.12 (1977); *M.L.B. v. S.L.J.*, 519 U.S. 102, 124 (1996). Here, Defendants have repeatedly attempted to discover Plaintiff's Address Confidentiality Program location, and the $75,000 bond demand creates an insurmountable

wealth-based barrier to vindication of federal whistleblower rights. These considerations reinforce federal jurisdiction.

### A. Bad Faith Exception

### 1. Legal Standard

*Younger* does not require abstention when a state proceeding is "brought in bad faith or to harass." *Kugler v. Helfant*, 421 U.S. 117, 126 n.6 (1975); *Dombrowski v. Pfister*, 380 U.S. 479 (1965). Bad faith exists when judicial process is used as a weapon—to punish, harass, or deny constitutional rights—rather than to adjudicate fairly. Bad faith also includes circumstances where there is "no reasonable expectation of a valid conviction or judgment." *Kugler*, 421 U.S. at 126 n.6. The Second Circuit recognizes these exceptions as extraordinary, but this case presents precisely the kind of retaliatory, non-judicial misuse of process that *Diamond D* and its progeny left open. 282 F.3d at 198–99.

### 2. Foundation in Perjured Testimony

On August 29, 2024, attorney Jeanne Fugate swore under oath that she "never communicated any settlement offer." Emails directly contradict that sworn testimony: on September 15 and 30, 2022, she discussed "global mediation" and "$250,000 to $300,000 settlement payment." This false testimony was material—it supplied the factual basis for the bond motions. (Ex. E-G)

The knowing use of perjury to obtain judicial orders constitutes fraud on the court and bad faith *per se*. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). Courts may not abstain where their own processes are corrupted by intentional deceit.

### 3. Reliance on Void Judgments

Two judgments cited by Defendants as "evidence of vexatiousness" were entered without valid service and therefore lack any binding effect. The declaratory-relief judgment was issued while Plaintiff was abroad on medical leave, without proper service or notice, and purported to make factual findings ("no assault occurred") by default—findings impossible where the opposing party had no opportunity to be heard.

The second, the Creditcare judgment—approximately $635,000—was likewise entered without valid service at an address where Plaintiff did not reside, while she was enrolled in New York's Address Confidentiality Program. The default was compounded when her then-counsel abandoned the representation without notice after being confronted for basing the 'trade secret' claim on public government registration filings, thereby ensuring Plaintiff could not mount a defense.

Under California law, judgments entered without service are void *ab initio*. *Borsuk v. Appellate Div.*, 242 Cal. App. 4th 607, 612 (2015). Ordinarily, defects such as void judgments can be remedied through state appellate process. Here, however, the structure of California's bond statute forecloses timely review—mandating dismissal within thirty days—leaving no opportunity for appellate correction before irreparable harm occurs. That distinction brings this case within the narrow *Younger* exceptions.

Reliance on void orders to impose sanctions or financial barriers is not legal error—it is bad-faith manipulation: silence the party, declare her wrong because she cannot respond, then punish her for that silence. Continued invocation of these void judgments as predicates for sanctions

exemplifies the "bad faith" exception to *Younger* abstention—proceedings devoid of any legitimate adjudicative purpose and aimed solely at punishment.

*Cf. Falco v. Justices of the Kings Cty. Family Ct.*, 805 F.3d 425 (2d Cir. 2015) (denying bad-faith exception where plaintiff could raise federal claims in ongoing state process). Unlike *Falco*, the statutory dismissal window here forecloses any such review.

### 4. Structural Breakdown of Judicial Process

Bad faith also exists where the process itself has broken down such that no legitimate adjudication can occur. On June 20, 2025, Judge Quinn issued five substantive orders—while jurisdiction was suspended under both Cal. Civ. Proc. Code §§ 916 (appeal stay) and 170.4(d) (disqualification stay). Those orders advanced significant matters—setting discovery, sanctions, and bond hearings—despite the lack of jurisdiction. The clerk later confirmed that the case **"has not been assigned yet."** (Ex. J)

Yet a Law & Motion judge acting without assignment has conducted substantive proceedings for over eight months, including scheduling the November 3 bond hearing—an act far beyond the ministerial authority of an unassigned calendar judge. The pattern reveals a structural failure: each time Defendants file a motion, orders issue despite mandatory procedural bars.

Judge Quinn even attempted to rule on his own disqualification motion, contrary to Cal. Civ. Proc. Code § 170.3(c)(5), and retained private counsel—demonstrating personal stake in the outcome. A court that cannot answer which judge has authority, yet continues issuing orders benefiting one party, cannot provide due process.

Federal intervention is needed here not because of judicial motive but because the process itself has failed. When proceedings are conducted without jurisdiction or assignment, creating systemic inability to provide fair adjudication, federal courts may intervene to restore basic procedural integrity. *Diamond D*, 282 F.3d at 198–99.

## 5. Targeting Federal Rights

Fugate's June 20, 2025 motion explicitly cited Plaintiff's "vexatious lawsuit in the United States District Court for the Southern District of New York" as evidence of misconduct. Punishing a whistleblower for invoking federal jurisdiction and SEC protections is the definition of bad faith. *Dombrowski*, 380 U.S. at 490. The record shows that Plaintiff's exercise of federal rights—filing in SDNY and cooperating with the SEC—has been recharacterized as "vexatiousness" in state motions. That is not simple overreach; it is the use of state process to chill federally protected activity. The targeting of federal filings as sanctionable conduct also violates the Supremacy Clause: a state tribunal may not penalize invocation of federal remedies.

## 6. No Expectation of a Valid Judgment

Under *Kugler*, bad faith is established when there is "no reasonable expectation of a valid conviction or judgment." 421 U.S. at 126 n.6. Here, any bond order would be void for multiple independent reasons: It rests on perjured testimony; relies on void judgments; punishes the exercise of federal whistleblower protections (15 U.S.C. § 78u-6); was issued during mandatory stays; and would be issued by a judge without authority in an unassigned case. Even if formally entered, such an order would be void for fraud, lack of jurisdiction, and violation of due process. The absence of any legitimate adjudicative purpose satisfies the *Kugler* bad-faith standard.

**B. Harassment Exception**

Closely related to bad faith is the harassment exception. When state proceedings constitute "harassment" or are brought for purposes other than legitimate adjudication, *Younger* abstention does not apply. *Perez v. Ledesma*, 401 U.S. 82, 85 (1971); *Dombrowski*, 380 U.S. at 489-90; *Kirschner*, 225 F.3d at 231. The record demonstrates a systematic, escalating campaign designed to punish Plaintiff for protected federal cooperation and to deter future whistleblowers.

**1. Multi-Forum Campaign Provoked and Weaponized by Defendants**

Defendants' harassment is evidenced by their strategy of initiating aggressive, groundless actions to provoke defensive litigation, which they then cite as evidence of "vexatiousness." This creates a self-fulfilling prophecy:

- **October 2022**: Defendants file declaratory relief action (San Francisco Superior Court) while Plaintiff was abroad, obtaining a default "finding of innocence."

- **In Response**: Plaintiff is forced to file in other forums (including Creditcare, the current action CGC-23-611166, and the malpractice action) to defend her rights and address the fallout from Defendants' own misconduct.

- **June 2025**: Defendants then file twin bond motions, citing the very lawsuits they provoked as "proof" of Plaintiff's vexatiousness.

This pattern demonstrates that Defendants are not engaged in good-faith litigation. They are executing a strategy of provocative retaliation: file a baseless action, force the victim to defend herself across multiple fronts, and then weaponize her necessary defensive filings to impose financial sanctions. This is the essence of litigation harassment.

## 2. Beyond-Litigation Harassment

The campaign extends beyond courtrooms. Public disclosure of confidential PTSD records to embarrass and discredit; over 5,000 DDoS attacks and unauthorized access to 150+ attorney-client communications; repeated attempts to discover Plaintiff's Address Confidentiality Program location through in-person deposition demands; and explicit threats: "Drop the Ripple matter, or it gets worse." The escalating severity demonstrates intent to harm Plaintiff financially, emotionally, and professionally, not to resolve any legitimate dispute. (Ex. C, K)

## 3. Chilling Effect on Federal Enforcement

The retaliation has both individual and systemic chilling effects. Plaintiff has suffered years of financial and psychological harm for her SEC cooperation; future whistleblowers will reasonably conclude that cooperation invites ruinous litigation. This undermines the federal enforcement structure Congress sought to protect through the Dodd-Frank Act and directly threatens the public interest. Such retaliation, carried out through coordinated misuse of state process, fits squarely within *Dombrowski*'s harassment exception. 380 U.S. at 489-90.

## C. Federal Statutory Exception—*Mitchum v. Foster*

## 1. The Mitchum Framework

In *Mitchum v. Foster*, 407 U.S. 225 (1972), the Supreme Court held that 42 U.S.C. § 1983 is an express exception to *Younger*'s abstention doctrine. Congress intended § 1983 to authorize federal courts to enjoin state proceedings when necessary to vindicate constitutional rights. *Id.* at 242-43. However, § 1983 is an **authorization**, not an automatic override of abstention principles. Courts exercise that power only when the state forum itself is the instrument of violation—that

is, when the constitutional deprivation cannot be remedied through the state judicial process because that process is the means by which rights are being denied.

## 2. Application Here

While § 1983 authorizes federal injunctions against state proceedings, courts exercise that power only when the state forum itself is the instrument of violation—as here, where the bond mechanism and proceedings conducted without assignment foreclose any federal rights review. The California proceedings are not neutral forums—they are the vehicles of constitutional violation. The state court is:

- **Proceeding without judicial authority**: Clerk confirmed October 16, 2025 that "the case has not been assigned yet." Yet Judge Quinn—a Law & Motion judge—has conducted evidentiary and discretionary proceedings, lacking authority to make vexatious-litigant determinations.

- **Issuing orders during mandatory stays**: Five substantive orders issued June 20, 2025 while jurisdiction was divested by §§ 916 and 170.4(d).

- **Relying on void judgments and perjured testimony**: Both void defaults and false testimony form the basis for sanctions.

- **Imposing financial barriers coordinated with private actors**: Twin motions, 90% identical and filed twelve days apart, seek $75,000—an amount beyond Plaintiff's means.

- **Targeting federal activity**: Both bond motions cite Plaintiff's SDNY filing and SEC cooperation as "vexatious."

A tribunal acting without authority, during mandatory stays, relying on false evidence, and punishing the invocation of federal rights cannot be deemed an adequate forum under *Mitchum*. 407 U.S. at 242-43.

### 3. Futility of State Relief

Requiring Plaintiff to seek relief from the very court engaged in this pattern would be futile. The structural breakdown—proceeding without assignment, issuing orders during mandatory stays, suppressing federal notices—demonstrates that the state process cannot remedy the constitutional violations because it is the source of those violations. State courts cannot adjudicate Dodd-Frank whistleblower claims (15 U.S.C. § 78u-6), cannot provide § 1983 remedies, and cannot address civil-rights conspiracies under § 1985 or Supremacy Clause violations. Federal review is the only effective remedy.

### 4. Policy Rationale

*Mitchum*'s policy rationale applies with exceptional force here. If federal courts abstained whenever state proceedings remain technically open, wealthy litigants could indefinitely insulate systematic constitutional violations by maintaining continuous state litigation—filing strategic actions, obtaining void judgments, appealing to preserve "ongoing proceedings," and invoking *Younger* at every stage. That is what Defendants have executed since October 2022.

Unlike *Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1 (1987), where the state provided a full appellate mechanism to vindicate federal rights, the California bond statute's 30-day dismissal provision provides none. Abstention would reward procedural manipulation and make *Younger* a tool for

oppression rather than comity. Federal intervention is the only mechanism capable of restoring balance between state process and constitutional supremacy.

## D. Conclusion

The California vexatious-litigant bond proceeding falls outside *Younger*'s categorical scope under *Sprint* because it is neither a criminal prosecution, a quasi-criminal enforcement action, nor a proceeding implicating core judicial functions. It is a private civil mechanism that does not trigger abstention principles.

Even if *Younger* applied, abstention would remain improper. The Second Circuit recognizes that the exceptions for bad faith and harassment are extraordinary, but this case presents precisely those extraordinary circumstances. The record establishes bad faith through sworn perjury, reliance on void judgments, and a structural breakdown of judicial process—with proceedings conducted without assignment, during mandatory stays, and targeting the exercise of federal rights. Harassment is shown by a multi-forum, escalating retaliation campaign extending beyond litigation to privacy breaches, cyber intrusions, and physical intimidation. The *Mitchum* exception applies because the state proceedings themselves are the instruments of constitutional violation, leaving no adequate state remedy.

Ordinarily, defects in state proceedings can be remedied through appellate review. Here, the structure of California's bond statute forecloses timely review—mandating dismissal within thirty days—leaving no opportunity for appellate correction before irreparable harm occurs. Federal intervention is not an affront to comity but a necessary response to a structural denial of access to federal rights. Together, these facts demonstrate that the California proceedings serve

no legitimate adjudicative purpose. Accordingly, *Younger* abstention is inapplicable, and this Court must exercise its full jurisdiction to enjoin further state action and preserve the supremacy of federal law.

## C. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

### A. Securities Whistleblower Retaliation - 15 U.S.C. § 78u-6(h)

#### 1. Legal Framework and Elements

Section 21F(h) of the Securities Exchange Act, established by Dodd-Frank, prohibits retaliation against individuals who provide information to the SEC regarding securities law violations. 15 U.S.C. § 78u-6(h)(1)(A). To establish whistleblower retaliation, Plaintiff must show: (1) protected activity; (2) defendant's knowledge of that activity; (3) adverse action; and (4) the protected activity was a contributing factor to the adverse action. *Murray v. UBS Sec., LLC*, 43 F. Supp. 3d 486, 498 (S.D.N.Y. 2014).

#### 2. Element One: Protected Activity

Plaintiff's SEC cooperation is documented, formal, and indisputable. Recorded interviews on November 18-19, 2020, with SEC investigators provided critical information about Defendants' XRP operations. Form 1162 issued November 20, 2020, formally acknowledging cooperation and establishing protected status. Government portal access for document upload demonstrates the SEC treated Plaintiff as a formal cooperating witness, not an anonymous tipster. Material contribution to enforcement—the SEC filed its $1.3 billion action just one month after Plaintiff's cooperation, and this Court entered judgment and permanent injunction on June 26, 2025. Non-financial motive underscores civic duty rather than false reporting—Plaintiff never sought or

received monetary awards. This is precisely the cooperation Congress sought to protect. No factual dispute exists on this element.

### 3. Element Two: Knowledge

On January 29, 2021, just five weeks after the SEC filed enforcement, Defendants' counsel wrote: "Larsen believes you are partially responsible for the SEC investigation." This explicit admission eliminates any dispute about whether Defendants knew of protected activity. It shows Defendants correctly attributed the SEC action to Plaintiff's cooperation and formed beliefs specifically linking her to federal investigation. Direct evidence of retaliatory intent is rare and dispositive.

### 4. Element Three: Adverse Action

The statute is not limited to employment actions. Courts recognize retaliation through systematic harassment designed to punish and deter cooperation. Defendants' retaliation includes:

**(a)** strategic litigation timed while Plaintiff was abroad to obtain default "findings of innocence" now wielded as proof;

**(b)** public disclosure of confidential PTSD records to invoke "unstable" stereotypes;

**(c)** over 5,000 DDoS attacks and unauthorized access to attorney-client communications;

**(d)** attempts to discover her Address Confidentiality Program location despite safety enrollment; and

**(e)** coordinated $75,000 bonds explicitly citing her SDNY filing as "vexatious".

These actions would "dissuade a reasonable worker from making or supporting a charge."

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

**5. Element Four: Causation**

Multiple, mutually reinforcing sources establish causation:

**a. Direct admission:** The January 29, 2021 email is explicit statement of but-for causation.

**b. Temporal proximity:** SEC filed December 22, 2020; admission January 29, 2021 (5 weeks); first declaratory relief October 2022 (less than 2 years after admission); bond conspiracy June 2025 (escalating pattern). Courts recognize temporal proximity plus direct evidence creates strong causation inference. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).

**c. Pattern and escalation:** Systematic campaign escalating from litigation to privacy violations to cyber crimes to physical safety threats to financial barriers. No legitimate alternative explanation offered.

**d. Explicit federal filing retaliation:** June 20, 2025 motion cites SDNY filing as "vexatious." Direct evidence bonds designed to suppress federal claims—transparent retaliatory motive.

**e. Comparative evidence:** Other SEC cooperators in Ripple matters not subjected to similar treatment.  Plaintiff—who never sought money—singled out. Disparity supports inference cooperation was but-for cause.

**f. Absence of alternative explanation:** Defendants offer no legitimate, non-retaliatory reason. Declaratory relief, bonds, cyber attacks serve no purpose except punishment. If legitimate dispute, why perjury? Why void judgments? Why federal filing citation?

Dodd-Frank uses "contributing factor" standard (lower than but-for), yet evidence here establishes but-for causation. Direct admission plus temporal proximity plus pattern plus explicit targeting equals overwhelming proof. Defendants cannot rebut with legitimate reasons when foundation is perjury.

**B. Civil Rights Conspiracy - 42 U.S.C. § 1985(3)**

**1. Legal Framework**

Section 1985(3) creates a federal cause of action for conspiracies "for the purpose of depriving...any person...of the equal protection of the laws, or of equal privileges and immunities under the laws." To establish a § 1985 claim, Plaintiff must show: (1) conspiracy between two or more persons; (2) motivated by class-based animus; (3) overt acts in furtherance; and (4) injury or deprivation of constitutional rights. *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971).

**2. The Conspiracy**

**a. Documentary evidence of agreement - Twin bond motions coordination**

The 90% identical language across supposedly independent filings is direct evidence of agreement. Filed twelve days apart by different attorneys—sequential, not simultaneous, suggesting second incorporated first.

**Shared false narrative:** "no settlement discussed" despite documented $250,000-$300,000 negotiations. **Shared evidence base:** same void judgments cited. **Shared discriminatory language:** "foreign," "unstable," "untrustworthy." **Shared federal filing citation:** both reference SDNY filing as "vexatious." This *90% overlap* cannot be explained by parallel reasoning or coincidence—it's direct evidence of "meeting of minds." *Dennis v. Sparks*, 449 U.S. 24, 28 (1980).

**b. Coordination with state judicial actors - Temporal synchronization during jurisdictional stays**

June 9: Both mandatory stays triggered. June 20: (1) Judge Quinn issues five orders during stays, AND (2) Fugate files $50,000 motion. Same-day coordination defies probability without communication. Orders precisely advance Defendants' strategy: discovery enforcement, sanctions, bond scheduling—all issued while court lacks jurisdiction.

**Administrative coordination:** Federal filing notice suppressed from public docket. Disqualification motion redirected to judge being disqualified. Ex parte chambers communications. Judge retained private counsel against Plaintiff.

**Pattern over eight months:** Defendants file motions → Court issues favorable orders despite procedural problems. Stays take effect → Court violates stays to advance Defendants' strategy. Plaintiff files federal notice → Clerk suppresses from public view. Perjury presented → Court relies without inquiry. Pattern demonstrates sustained coordination, not isolated coincidences. Under *Dennis*, private parties plus state officials acting jointly equals conspiracy. "Such a close

nexus between State and challenged action" that private behavior is state action. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).

### c. HIPAA information sharing as conspiracy evidence

**February**-June 2025: Both attorneys discussed Plaintiff's confidential therapy records. Weinreb brought Fugate into deposition discussion of HIPAA-protected information. Same information appeared in both bond motions. No legitimate litigation purpose—used to stigmatize as "unstable." Coordinated use of unlawfully obtained medical information is circumstantial evidence of agreement. (Ex. L)

### d. Class-Based Animus

Defendants' conduct reflects three forms of animus. **First, racial animus:** characterizing a U.S. citizen as "foreign" with "limited community ties" invokes the "perpetual foreigner" stereotype bearing more heavily on Asian Americans. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); **Second, gender-based animus:** using PTSD treatment to label Plaintiff "unstable" deploys stereotypes historically used to discredit women reporting misconduct, compounded by public display of her deceased mother's image. (Ex. H). **Third, whistleblower animus:** Defendants admitted targeting Plaintiff for SEC cooperation and explicitly cited her SDNY filing as sanctionable conduct. Section 1985 reaches conspiracies to deprive persons of congressionally-created rights. *Griffin*, 403 U.S. at 105.

**e. Overt Acts**

**June 4:** Weinreb files $25,000 motion.  **June 20:** Fugate files $50,000 motion plus Judge Quinn issues orders during stays. **July 18:** Clerk suppresses federal notice from docket. **August 29:** Fugate perjury. **October 14:** Hearing scheduled despite lack of judge assignment.  Each act advances shared objective: impose financial barriers, portray federal filing as vexatious, silence federal cooperation.

**f. Injury and Deprivation**

**Constitutional:** Access to courts, due process, equal protection. Economic: Legal fees, cyber losses, $75,000 bond she cannot pay. Reputational: Court-sanctioned "findings" declaring trauma false. Chilling: Deterrence from future cooperation.

## C. Constitutional Violations Under Color of State Law - 42 U.S.C. § 1983

### 1. Legal Framework

Section 1983 requires: (1) defendants acted under color of state law; and (2) their conduct deprived plaintiff of constitutional rights. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 930 (1982).

### 2. State Action Through Joint Participation

Four independent bases establish state action. **First,** Judge Quinn issued five substantive orders on June 20, 2025, while jurisdiction was suspended by dual mandatory stays—the same day Fugate filed her $50,000 motion, demonstrating coordinated "joint activity." *Dennis v. Sparks*, 449 U.S. 24, 28 (1980). **Second,** the court suppressed Plaintiff's federal filing notice from the

public docket while Judge Quinn retained private counsel and attempted to rule on his own disqualification. **Third,** judicial reliance on materially false testimony creates the *Lugar* nexus when courts issue orders based on coordinated perjury. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). **Fourth,** court personnel confirmed the case remains unassigned, yet a Law & Motion judge without authority has conducted substantive proceedings.

### 3. Constitutional Deprivations

#### a. Due Process violations

**Void judgments:** Declaratory relief obtained without service while Plaintiff abroad. Creditcare $635,000 judgment without service. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950): due process requires notice. Using void judgments as sanctions predicates violates fundamental fairness.

**Perjury-based orders:** Orders obtained through materially false testimony. Due process requires reliable evidence, not knowing falsehoods.

**Proceedings during stays:** Orders issued without jurisdiction. Orders without jurisdiction are void.

**Denial of neutral tribunal:** Ex parte communications. Judge ruling on own disqualification. Judge with personal stake (private counsel). *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009): due process requires impartial decision-maker.

#### b. Equal Protection violations

$75,000 bonds based on race, gender, whistleblower status. Coded language: "foreign," "unstable," "untrustworthy." **Disparate treatment:** Court docket show Defendants' motions

consistently granted while denying Plaintiff's identical requests. Comparative evidence: Others are not subjected to same burdens.

## c. Access to Courts violations

$75,000 bond equals *"poll tax"* on constitutional rights. *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 666 (1966). Plaintiff cannot pay. If imposed, claims dismissed and appeals foreclosed.

*Boddie v. Connecticut*, 401 U.S. 371 (1971): state cannot condition court access on fees plaintiff cannot afford. **Federal rights explicitly targeted:** SDNY filing cited as "vexatious." Violates First Amendment petition right and Supremacy Clause.

## Defensive Litigation Is Not Vexatiousness

Defendants have repeatedly mischaracterized Plaintiff's defensive and remedial filings as "vexatious." The record shows the opposite. Each case cited by Defendants arose directly from their own unlawful or procedurally defective actions—defaults entered without service, bond motions filed during stays, or declaratory judgments obtained while Plaintiff was abroad and unrepresented. Plaintiff's filings in state and federal courts were compelled responses to protect basic due process and whistleblower rights, not efforts to harass or relitigate. The multiplicity of proceedings thus reflects Defendants' multi-forum provocation strategy, not Plaintiff's litigiousness. This distinction is critical: a whistleblower forced into successive defensive actions by retaliatory litigation cannot, as a matter of law or equity, be deemed a "vexatious litigant." Rather, the pattern exemplifies the very kind of bad-faith and harassing conduct that triggers the *Younger* exceptions invoked below. Federal courts have long recognized that compelled defensive litigation in response to retaliation or procedural abuse cannot be equated with

vexatiousness—particularly where the underlying state actions are void, jurisdictionally defective, or constitutionally infirm.

## D. PLAINTIFF WILL SUFFER IRREPARABLE HARM

### A. Constitutional Injury Presumed

When a plaintiff establishes likelihood of success on constitutional claims, irreparable harm is presumed as a matter of law. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). This presumption extends to violations of due process, equal protection, and access to courts. *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville*, 274 F.3d 377, 400 (6th Cir. 2001).

Plaintiff has established likelihood of success on: (1) access to courts—$75,000 financial barrier to federal forum; (2) due process—void judgments, proceedings during mandatory stays; and (3) equal protection—discriminatory treatment based on race, gender, and whistleblower status. Violation of federal whistleblower protections under 15 U.S.C. § 78u-6 constitutes irreparable injury that monetary damages cannot remedy. *Berman v. Neo@Ogilvy LLC*, 801 F.3d 145, 155 (2d Cir. 2015).

### B. Court-Sanctioned Findings Obtained Without Due Process

Defendants obtained—and continue to wield—a California appellate judgment declaring "findings of innocence" through a declaratory-relief action without due process. The judgment was entered by default while Plaintiff was abroad on documented medical leave, without proper service or notice. This creates irreparable harm distinct from ordinary defamation.

**1. Weaponization of Judicial Authority**

Ordinary defamation turns on the speaker's credibility. Judicial findings carry the presumed reliability and authority of the state. The judgment is cited in every major filing as evidence of vexatiousness. Each citation constitutes republication with official sanction. Unlike ordinary defamation, court records are permanent and publicly searchable. Future employers, colleagues, and potential cooperators can access these "findings" indefinitely. Money damages cannot remedy this harm. A later damages award does not erase the public record or restore credibility once a court has made factual findings against a party.

**2. Preclusive Effect and Collateral Estoppel Risks**

Though the judgment should be void, it creates preclusion risks in other forums. Defendants cite it to argue claims are barred or frivolous. Courts unfamiliar with how it was obtained may give unwarranted deference. The void judgment operates as a permanent cloud on Plaintiff's ability to vindicate rights in any forum. Once a judgment is used to bar claims or impeach credibility, the harm to legal rights is permanent. Money cannot restore a lost opportunity to be heard on the merits.

**3. Systemic Harm—Chilling Effect on Reporting**

If this tactic succeeds, the precedent becomes available to any defendant: (1) file declaratory relief seeking judicial declaration that allegations are false; (2) time filing when victim is vulnerable; (3) obtain default when victim cannot respond; (4) cite judgment as "proof" of innocence; (5) use judgment to seek sanctions and financial barriers. This converts declaratory relief from a mechanism for *clarifying legal rights* into a weapon for **silencing** accusers. Sexual

assault victims, whistleblowers, and fraud reporters become vulnerable to manufactured exculpatory findings without adversarial process. The chilling effect extends beyond Plaintiff. Future victims will observe: Report misconduct → Court declares you a liar → Face financial ruin. Money damages to Plaintiff cannot remedy this systemic harm.

## C. Chilling Effect on Federal Cooperation

### 1. Individual Deterrence

If Defendants succeed in obtaining "findings of innocence" by preventing testimony, characterizing Plaintiff as vexatious, and imposing $75,000 in financial barriers while explicitly citing federal filing as sanctionable conduct, the message is unmistakable: cooperation with federal authorities results in financial ruin and permanent silencing. Plaintiff has spent substantial funds defending against retaliation. She lost revenue due to cyber attacks. Her private medical information was publicly disclosed. She now faces a $75,000 barrier she cannot pay. All of this resulted from civic-minded cooperation seeking no financial reward.

### 2. Systemic Chilling—Impact on Future Cooperators

Potential whistleblowers will observe Plaintiff's experience and remain silent. Securities enforcement depends critically on cooperation from insiders with knowledge regulators cannot independently obtain. This dependence is particularly acute in complex, technical areas like cryptocurrency. Companies engaged in securities fraud will understand they can silence whistleblowers through strategic litigation backed by King & Spalding and unlimited resources, coordinated across multiple fronts—legal, cyber, reputational and financial. If cooperators face what Plaintiff has faced, rational actors will not cooperate. The industry becomes an

enforcement-free zone because defendants' financial resources can fund retaliation campaigns that destroy cooperators.

**3. Institutional Threat—This Court's Authority**

Defendants remain under this Court's permanent injunction in *SEC v. Ripple Labs, Inc.*, No. 1:20-cv-10832 (S.D.N.Y.). As Judge Torres observed on June 26, 2025, "Ripple's willingness to push the boundaries of the [Summary Judgment] Order evinces a likelihood that it will eventually (if it has not already) cross the line." That warning has proved prescient: Defendants have now retaliated against a witness whose cooperation helped secure this Court's enforcement action.

If such retaliation proceeds unchecked, it signals that even this Court's injunctions cannot deter ongoing misconduct or protect those who aid federal enforcement. The injury extends beyond Plaintiff—it threatens the integrity of federal judgments and the credibility of securities regulation itself. Monetary relief cannot remedy that institutional harm; only an injunction safeguarding the cooperator whose testimony supported this Court's order can preserve its authority.

**D. No Adequate Remedy at Law**

Money damages cannot make Plaintiff whole for multiple independent reasons.

**1. Constitutional Rights Once Lost Cannot Be Restored**

**Access to courts:** If Plaintiff is forced to pay a bond she cannot afford, or if her claims are dismissed for failure to pay, the lost opportunity to vindicate her rights is irreparable. Money

cannot restore the ability to pursue claims—it can only compensate for loss, but the loss here is the right itself.

**Due process:** Void judgments will remain on the public record. Future litigants and courts may continue to cite them. "Findings of innocence" obtained without due process cannot be erased by later payment of damages.

**Equal protection:** Discriminatory treatment and its reputational consequences are permanent. Money cannot eliminate the public record of racially and gender-coded characterizations or the stigma of "vexatious litigant" findings.

## 2. State Court Cannot Provide Adequate Relief

The California Superior Court clerk confirmed on October 16, 2025, that the case "has not been assigned yet." Judge Quinn is a "Law & Motion" judge conducting substantive hearings without clear authority. The state court has issued orders during mandatory stays , suppressed Plaintiff's federal filing notice from the public docket, and relied on void judgments and contradicted testimony without inquiry. Most importantly, state courts lack jurisdiction over federal whistleblower claims under 15 U.S.C. § 78u-6, civil rights violations under 42 U.S.C. §§ 1983 and 1985, and Supremacy Clause violations. The state proceedings explicitly target federal court access as "vexatious." The state forum is the instrument of constitutional violation, not a neutral arbiter.

## 3. Reputational and Dignitary Harms Not Quantifiable

No formula exists to quantify in damages: a court judgment declaring sexual assault allegations false, obtained without hearing testimony; being labeled "foreign," "unstable," and

"untrustworthy" in public court records; having private medical records disclosed publicly; or having federal court access characterized as "vexatious". These **harms** affect reputation, dignity, emotional well-being, future opportunities, and the ability to cooperate with authorities again. *None can be reduced to monetary compensation.*

### 4. Time-Sensitive and Permanent Foreclosure

The November 3 hearing is imminent. Only preliminary injunctive relief can preserve Plaintiff's constitutional rights pending adjudication. Money damages awarded years later cannot restore rights lost now, undo court-sanctioned findings, or remedy the systemic chilling of whistleblower cooperation.

### 5. State Bond Requirement as Foreclosure of Federal Rights

The $75,000 bond imposed in the California proceeding functions as a financial gate that forecloses Plaintiff's ability to exercise rights guaranteed by federal law. The motion for bond expressly targeted Plaintiff's SEC cooperation and this federal filing as "vexatious." Conditioning court access on payment of a prohibitive bond converts a state procedural device into a retaliatory barrier against federally protected whistleblowing. Federal rights cannot depend on an individual's ability to satisfy a state-imposed bond. *Haywood v. Drown*, 556 U.S. 729, 736 (2009). The bond effectively silences a federal witness, nullifies Dodd-Frank's anti-retaliation protections, and obstructs this Court's jurisdiction to enforce its own injunction in *SEC v. Ripple Labs, Inc.* Such interference is precisely the type of Supremacy Clause conflict that warrants immediate injunctive relief.

## E. THE BALANCE OF EQUITIES TIPS DECIDEDLY IN PLAINTIFF'S FAVOR

The equities strongly favor preserving the status quo until this Court can adjudicate Plaintiff's federal claims.

### 1. Plaintiff's Interests Are Paramount

Plaintiff faces imminent and irreparable harm. The November 3 bond hearing will, if allowed to proceed, trigger dismissal of her claims and extinguish federally protected whistleblower and due-process rights. These interests lie at the core of constitutional protection: the right to report securities violations without retaliation and to access courts free from prohibitive financial barriers. As a documented SEC cooperator whose assistance contributed to this Court's enforcement action, Plaintiff's protection directly implicates this District's enforcement authority. *Berman v. Neo@Ogilvy LLC*, 801 F.3d 145, 155 (2d Cir. 2015). She also remains under safety protections through New York's Address Confidentiality Program—interests that monetary relief cannot restore. (Ex. C)

### 2. Defendants' Interests Are Minimal

Defendants face no prejudice from a brief stay. They have litigated since October 2022; additional months pending federal adjudication will not harm them. State proceedings can resume if Plaintiff's claims fail. A stay merely postpones enforcement of a disputed order and preserves all defenses should Plaintiff's claims ultimately fail.

### 3. Power Disparity and Access to Justice

Defendants are a crypto currency billionaire and a multinational corporation represented by King & Spalding LLP. Plaintiff proceeds pro se after expending significant funds and now faces a $75,000 bond she cannot pay. A short delay imposes no hardship on well-resourced defendants, whereas denial of relief would permanently extinguish a cooperator's federal rights. The equities are one-sided. Equity exists to prevent such imbalances from foreclosing federal rights.

### 4. Defendants' Unclean Hands

Equitable relief is unavailable to parties who engage in serious misconduct. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). The record shows perjured testimony, reliance on void judgments, coordination with state actors during jurisdictional stays, unauthorized computer access, and disclosure of private medical information. Defendants come to equity with unclean hands, having engaged in documented perjury, reliance on void judgments, cyber crimes (5,000+ DDoS attacks, unauthorized computer access), privacy violations, and coordination with state actors to circumvent procedural protections. (Ex. N)

## F. THE PUBLIC INTEREST FAVORS INJUNCTION

The public interest likewise compels interim restraint.

### 1. Protecting Federal Whistleblowers

Plaintiff's cooperation in *SEC v. Ripple Labs, Inc.*, furthered a major enforcement action within this District. Federal securities enforcement depends on protecting insiders who disclose violations. Allowing retaliatory state processes to proceed would deter future cooperation and weaken regulatory integrity. *Berman*, 801 F.3d at 155 ("the public has a strong interest in

maintaining a robust regime protecting those that report securities violations"). Congress enacted Dodd-Frank whistleblower protections because securities enforcement depends critically on insider cooperation. Allowing retaliation against cooperators undermines federal enforcement and congressional policy.

## 2. Cryptocurrency Enforcement

This Court's enforcement action against Defendants established critical precedents for applying securities laws to digital assets. Protecting cooperators in this technically complex, rapidly-evolving sector is essential to maintaining effective oversight. If whistleblowers in the cryptocurrency industry—where enforcement is particularly dependent on insider cooperation due to technical complexity—can be silenced through coordinated retaliation, the regulatory framework collapses.

## 3. Preserving Judicial Integrity and This Court's Institutional Authority

The public also has a compelling interest in honest proceedings and in safeguarding this Court's enforcement authority. Attorney perjury and misuse of declaratory-relief defaults erode confidence in both state and federal proceedings. Federal intervention here reinforces that judicial processes cannot be misused against whistleblowers. Preventing attorney perjury, abuse of declaratory relief mechanisms, and wealth-based barriers to justice protects the integrity of the judicial system and ensures equal access to courts.

Because this District supervised the SEC action and entered a permanent injunction against Defendants, retaliation against a cooperator undermines not only individual rights but the effectiveness of this Court's own orders. Maintaining a short stay ensures that federal judgments

remain supreme and enforceable. Defendants are subject to this Court's ongoing supervision through a permanent injunction; their retaliation against the cooperator who contributed to that enforcement undermines this Court's authority and the effectiveness of its orders.

Courts consistently hold that when constitutional rights and access to federal courts are threatened, the balance of hardships tilts sharply toward protection. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The modest inconvenience of delay to Defendants is far outweighed by the risk that Plaintiff's federal rights will be extinguished before merits review. Accordingly, the balance of equities and the public interest both compel issuance of a narrowly tailored preliminary injunction preserving the status quo pending this Court's final determination.

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that this Court issue an Order to Show Cause setting an expedited hearing on this Motion for Preliminary Injunction and granting such interim relief as may be just and proper under Federal Rule of Civil Procedure 65(b).

The record establishes each of the four elements required for preliminary injunctive relief:

**A. Likelihood of Success on the Merits** — Plaintiff is a documented SEC cooperator protected by 15 U.S.C. § 78u-6(h). Defendants have admitted retaliatory motive ("Larsen believes you are partially responsible for the SEC investigation"), and their coordinated bond motions rest on demonstrably perjured testimony and void state-court findings issued without due process. Plaintiff has established strong likelihood of success on three independent federal claims:

whistleblower retaliation, civil rights conspiracy under §1985, and constitutional violations under §1983.

**B. Irreparable Harm** — The November 3, 2025 bond hearing threatens immediate dismissal of Plaintiff's claims with prejudice, foreclosing access to federal rights that cannot later be reinstated. Constitutional injuries to due process, court access, and protection from retaliation are irreparable as a matter of law. Court-sanctioned defamation obtained without due process, chilling effects on federal cooperation, and institutional threats to this Court's enforcement authority cannot be remedied through monetary damages.

**C. Balance of Equities** — Defendants will suffer no cognizable prejudice from a short stay or delayed hearing, while Plaintiff faces total deprivation of rights absent immediate relief. Equity favors preserving the status quo pending adjudication of her federal claims. The power disparity between a pro se plaintiff and defendants represented by King & Spalding with unlimited resources, combined with defendants' unclean hands through perjury and procedural manipulation, tips the balance decisively in Plaintiff's favor.

**D. Public Interest** — Protecting SEC cooperators from retaliation serves the public interest in fair markets and reinforces the integrity of this Court's own enforcement authority in *SEC v. Ripple Labs, Inc.* Preventing the use of perjured filings and void judgments to silence federal witnesses preserves confidence in both state and federal judicial systems. The public has a paramount interest in protecting whistleblowers, maintaining judicial integrity, and ensuring this Court's institutional authority to enforce its own orders.

Three independent exceptions to *Younger* abstention bar deferral to state proceedings: (1) bad faith, demonstrated through perjury, void judgments, and targeting of federal rights; (2) harassment, shown by multi-forum retaliation extending to cyber attacks and physical threats; and (3) the *Mitchum* statutory exception for §1983 claims, where state proceedings are themselves the instrument of constitutional violation.

WHEREFORE, Plaintiff respectfully requests that this Court:

1. **Grant a preliminary injunction** staying all proceedings in *Jane Doe v. Christian Larsen, et al.*, San Francisco Superior Court Case No. CGC-23-611166, pending resolution of this federal action or further order of this Court;

2. **Preliminarily enjoin** Defendant Ripple Labs, Inc., and their agents, attorneys, employees, and all persons acting in concert with them from: a. Proceeding with any bond hearing or enforcement of any bond order in that action; b. Taking any steps to enforce, execute, or collect any bond or undertaking ordered therein; c. Filing additional motions or requests for sanctions, bonds, or other financial penalties against Plaintiff in that action; and d. Taking any action to dismiss or otherwise prejudice Plaintiff's claims based on failure to post any bond while this motion is pending;

3. **Order tolling** of any payment or compliance deadline imposed under Cal. Code Civ. Proc. § 391.3 until further order of this Court;

4. **Issue an Order to Show Cause** directing Defendants to respond within five (5) days and setting an expedited hearing on this Motion at the earliest practicable date, and in any event before November 3, 2025;

5. **Temporarily restrain Defendants**, pending the preliminary injunction hearing, from enforcing or proceeding with any California bond motions or payment deadlines that could dismiss Plaintiff's claims;

6. **Grant such other and further relief** as this Court deems just and proper.

Dated: October 21, 2025

Respectfully submitted,

/s/ Jane Doe
_____
Jane Doe
Address Confidentiality Program
P.O. Box 1100
Albany, NY 12201
Email: jgk246@gmail.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JANE DOE, | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-06020 (MMG) |
| CHRISTIAN LARSEN, RIPPLE LABS INC., and DOES 1-10, | |
| Defendants. | |

## DECLARATION OF JANE DOE IN SUPPORT OF MOTION FOR

## PRELIMINARY INJUNCTION

I, Jane Doe, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct based on my personal knowledge:

## I. INTRODUCTION AND OVERVIEW

1. I am the Plaintiff in this action. I submit this declaration in support of my Motion for Preliminary Injunction to stay proceedings in the California Superior Court and prevent Defendants from continuing their campaign of retaliation against me for my cooperation with the Securities and Exchange Commission.

2. I am a pro se litigant. I cannot afford to retain counsel. Over the past three years, I have spent significant legal fees and costs defending against Defendants' systematic retaliation campaign. I have been forced to proceed without counsel since approximately February 1, 2025. I have personal knowledge of all facts stated in this declaration except where I

indicate I am stating something based on information and belief, and as to those matters, I believe them to be true.

## II. MY BACKGROUND

3. I am a United States citizen and have resided in the United States for thirty years.

4. I am an entrepreneur and small business owner. My business provides financial services to consumers in emerging markets. I have lived and worked in emerging markets for over six years, collaborating with regulators, financial institutions, the broader ecosystem, and I have developed deep industry knowledge through this work.

5. Due to safety concerns arising from Defendants' harassment and retaliation campaign, I enrolled in the New York State Address Confidentiality Program (ACP) in November 2022. My substitute address is: ACP 5566, P.O. Box 1100, Albany, NY 12201. A true and correct copy of my ACP enrollment confirmation is attached as **Exhibit C.**

## III. MY SEC COOPERATION AND THIS COURT'S ENFORCEMENT ACTION

6. On November 18 and 19, 2020, I participated in recorded telephone interviews with SEC investigators regarding potential securities violations by Defendants Christian Larsen and Ripple Labs, Inc. related to their XRP cryptocurrency operations.

7. During these interviews, I provided substantial information about Defendants' operations, business practices, and potential violations of federal securities laws based on my personal knowledge, observations, product information and emerging market data. The SEC provided me with secure login credentials to upload documents directly to the agency's government portal—a level of access provided only to formal cooperating witnesses.

8. On November 20, 2020, the SEC issued Form 1162 to me, formally acknowledging my cooperation and establishing my protected status under federal whistleblower statutes, specifically 15 U.S.C. § 78u-6. A true and correct copy of SEC Form 1162 attached as **Exhibit B**.

9. I cooperated with the SEC out of civic duty, not for financial gain. I have never sought or received any monetary award from the SEC whistleblower program. I have never applied for a whistleblower award. My cooperation was motivated solely by my belief that potential securities violations should be reported to appropriate federal authorities and that emerging market consumers should not be exploited for gain by a few individuals.

10. Just one month after my cooperation, on December 22, 2020, the SEC filed a comprehensive enforcement action against Defendants in the United States District Court for the Southern District of New York, Case No. 1:20-cv-10832, seeking $1.3 billion in penalties and disgorgement. On June 26, 2025, Judge Analisa Torres entered orders imposing financial penalties and permanently enjoining certain of Defendants' business operations. A true and correct copy of the June 26, 2025 Order is attached as **Exhibit D**.

## IV. DEFENDANTS' ADMITTED RETALIATION

11. On January 29, 2021—just five weeks after the SEC filed its enforcement action— Defendants' attorney Jeanne A. Fugate sent an email to my then-counsel stating: **"Larsen believes you are partially responsible for the SEC investigation."** A true and correct copy of this January 29, 2021 email is attached as **Exhibit A**.

12. This admission explicitly linked Defendants' knowledge of my SEC cooperation to their subsequent conduct toward me. Since that admission, I have faced a three-year systematic

campaign of retaliation that has escalated in severity and now threatens to completely foreclose my access to federal courts.

## V. THE PERJURY FOUNDATION FOR BOND MOTIONS

### A. The August 29, 2024 Deposition Testimony

13. On August 29, 2024, attorney Jeanne A. Fugate was deposed under oath in related litigation (*Doe v. Wiener*, Contra Costa County Superior Court Case No. C23-02249). During that deposition, she testified as follows:

14. **Q:** Throughout the entire time of your representation of Mr. Larsen while Mr. Wiener was representing Ms. Doe, you're not aware of—you never communicated a monetary settlement offer on behalf of Mr. Larsen to Mr. Wiener?

15. **A:** During the time period you stated, I never communicated any settlement offer to Mr. Wiener on behalf of Mr. Larsen.

16. A true and correct copy of the relevant pages of Ms. Fugate's August 29, 2024 deposition is attached as **Exhibit E**.  This testimony was material. It formed the basis for the narrative—repeated in both bond motions.

### B. Documentary Proof of Falsehood

17. Ms. Fugate's testimony was false.

18. On September 15, 2022, my then-attorney Seth Wiener sent me an email reporting on his telephone call with Ms. Fugate that day. The email states:

19. "I **spoke with Jeanne Fugate this afternoon. Larsen would like to resolve all matters simultaneously and is amenable to a global mediation.** She indicated that he wants to

avoid further litigation if possible. Fugate noted that Larsen was unhappy that our settlement demand had increased from $250,000 to $300,000, but she said she would discuss it with him and get back to me."

20. A true and correct copy of the September 15, 2022 email from Mr. Wiener to me is attached as **Exhibit F**.

21. Two weeks later, on September 30, 2022, Mr. Wiener sent an email directly to Ms. Fugate stating:

22. "Jeanne, I will be happy to hold off on filing if your client makes the requested **$300,000 settlement payment or agrees to mediation** by the close of business on October 3, 2022. Please let me know."

23. A true and correct copy of the September 30, 2022 email from Mr. Wiener to Ms. Fugate is attached as **Exhibit G**.

24. These emails are not ambiguous. They document active settlement negotiations in which Ms. Fugate personally participated, discussing specific settlement amounts and mediation.

25. Ms. Fugate's sworn testimony that she "never communicated any settlement offer" was therefore a knowing, material falsehood.

## C. Use of False Testimony in Bond Motions

26. This false testimony now forms the evidentiary foundation for both bond motions seeking $75,000 in combined sanctions against me. Both attorney Marnin Weinreb's June 4, 2025 motion (seeking $25,000, **Exhibit O**) and Ms. Fugate's June 20, 2025 motion (seeking $50,000, **Exhibit P**) cite the absence of settlement discussions as proof that my claims are frivolous and warrant financial sanctions.

27.  The false narrative is central to both motions' argument that I am a vexatious litigant.

## VI. THE VOID JUDGMENTS USED AS "EVIDENCE"

### A. The Declaratory Relief Judgment

28.  In October 2022—approximately one year and nine months after Defendants admitted their retaliation motive—Defendant Larsen filed a declaratory relief action in California Superior Court, Case No. CGC-22-602893, seeking judicial declaration that my allegations against him were false.

29.  At the time this action was filed, I was abroad on medical leave for post-traumatic stress disorder (PTSD) and clinical depression arising from the above events. I was under a physician's care. I was not properly served with the declaratory relief complaint while abroad. Due to my medical leave and location, I was unable to timely respond.

30.  Defendants obtained a default judgement that declared—as a matter of legal record—that my allegations were false and that the events I reported never occurred. This judgement purports to make factual findings about disputed historical events, yet those *"findings"* were obtained by ensuring I was *never allowed to testify or present evidence.*

31.  I appealed the default judgment, raising fundamental **due process violations** and providing evidence that I was never properly served while abroad on medical leave. On December 12, 2024, the California Court of Appeal, affirmed the judgement and issued a remittitur that included "findings of innocence" regarding the disputed allegations. A true and correct copy of the December 12, 2024 remittitur is attached as **Exhibit I**.

32. The California Court of Appeal, located just one block from the Superior Court, issued those factual findings based entirely on a default record—a record that lacked any adversarial testing because I was prevented from participating.

## B. The Creditcare Judgment

33. In the *Creditcare Technology, Inc.* action, my former attorney filed pleadings and asserted a "trade secret" claim *without my authorization or informed consent.* He used **publicly available corporate registration filings** downloaded from a California government website as the basis for a 'trade secret'. I was never informed this material had been filed, nor given any opportunity to review or object. When I confronted counsel about using public records, he abruptly withdrew from representation. The case then proceeded by default, without valid service, resulting in a judgment based on a demonstrably false premise. I was denied any opportunity to defend myself due to counsel's failure to disclose material facts.

34. That judgment is now being weaponized as "evidence" of vexatiousness in bond motions seeking $75,000 in sanctions, despite lacking any legitimate adjudicative validity. Its use as a predicate for financial sanctions demonstrates Defendants' reliance on procedurally defective judgments to silence a federal whistleblower

## C. Weaponization in Bond Motions

35. Defendants cite both of these void judgments—the declaratory relief judgement and the Creditcare judgment—as primary evidence that I am a "vexatious litigant" warranting $75,000 in financial sanctions. (**Exhibits O-P**.) Both judgments were obtained by ensuring I could not participate in the proceedings: one while I was abroad on medical leave, the other through service at an address protected under my ACP enrollment.

36. Defendants now wield these judgments as their primary weapons. They cite them repeatedly in court filings as proof that my allegations have been "judicially determined to be false." But those findings were obtained precisely by *denying me the opportunity to prove they are true.*

## VII. THE COORDINATED BOND MOTIONS

### A. Twin Motions Filed Twelve Days Apart

37. On June 4, 2025, attorney Marnin Weinreb filed a 'Foreign Resident' bond motion in related California litigation (*Doe v. Wiener*, Contra Costa County Superior Court Case No. C23-02249) seeking a $25,000 security bond against me.

38. Just twelve court days later, on June 20, 2025, Defendants' attorney Jeanne A. Fugate filed a parallel motion in the California Superior Court action (*Doe v. Larsen*, Case No. CGC-23-611166) seeking a $50,000 vexatious litigant bond.

### B. 90% Identical Language Demonstrates Coordination

39. I have carefully compared the two bond motions. They are virtually identical. Approximately 90% of the factual allegations, legal arguments, and even specific language overlaps between the two filings. A true and correct copy of my detailed comparison showing this overlap is attached as **Exhibit Q**.

40. This level of coordination—90% identical language across two supposedly independent filings by different attorneys in different courts—cannot be explained by coincidence or parallel reasoning. It demonstrates a coordinated strategy.

## C. Explicit Targeting of Federal Court Access

41. Most significantly, the June 20, 2025 Fugate motion explicitly cites my intent to file federal claims in this Court as evidence of "vexatious" conduct. Specifically, the motion states:

42. "Ms. Ko threatened to file yet another vexatious lawsuit in the United States District Court for the Southern District of New York against Defendants and their counsel." **(Exhibit P)**

43. This characterization of my exercise of federal jurisdiction as evidence of sanctionable conduct reveals the true purpose: to chill my access to federal courts and my pursuit of federal whistleblower protections.

## D. Racially and Gender-Coded Language

44. In the 'Foreign Resident' bond motion, Weinreb characterized me—a United States citizen who has resided in this country for decades—as having "limited ties to the community" and portrayed me as "foreign." This language invokes *xenophobic tropes* based on my Asian heritage and has no basis in fact. I am not "foreign." I am a U.S. citizen and longtime resident.

45. Both motions also weaponize my mental health treatment, using terms like "unstable" based on public disclosure of my PTSD diagnosis. This invokes *gender-based stereotypes historically used* to discredit women who report misconduct.

## E. Identical Evidentiary Foundation

46. Both bond motions rely on the **same evidentiary foundation**:

47. The void declaratory relief judgement obtained while I was abroad

48. The void Creditcare judgement obtained without proper service at my ACP-protected address

49. The false narrative that "no settlement was ever discussed" (contradicted by Ms. Fugate's own emails)

50. Racially and gender-coded language portraying me as "foreign," "unstable," and "untrustworthy"

## F. My Inability to Pay

51. I cannot pay $75,000 in combined bonds. I do not have $75,000 available and I do not have access to credit sufficient to post a $75,000 bond.

52. If the California court imposes this bond and I cannot pay it, my claims will be dismissed with prejudice and my appellate rights will be foreclosed under California Code of Civil Procedure § 391.3. I will permanently lose my ability to vindicate federal whistleblower protections and constitutional rights based on financial barriers I cannot overcome.

## VIII. COORDINATION WITH STATE COURT ACTORS

## A. The Dual Mandatory Stays

53. On June 9, 2025, I filed two documents in the California Superior Court that triggered immediate, automatic, self-executing stays:

54. **First:** A notice of appeal. Under California Code of Civil Procedure § 916, the filing of a notice of appeal automatically stays all trial court proceedings. This stay is mandatory and self-executing—it completely divests the trial court of jurisdiction.

55. **Second:** A motion to disqualify Judge Quinn pursuant to California Code of Civil Procedure § 170.3. Under California law, the filing of a disqualification motion triggers an immediate,

automatic stay of all proceedings before that judge under § 170.4(d). This stay is also mandatory and self-executing.

56. Both stays took effect on June 9, 2025. From that moment forward, the trial court had no jurisdiction to proceed with any substantive matters.

## B. Five Substantive Orders Issued During the Stays

57. Despite these mandatory jurisdictional bars, on June 20, 2025—just eleven days after both stays took effect—Judge Quinn issued five substantive orders:

- Order granting Defendants' motion to compel discovery from me
- Order imposing $2,500 in monetary sanctions against me
- Order setting briefing schedule for Defendants' vexatious litigant bond motion
- Order denying my request for stay pending appeal
- Order setting hearing date on the bond motion for November 3, 2025

58. All five orders were substantive, not ministerial. All five required exercise of judicial discretion. All five advanced Defendants' strategy: discovery enforcement, financial sanctions, bond scheduling.

## C. Temporal Synchronization

59. These five orders were issued on the **same day** Ms. Fugate filed her $50,000 bond motion—June 20, 2025.

60. The synchronization of these actions strongly suggests coordination. Five orders were issued on the same day Defendants file a major motion, while the court lacks jurisdiction due to two mandatory stays. **Exhibit M**.

61. This temporal coordination demonstrates coordination between Defendants' counsel and the court.

## D. Unassigned Judge

62. On October 16, 2025, I contacted the clerk's office of the California Superior Court to confirm the judicial-assignment status of my case. The clerk responded in writing: **"the case has not been assigned yet."** A true and correct copy of that email is attached as **Exhibit J**.

63. This confirmation establishes that as of October 2025—more than two years after the case was filed—no judge had been assigned to the matter.

64. Judge Quinn is designated as a "Law & Motion" judge—a rotating assignment for handling routine procedural matters, not substantive case management. Yet Judge Quinn has conducted eight months of substantive proceedings, including scheduling the November 3 vexatious litigant bond hearing, which requires evidentiary findings, credibility assessments, and exercise of substantial discretion.

65. Proceedings conducted without an assigned judge *lack lawful authority and cannot produce enforceable orders.*

## E. Judge Quinn's Personal Stake

66. When I filed my motion to disqualify Judge Quinn, Defendants' counsel Ms. Fugate **redirected** the motion back to Judge Quinn himself rather than allow the hearing to proceed with the Presiding Judge as required by California Code of Civil Procedure § 170.3(c)(4).

67. On July 3, 2025, Judge Quinn retained private legal counsel to represent him personally. This extraordinary step demonstrates Judge Quinn's personal stake in remaining on the case.

## IX. PRIVACY VIOLATIONS AND BEYOND-LITIGATION HARASSMENT

### A. Public Disclosure of Confidential Mental Health Information

68. During settlement discussions in September 2022, my then-attorney, Seth Wiener, shared my confidential health information with Ms. Fugate in confidence. The information was shared in the context of explaining the impact of the underlying events and why I needed time before engaging in litigation.

69. Despite the confidential nature of this information, Ms. Fugate repeatedly disclosed my PTSD diagnosis and therapy records in public court filings. My subsequent attorney, Jance Weberman, formally notified Ms. Fugate that her repeated disclosure violate HIPAA.

70. In declarations filed in California Superior Court, Ms. Fugate initially denied ever receiving my confidential therapy information.

71. However, the draft complaint Ms. Fugate acknowledges receiving on September 30, 2022, contains detailed allegations sourced directly from my therapy records, including specific references to my "clinical depression," "PTSD diagnosis," and "suicidal ideation." **Exhibit L.**

72. The repeated public disclosure of my confidential mental health information has been devastating. It has been used to stigmatize me, undermine my credibility, and portray me as "unstable"—a gender-based stereotype used to discredit women who report misconduct.

### B. Exploitation of Deceased Mother's Image

73. Defendants' counsel repeatedly inserted images of my deceased mother into court filings. My former attorney explicitly and formally requested that Defendants stop using my mother's

image. Despite this request, Defendants continued to display these images in subsequent filings. A true and correct copy of my mother's image is also attached as **Exhibit H**.

74. The use of my deceased mother's deathbed photograph in litigation materials, after objection, was designed to cause me emotional distress. The continued use after *explicit objection* demonstrates this was not inadvertent.

### C. Cyber Disruptions to Business Operations

75. I operate several business websites that generate income from lead generation and advertising. Between June 2022 and July 2024, these websites experienced thousands of service disruptions that caused the sites to become unavailable to customers for extended periods.

76. While definitive proof of attribution is difficult in cyber contexts, the timing, scale, and persistence of these disruptions—spanning two years—are not consistent with random internet activity. The temporal correlation between disruptions and key litigation events (intensifying after I filed major responses or motions) is striking.

### D. Unauthorized Access to Attorney-Client Communications

77. In May 2024, my attorney Jance Weberman discovered that his computer system had been compromised. Someone had gained unauthorized access to his email accounts and internal case management systems.

78. Over 150 attorney-client communications between Mr. Weberman and me had been accessed without authorization. These communications included privileged discussions of litigation strategy, settlement positions, and confidential information about my case. A true and correct

copy of forensic analysis and evidence of unauthorized computer access is attached as **Exhibit N**.

79. The intrusion violated 18 U.S.C. § 1030 (Computer Fraud and Abuse Act) and constituted a direct assault on attorney-client privilege.

## E. Physical Intimidation and Direct Threats

80. The retaliation campaign has escalated beyond the courtroom and digital realm to include direct physical intimidation.

81. On **October 24, 2022**, two unidentified men approached me outside my residence in New York City and stated, "Drop the Ripple matter, or it gets worse."

82. On **November 15, 2022**, an unidentified man confronted me at a co-working space in New York City, stating, "We know where you are," in the presence of multiple witnesses.

83. These incidents of physical intimidation appear to be a continuing pattern of harassment intended to deter me from pursuing my constitutional rights. The explicit demand to "drop the Ripple matter" directly links these threats to this litigation and to my cooperation with the Securities and Exchange Commission.

## X. ADDRESS CONFIDENTIALITY PROGRAM VIOLATIONS

## A. Enrollment and Purpose

84. As mentioned, I enrolled in the New York State Address Confidentiality Program in November 2022 due to safety concerns arising from Defendants' harassment campaign. My substitute address is: ACP 5566, PO Box 1100, Albany, NY 12201.

85. ACP enrollment under NY Executive Law § 108 requires certification by a state agency that the applicant faces circumstances warranting confidentiality protections. The purpose of the

ACP is to protect persons who have experienced domestic violence, sexual assault, stalking, or human trafficking and for whom address confidentiality is necessary for safety.

86. New York determined that I meet these criteria.

- Under NY Executive Law § 108:

- The substitute address must be used for all legal purposes

- Actual residential addresses are kept confidential by the state

- It is unlawful to attempt to discover or obtain an ACP participant's actual address

- All service must be made at the substitute address

**B. Systematic Attempts to Breach Protections**

87. Despite my enrollment in this program and multiple notifications to Ms. Fugate that I am an ACP participant, Defendants have repeatedly attempted to discover my residential address.

88. **Service at Non-ACP Address:** As described above, in the *Creditcare* action, service was attempted at an address where I was not residing—an address protected under my ACP enrollment. The California court accepted this void service and entered a $635,000 judgement based on it.

89. **In-Person Deposition Demands:** Defendants' counsel repeatedly demanded that I appear for in-person depositions in New York City and San Francisco at specific locations, claiming they needed to depose me in person. A true and correct copy of the deposition notice demanding in-person appearance is attached as **Exhibit K**.

90. There is no legitimate need for in-person depositions when remote depositions via video conference serve the same purpose. I believe these demands were designed to enable surveillance to discover my actual residence.

91. **Discovery Seeking Residential Information:** Through various discovery requests, Defendants have sought residential addresses, personal phone numbers, and location-identifying information, despite knowledge that such information is confidential under New York law.

92. These attempts to circumvent my ACP protections violate state law and put my physical safety at risk. I enrolled in the ACP because I have safety concerns related to Defendants.

## XI. THE IMMINENT NOVEMBER 3 HEARING

93. On October 14, 2025, the California Superior Court scheduled a bond hearing for **November 3, 2025**. A true and correct copy of the notice scheduling this hearing is attached as **Exhibit R**.

94. If the California court imposes the requested $75,000 bond:

- I have thirty days to pay under Cal. Civ. Proc. Code § 391.3

- If I cannot pay (which I cannot), my claims will be automatically dismissed with prejudice

- My appellate rights will be foreclosed

- My federal whistleblower protections under 15 U.S.C. § 78u-6 will be permanently extinguished

- My constitutional rights to due process and access to courts will be irrevocably lost

- There is no mechanism to undo a dismissal under § 391.3 for failure to pay a bond. The foreclosure of rights is permanent.

## XII. STATE COURT REMEDIES EXHAUSTED

95. I have repeatedly sought relief in the California state courts, but no meaningful review has been provided.

96. On **October 3, 2025**, I filed an emergency *ex parte* motion to stay proceedings based on jurisdictional irregularities, evidence of attorney perjury, and the pendency of overlapping proceedings in the Southern District of New York. I was removed from the CourtCall list immediately before the scheduled hearing, according to the Court Clerk. The Court later denied the motion, citing a case-number discrepancy on the printed courtesy copy—an error the Court Clerk had already corrected. A true and correct copy of the application is attached as **Exhibit S**.

97. On **October 14, 2025**, I refiled the same *ex parte* motion, again seeking to stay proceedings and requesting orders to prevent further retaliation using an unserved, void judgement and evidence of sworn false statements. Without notice, a criminal judge, Judge Samuel Feng, was substituted to hear the matter. During the hearing, Judge Feng asked three separate times whether the bond motion originated from this federal court. I clarified that it originated from Judge Quinn's Law & Motion department. He did not address the evidence of perjury or procedural violations and continued the matter on procedural grounds.

98. In both instances, the court refused to consider the substantive issues raised. I specifically notified the state court of (1) unserved, void judgement, (2) void orders entered during mandatory stays, (3) perjured testimony forming the basis for the bond motions, (4) federal proceedings. Despite these notices, all relief was denied.

99. These denials confirm that state remedies are **simply unavailable** to me.

## XIII. TIMELINE OF ESCALATING RETALIATION

100. The following timeline demonstrates the pattern of escalating retaliation:

101. **November 18-19, 2020:** I provided information about Defendants by interviews and uploaded emerging market data and product information

102. **November 20, 2020:** SEC issued Form 1162 acknowledging my cooperation

103. **December 22, 2020:** SEC filed $1.3 billion enforcement action against Defendants in this District

104. **January 29, 2021:** Defendants' counsel admitted retaliation motive: "Larsen believes you are partially responsible for the SEC investigation"

105. **October 2022:** Defendants filed declaratory relief action while I was abroad, obtaining default "findings of innocence" (nearly 4 years after underlying events, and one year and nine months after admitting retaliation motive)

106. **June 2022-July 2024:** Thousands of cyber disruptions to my business websites

107. **September 15 & 30, 2022:** Settlement discussions documented in emails (later falsely denied under oath)

108. **May 2024:** Unauthorized access to my attorney's computer system, compromising 150+ privileged communications

109. **August 29, 2024:** Ms. Fugate provided perjured testimony denying settlement negotiations

110. **December 12, 2024:** California Court of Appeal issued "findings of innocence" based on default judgment

111. **June 4, 2025:** Marnin Weinreb filed $25,000 Foreign Resident bond motion

112. **June 9, 2025:** I filed notice of appeal and disqualification motion (triggering dual mandatory stays)

113. **June 20, 2025:** (1) Fugate filed $50,000 bond motion explicitly citing my planned SDNY filing as "vexatious," (2) Judge Quinn issued five orders during mandatory stays

114. **October 5, 2025:** I was removed from the CourtCall list immediately before my scheduled *Ex Parte* application, per the Court Clerk.

115. The Court then denied hearing the application based on a case-number discrepancy on the printed courtesy copy, even though the Court Clerk had already corrected the error in the record.

116. **October 14, 2025:** Without prior notice, a criminal judge, Judge Samuel Feng, was substituted to hear the *same Ex Parte* application. During the hearing, Judge Feng asked three separate times whether the bond motion originated from the United States District Court for the Southern District of New York. I informed him each time that the motion originated from Judge Quinn's Law & Motion department. Judge Feng declined to engage with any evidence of perjury and continued the motion on procedural grounds.

117. **October 16, 2025:** Court Clerk confirmed case "not assigned yet".

**XIV. WHY FEDERAL INTERVENTION IS NECESSARY**

118. I am a pro se litigant facing billionaire defendants represented by King & Spalding LLP, one of the world's largest law firms. I have spent substantial fees over three years defending against their systematic campaign. I have been subjected to:

- Perjured testimony used to justify sanctions

- Void judgments obtained without service used as "evidence" against me

- Explicit characterization of my federal court filing as "vexatious"

- Coordination with state court actors to issue orders during mandatory stays

- Public disclosure of confidential mental health records

- Cyber disruptions to my business

- Unauthorized access to attorney-client communications

- Attempts to breach Address Confidentiality Program protections

- $75,000 in financial barriers I cannot overcome

119. The state courts have demonstrated systematic bias: all defendants' motions granted (including during jurisdictional stays), all my protective requests denied. My federal filing notice was suppressed from the public docket while defense filings remained visible.

120. State courts cannot adjudicate:

- Federal whistleblower retaliation claims under 15 U.S.C. § 78u-6

- Civil rights conspiracies under 42 U.S.C. § 1985

- Constitutional violations under 42 U.S.C. § 1983

121. This Court supervised the SEC enforcement action that my cooperation helped enable. This Court entered a permanent injunction against Defendants on June 26, 2025. This Court has institutional knowledge of Defendants' securities violations and ongoing jurisdiction over their conduct.

122. Only this Court can protect the federal rights that San Francisco city court cannot or will not protect: my right to cooperate with federal authorities without retaliation, my right to due process, and my right to access federal courts without insurmountable financial barriers.

123. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on October 21, 2025, at New York, New York.

Respectfully submitted,


/s/ Jane Doe
Jane Doe
Address Confidentiality Program
P.O. Box 1100
Albany, NY 12201
Email: jgk246@gmail.com

## EXHIBIT LIST

**Exhibit A:** January 29, 2021 email from Jeanne Fugate admitting retaliation motive

**Exhibit B:** SEC Form 1162 acknowledging cooperation (November 20, 2020)

**Exhibit C:** Address Confidentiality Program

**Exhibit D:** June 26, 2025 Order in *SEC v. Ripple Labs, Inc.*, No. 1:20-cv-10832

**Exhibit E:** August 29, 2024 Fugate deposition excerpts (perjury re: settlement)

**Exhibit F:** September 15, 2022 email proving settlement discussions

**Exhibit G:** September 30, 2022 email proving settlement discussions

**Exhibit H:** Mother's deathbed photo

**Exhibit I:** December 12, 2024 Court of Appeal remittitur with "findings of innocence"

**Exhibit J:** Clerk email confirmation: case "not assigned yet"

**Exhibit K:** Deposition notice attempting to discover Confidential Address

**Exhibit L:** Fugate declaration denying receipt of medical information

**Exhibit M:** Five orders issued by Judge Quinn on June 20, 2025 during mandatory stays

**Exhibit N:** Cybersecurity unauthorized computer access

**Exhibit O:** June 4, 2025 Weinreb bond motion ($25,000)

**Exhibit P:** June 20, 2025 Fugate bond motion ($50,000)

**Exhibit Q:** Comparison chart showing 90% overlap between bond motions

**Exhibit R:** Order continuing November 3, 2025 bond hearing

**Exhibit S:** Ex Parte application to stay filed in California Superior Court (October 3, 2025 & October 14, 2025)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 21, 2025, at New York, New York.

Respectfully submitted,

/s/ Jane Doe
_____
Jane Doe
Address Confidentiality Program
P.O. Box 1100
Albany, NY 12201
Email: jgk246@gmail.com

# EXHIBIT A

 Gmail

## Meeting with Frugate

**Seth Wiener** <sethwiener@yahoo.com>                                        Fri, Jan 29, 2021 at 2:36 PM
To: "Julia G. Ko" <juliako2014@gmail.com>

Hi Julia,

On January 29, 2021, I spoke with Chris' Larsen's counsel, Jeanne Frugate, for approximately twenty minutes. Following is a summary of our discussion and my thoughts and impressions thereof.

1.      Larsen admits that he met with you on January 25, 2018.

2.      According to Grugate, the meeting took place at around 11:00 a.m., and the door of the meeting room was glass. The "open" nature of the meeting room might be used to suggest that Larsen would not have engaged in any improper physical conduct.

3.      Larsen adamantly denies that he engaged in any improper physical conduct toward you.

4.      Larsen is not amenable to a settlement at this time, but Frugate will push him toward settlement if we can provide credible evidence of the incident.

5.      Frugate stated that Larsen believes you are partially responsible for the SEC investigation.

6.      Frugate stated that CreditCare sued Ripple in Fall 2020 for trade secret misappropriation, and stated she would send me the complaint from the trade secret misappropriation lawsuit.

7.      I informed Frugate that I am working on my investigation of the matter and gathering witness statements which I will share with her. I also noted that I would try and provide therapy notes subject to an understanding that they are confidential and not to be disclosed absent a protective order.

# EXHIBIT B

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

## Supplemental Information for Persons Requested to Supply
## Information Voluntarily or Directed to Supply Information
## Pursuant to a Commission Subpoena

### A.  False Statements and Documents

Section 1001 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
> (1)  falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> (2)  makes any materially false, fictitious, or fraudulent statement or representation; or
> (3)  makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.

Section 1519 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . ., or in relation to or contemplation of any such matter.

### B.  Testimony

If your testimony is taken, you should be aware of the following:

1.  *Record*.  Your testimony will be transcribed by a reporter. If you desire to go off the record, please indicate this to the Commission employee taking your testimony, who will determine whether to grant your request. The reporter will not go off the record at your, or your counsel's, direction.

2.  *Counsel*.  You have the right to be accompanied, represented and advised by counsel of your choice. Your counsel may advise you before, during and after your testimony; question you briefly at the conclusion of your testimony to clarify any of the answers you give during testimony; and make summary notes during your testimony solely for your use. If you are accompanied by counsel, you may consult privately.

If you are not accompanied by counsel, please advise the Commission employee taking your testimony if, during the testimony, you desire to be accompanied, represented and advised by counsel. Your testimony will be adjourned once to afford you the opportunity to arrange to be so accompanied, represented or advised.

You may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's. If you are represented by counsel who also represents other persons involved in the investigation, the Commission will assume that you and counsel have discussed and resolved all issues concerning possible conflicts of interest. The choice of counsel, and the responsibility for that choice, is yours.

3.  *Transcript Availability*.  Rule 6 of the Commission's Rules Relating to Investigations, 17 CFR 203.6, states:

> A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees: *Provided, however*, That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request. In any event, any witness, upon proper identification, shall have the right to inspect the official transcript of the witness' own testimony.

If you wish to purchase a copy of the transcript of your testimony, the reporter will provide you with a copy of the appropriate form. Persons requested to supply information voluntarily will be allowed the rights provided by this rule.

4.  *Perjury*.  Section 1621 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> Whoever--
>
> (1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify

truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true.

5. *Fifth Amendment and Voluntary Testimony*. Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you.

If your testimony is not pursuant to subpoena, your appearance to testify is voluntary, you need not answer any question, and you may leave whenever you wish. Your cooperation is, however, appreciated.

6. *Formal Order Availability*. If the Commission has issued a formal order of investigation, it will be shown to you during your testimony, at your request. If you desire a copy of the formal order, please make your request in writing.

## C. Submissions and Settlements

Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(c), states:

> Persons who become involved in . . . investigations may, on their own initiative, submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation. Upon request, the staff, in its discretion, may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing and submitting a statement prior to the presentation of a staff recommendation to the Commission for the commencement of an administrative or injunction proceeding. Submissions by interested persons should be forwarded to the appropriate Division Director or Regional Director with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which they relate. In the event a recommendation for the commencement of an enforcement proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

The staff of the Commission routinely seeks to introduce submissions made pursuant to Rule 5(c) as evidence in Commission enforcement proceedings, when the staff deems appropriate.

Rule 5(f) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(f), states:

> In the course of the Commission's investigations, civil lawsuits, and administrative proceedings, the staff, with appropriate authorization, may discuss with persons involved the disposition of such matters by consent, by settlement, or in some other manner. It is the policy of the Commission, however, that the disposition of any such matter may not, expressly or impliedly, extend to any criminal charges that have been, or may be, brought against any such person or any recommendation with respect thereto. Accordingly, any person involved in an enforcement matter before the Commission who consents, or agrees to consent, to any judgment or order does so solely for the purpose of resolving the claims against him in that investigative, civil, or administrative matter and not for the purpose of resolving any criminal charges that have been, or might be, brought against him. This policy reflects the fact that neither the Commission nor its staff has the authority or responsibility for instituting, conducting, settling, or otherwise disposing of criminal proceedings. That authority and responsibility are vested in the Attorney General and representatives of the Department of Justice.

## D. Freedom of Information Act

The Freedom of Information Act, 5 U.S.C. 552 (the "FOIA"), generally provides for disclosure of information to the public. Rule 83 of the Commission's Rules on Information and Requests, 17 CFR 200.83, provides a procedure by which a person can make a written request that information submitted to the Commission not be disclosed under the FOIA. That rule states that no determination as to the validity of such a request will be made until a request for disclosure of the information under the FOIA is received. Accordingly, no response to a request that information not be disclosed under the FOIA is necessary or will be given until a request for disclosure under the FOIA is received. If you desire an acknowledgment of receipt of your written request that information not be disclosed under the FOIA, please provide a duplicate request, together with a stamped, self-addressed envelope.

### E.  Authority for Solicitation of Information

*Persons Directed to Supply Information Pursuant to Subpoena*. The authority for requiring production of information is set forth in the subpoena. Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have.

*Persons Requested to Supply Information Voluntarily*. One or more of the following provisions authorizes the Commission to solicit the information requested: Sections 19 and/or 20 of the Securities Act of 1933; Section 21 of the Securities Exchange Act of 1934; Section 321 of the Trust Indenture Act of 1939; Section 42 of the Investment Company Act of 1940; Section 209 of the Investment Advisers Act of 1940; and 17 CFR 202.5. Disclosure of the requested information to the Commission is voluntary on your part.

### F.  Effect of Not Supplying Information

*Persons Directed to Supply Information Pursuant to Subpoena*. If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so. If such an order is obtained and you thereafter fail to supply the information, you may be subject to civil and/or criminal sanctions for contempt of court. In addition, Section 21(c) of the Securities Exchange Act of 1934, Section 42(c) of the Investment Company Act of 1940, and Section 209(c) of the Investment Advisers Act of 1940 provide that fines and terms of imprisonment may be imposed upon any person who shall, without just cause, fail or refuse to attend and testify or to answer any lawful inquiry, or to produce books, papers, correspondence, memoranda, and other records in compliance with the subpoena.

*Persons Requested to Supply Information Voluntarily.* There are no direct sanctions and thus no direct effects for failing to provide all or any part of the requested information.

### G.  Principal Uses of Information

The Commission's principal purpose in soliciting the information is to gather facts in order to determine whether any person has violated, is violating, or is about to violate any provision of the federal securities laws or rules for which the Commission has enforcement authority, such as rules of securities exchanges and the rules of the Municipal Securities Rulemaking Board. Facts developed may, however, constitute violations of other laws or rules. Information provided may be used in Commission and other agency enforcement proceedings. Unless the Commission or its staff explicitly agrees to the contrary in writing, you should not assume that the Commission or its staff acquiesces in, accedes to, or concurs or agrees with, any position, condition, request, reservation of right, understanding, or any other statement that purports, or may be deemed, to be or to reflect a limitation upon the Commission's receipt, use, disposition, transfer, or retention, in accordance with applicable law, of information provided.

### H.  Routine Uses of Information

The Commission often makes its files available to other governmental agencies, particularly United States Attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate. Whether or not the Commission makes its files available to other governmental agencies is, in general, a confidential matter between the Commission and such other governmental agencies.

Set forth below is a list of the routine uses which may be made of the information furnished.

1.  To appropriate agencies, entities, and persons when (a) it is suspected or confirmed that the security or confidentiality of information in the system of records has been compromised; (b) the SEC has determined that, as a result of the suspected or confirmed compromise, there is a risk of harm to economic or property interests, identity theft or fraud, or harm to the security or integrity of this system or other systems or programs (whether maintained by the SEC or another agency or entity) that rely upon the compromised information; and (c) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with the SEC's efforts to respond to the suspected or confirmed compromise and prevent, minimize, or remedy such harm.

2.  To other federal, state, local, or foreign law enforcement agencies; securities self-regulatory organizations; and foreign financial regulatory authorities to assist in or coordinate regulatory or law enforcement activities with the SEC.

3.  To national securities exchanges and national securities associations that are registered with the SEC, the Municipal Securities Rulemaking Board; the Securities Investor Protection Corporation; the Public Company Accounting Oversight Board; the federal banking authorities, including, but not limited to, the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, and the Federal Deposit Insurance Corporation; state securities regulatory agencies or organizations; or regulatory authorities of a foreign government in connection with their regulatory or enforcement responsibilities.

4.  By SEC personnel for purposes of investigating possible violations of, or to conduct investigations authorized by, the federal securities laws.

5.  In any proceeding where the federal securities laws are in issue or in which the Commission, or past or present members of its staff, is a party or otherwise involved in an official capacity.

6.  In connection with proceedings by the Commission pursuant to Rule 102(e) of its Rules of Practice, 17 CFR 201.102(e).

7.  To a bar association, state accountancy board, or other federal, state, local, or foreign licensing or oversight authority; or professional association or self-regulatory authority to the extent that it performs similar functions (including the Public Company Accounting Oversight Board) for investigations or possible disciplinary action.

8.  To a federal, state, local, tribal, foreign, or international agency, if necessary to obtain information relevant to the SEC's decision concerning the hiring or retention of an employee; the issuance of a security clearance; the letting of a contract; or the issuance of a license, grant, or other benefit.

9.  To a federal, state, local, tribal, foreign, or international agency in response to its request for information concerning the hiring or retention of an employee; the issuance of a security clearance; the reporting of an investigation of an employee; the letting of a contract; or the issuance of a license, grant, or other benefit by the requesting agency, to the extent that the information is relevant and necessary to the requesting agency's decision on the matter.

10.  To produce summary descriptive statistics and analytical studies, as a data source for management information, in support of the function for which the records are collected and maintained or for related personnel management functions or manpower studies; may also be used to respond to general requests for statistical information (without personal identification of individuals) under the Freedom of Information Act.

11.  To any trustee, receiver, master, special counsel, or other individual or entity that is appointed by a court of competent jurisdiction, or as a result of an agreement between the parties in connection with litigation or administrative proceedings involving allegations of violations of the federal securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)) or pursuant to the Commission's Rules of Practice, 17 CFR 201.100 – 900 or the Commission's Rules of Fair Fund and Disgorgement Plans, 17 CFR 201.1100-1106, or otherwise, where such trustee, receiver, master, special counsel, or other individual or entity is specifically designated to perform particular functions with respect to, or as a result of, the pending action or proceeding or in connection with the administration and enforcement by the Commission of the federal securities laws or the Commission's Rules of Practice or the Rules of Fair Fund and Disgorgement Plans.

12.  To any persons during the course of any inquiry, examination, or investigation conducted by the SEC's staff, or in connection with civil litigation, if the staff has reason to believe that the person to whom the record is disclosed may have further information about the matters related therein, and those matters appeared to be relevant at the time to the subject matter of the inquiry.

13.  To interns, grantees, experts, contractors, and others who have been engaged by the Commission to assist in the performance of a service related to this system of records and who need access to the records for the purpose of assisting the Commission in the efficient administration of its programs, including by performing clerical, stenographic, or data analysis functions, or by reproduction of records by electronic or other means. Recipients of these records shall be required to comply with the requirements of the Privacy Act of 1974, as amended, 5 U.S.C. 552a.

14.  In reports published by the Commission pursuant to authority granted in the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), which authority shall include, but not be limited to, section 21(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(a)).

15.  To members of advisory committees that are created by the Commission or by Congress to render advice and recommendations to the Commission or to Congress, to be used solely in connection with their official designated functions.

16.  To any person who is or has agreed to be subject to the Commission's Rules of Conduct, 17 CFR 200.735-1 to 200.735-18, and who assists in the investigation by the Commission of possible violations of the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), in the preparation or conduct of enforcement actions brought by the Commission for such violations, or otherwise in connection with the Commission's enforcement or regulatory functions under the federal securities laws.

17.  To a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the request of that individual.

18.  To members of Congress, the press, and the public in response to inquiries relating to particular Registrants and their activities, and other matters under the Commission's jurisdiction.

19.  To prepare and publish information relating to violations of the federal securities laws as provided in 15 U.S.C. 78c(a)(47)), as amended.

20.  To respond to subpoenas in any litigation or other proceeding.

21.  To a trustee in bankruptcy.

22.  To any governmental agency, governmental or private collection agent, consumer reporting agency or commercial reporting agency, governmental or private employer of a debtor, or any other person, for collection, including collection by administrative offset, federal salary offset, tax refund offset, or administrative wage garnishment, of amounts owed as a result of Commission civil or administrative proceedings.

* * * * *

*Small Business Owners*: The SEC always welcomes comments on how it can better assist small businesses. If you would like more information, or have questions or comments about federal securities regulations as they affect small businesses, please contact the Office of Small Business Policy, in the SEC's Division of Corporation Finance, at 202-551-3460. If you would prefer to comment to someone outside of the SEC, you can contact the Small Business Regulatory Enforcement Ombudsman at http://www.sba.gov/ombudsman or toll free at 888-REG-FAIR. The Ombudsman's office receives comments from small businesses and annually evaluates federal agency enforcement activities for their responsiveness to the special needs of small business.

# EXHIBIT C

Welcome! The New York State Address Confidentiality Program (ACP) has received and processed your application and has certified you as a participant as of November 10, 2022. Your ACP identification card is below. Please make sure that your name is spelled correctly.

The address listed on the front of your identification card is your new legal address. This address can be used for home, work or school. Avoid disclosing your actual address unless absolutely necessary. Please remember to include your ACP number when using your new address. Your address is:

**ACP 5566**
P.O. Box 1110
Albany, N.Y. 12201-1110

Your certification as an ACP participant is good for four years. You can withdraw from participation at any time. You may also renew your participation at the end of the four-year term by submitting a renewal application. The ACP will notify you about this option near the end of your four-year term.

The New York State Department of State is honored to have been entrusted with this vital program and we look forward to working with you and your family to ensure that your address is protected.

Sincerely

ROBERT J. RODRIGUEZ, Secretary of State



**NEW YORK STATE OF OPPORTUNITY** | **Department of State**

**Participant Identification Card**

*This is your new ACP ID Card!*

(Gently remove along perforations)

**Address Confidentiality Program**

Pursuant to N.Y. Executive Law § 108, the following person

is certified as a participant in the Address Confidentiality Program and is entitled to use the following substitute

**Julia Ko**

ACP 5566
P.O. Box 1110
Albany, NY 12201-1110

Expiration Date: 11/10/2026



# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
SECURITIES AND EXCHANGE COMMISSION,

                                    Plaintiff,

                  -against-

RIPPLE LABS, INC.,

                                    Defendant.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _6/26/2025___
```

20 Civ. 10832 (AT)

<u>**ORDER**</u>

ANALISA TORRES, District Judge:

Plaintiff, the Securities and Exchange Commission (the "SEC" or the "Agency"), and Defendant, Ripple Labs, Inc. ("Ripple"), ask the Court to state that it would (1) "dissolve" the Court's permanent injunction ordering Ripple to obey the law, and (2) cut the monetary penalty imposed against Ripple by more than half. Mot. at 1, ECF No. 987; ECF No. 988. The request is DENIED.

**BACKGROUND**

Back in 2020, the SEC sued Ripple. ECF Nos. 4, 46. The Agency argued that Ripple had violated the Securities Act of 1933 (the "Securities Act" or the "Act"), an act that Congress passed to "protect investors against fraud" and "promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976). To achieve this goal, Congress wrote in Section 5 of the Act that those who sell securities, like Ripple, must register those securities with the SEC before offering or selling them to the public. *See* 15 U.S.C. § 77e. This way, Congress ensured that investors receive the "information thought necessary to allow them to make informed investment decisions." *Pinter v. Dahl*, 486 U.S. 622, 638 (1988).

The SEC's theory was that Ripple offered and sold a security called "XRP" without first registering it with the Agency, so investors were deprived of information about XRP and Ripple's business that would allow them to make informed investment decisions. ECF No. 46. In 2023, the SEC moved for summary judgment, contending that it was "indisputable" that Ripple violated the Securities Act. ECF No. 837 at 50, 53, 63. In other words, the SEC asked the Court to rule in the Agency's favor because Ripple could not win. On July 13, 2023, the Court agreed in part with the SEC, finding that Ripple offered XRP as a security without registration, in violation of the Act, when Ripple sold XRP to certain institutional buyers. *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 328 (S.D.N.Y. 2023). This was the Court's Summary Judgment Order.

In March 2024, the SEC asked the Court to end this case. ECF No. 948. Specifically, the Agency requested that the Court permanently enjoin, or prohibit, Ripple from violating Section 5 of the Securities Act, and that the Court require Ripple to pay a massive penalty of nearly $1

billion, representing the money Ripple made from its illegal offer and sale of XRP. *See generally* Motion for Judgment, ECF No. 949. The SEC made clear that the stakes were high. It wrote that Ripple continued to recklessly engage in behavior that may have violated the Court's Summary Judgment Order and that was even more harmful to investors than when this case began. *Id.* at 1–2. Because of the "egregiousness of Ripple's misconduct," the Agency said, a permanent injunction and a hefty penalty were necessary to "ensure [that] Ripple cease[d] its illegal conduct." *Id.* at 1.

The Court agreed in part with the SEC and, on August 7, 2024, entered the Final Judgment in this case, permanently enjoining Ripple from violating Section 5 of the Act and directing Ripple to pay a substantially reduced civil penalty of $125,035,150 (the "Civil Penalty"). Final Judgment, ECF No. 974; *see also* ECF No. 973. Both parties appealed from the Final Judgment, ECF Nos. 978, 980, and their appeals remain pending before the Second Circuit.

On May 8, 2025, the SEC and Ripple signed an agreement (the "Agreement") to "settle" the litigation in this Court and in the Second Circuit. ECF No. 983-1. However, the parties stipulated that the settlement would only take effect if this Court vacates, or strikes down, the injunction against Ripple and reduces the Civil Penalty by sixty percent. *Id.* at 3–5. Now, the parties ask the Court, under Federal Rule of Civil Procedure 62.1, to state that it would do just that. Mot. at 1.[1]

## DISCUSSION

Rule 62.1 "allows a district court to inform the parties and [the court of appeals] how it would rule on the merits of certain motions after an appeal has been filed and the district court has been divested of jurisdiction." *LFoundry Rousset, SAS v. Atmel Corp.*, 690 F. App'x 748, 750 (2d Cir. 2017); *see* Fed. R. Civ. P. 62.1.

Here, the SEC and Ripple ask the Court to say how it would rule if the parties were to bring a motion to eliminate the injunction and reduce the Civil Penalty. Such a motion would be governed by Rule 60(b). *Burda Media, Inc. v. Viertel*, 417 F.3d 292, 298 (2d Cir. 2005). Under that Rule, a party may ask to be relieved from a final judgment "based on mistake or excusable neglect, newly discovered evidence, fraud, or the void or prospectively inequitable status of a judgment." *BLOM Bank SAL v. Honickman*, 145 S. Ct. 1612, 1619 (2025); *see* Fed. R. Civ. P. 60(b)(1)–(5). Rule 60(b) also has a "'catchall' provision," subsection (b)(6), that allows a district court to modify a judgment for "any other reason that justifies relief." *BLOM Bank*, 145 S. Ct. at 1619 (citation omitted); Fed. R. Civ. P. 60(b)(6). The Supreme Court has "consistently reaffirmed" that this provision is a "narrow" one that "should only be applied in extraordinary circumstances." *Id.* at 1619–20 (citation omitted) (collecting cases). "This very strict interpretation of Rule 60(b) is essential if the finality of judgments is to be preserved." *Id.* (citation omitted).

---

[1] This is the parties' second request to eliminate the permanent injunction and reduce the Civil Penalty. The Court denied the parties' first request because they did not identify or apply the legal standard that governs such requests. ECF No. 984.

Relying on Rule 60(b)'s catchall provision, the parties ask the Court to eliminate the injunction against Ripple and substantially reduce the Civil Penalty because of their private Agreement to end the case. The Supreme Court has emphasized, however, that the judgment of a court is "not merely the property of private litigants." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994) (citation omitted). It is a *final* judgment that belongs "to the legal community as a whole" and "should stand unless a court concludes that the public interest would be served by a vacatur." *Id.* (citation omitted). This means that the Court may vacate a judgment in the face of a settlement agreement only when "exceptional circumstances tip[] the equitable balance in favor of vacatur"—in other words, when "exceptional circumstances outweigh considerations of the public interest or the administration of justice." *Major League Baseball Props., Inc. v. Pac. Trading Cards, Inc.*, 150 F.3d 149, 151, 153 (2d Cir. 1998).

Not that long ago, the SEC made a compelling case that the public interest weighed heavily in favor of a permanent injunction and a substantial civil penalty. The Agency made clear that the public has a right to "full and fair disclosure of information . . . in the sales of securities," and it explained why a penalty and injunction against Ripple would protect that interest. Motion for Judgment at 25 (quoting *Pinter*, 486 U.S. at 646). First, a penalty was necessary because Ripple had violated the law. *Id.* at 4. In fact, the Agency believed that a "*significant* penalty that [was] not just a 'slap on the wrist' or 'cost of doing business'" was warranted because of the enormous sums of money Ripple made in violating the law and Ripple's incentives to continue doing so. *Id.* at 8–9, 24 (emphasis added) (quoting *SEC v. Rajaratnam*, 918 F.3d 36, 45 (2d Cir. 2019)).

Second, the SEC pressed for a permanent injunction because Ripple's misconduct was reckless and likely to continue. The Agency claimed that Ripple had deliberately violated the Securities Act for eight straight years because it knew that registering institutional offerings of XRP would damage its business. *Id.* at 5. And it likely continued to violate the law even after the Court issued its Summary Judgment Order. *Id.* at 8–9. Ripple's conduct was so egregious, according to the SEC, that the Agency "fully expect[ed]" Ripple "to keep hidden the information that Section 5 requires be disclosed for the benefit of investors." *Id.* In other words, all signs pointed to the likelihood that, without an injunction, Ripple would continue to disregard the laws of Congress in a manner that would hurt investors.

All in all, the SEC "ask[ed] the Court to consider the severity and pervasiveness of Ripple's misconduct, and the need to send a strong deterrent message to Ripple and others considering whether to raise capital by selling securities to the public in unregistered transactions." *Id.* at 25. As the Agency put it, "[i]f companies can raise money with the ease that Ripple did—by simply receiving billions of units of computer code that cost little to nothing to create and then turning it into billions of dollars, without registering these transactions with the SEC and providing the requisite disclosures—the legal structure underpinning our financial markets will be jeopardized." *Id.* Ultimately, the Court granted in part the SEC's request for an injunction and a civil penalty because the Court found that "Ripple's willingness to push the boundaries of the [Summary Judgment] Order evinces a likelihood that it will eventually (if it has not already) cross the line." ECF No. 973 at 7.

3

None of this has changed—and the parties hardly pretend that it has. Nevertheless, they now claim that it is in the public interest to cut the Civil Penalty by sixty percent and vacate the permanent injunction entered less than a year ago. Mot. at 3.

The parties argue that the public interest here is—now, at least—"'relatively small'" because the injunction and Civil Penalty concern only "the 'unique facts of this case.'" Mot. at 3–4 (quoting *Viera v. United States*, 595 F. Supp. 3d 1, 3 (S.D.N.Y 2022)). Wrong. First, neither the injunction nor the Civil Penalty bears only on the unique facts of this case. As the SEC stated in March 2024, "Section 5's registration and disclosure provision [is] the key to th[e] statutory structure" that Congress enacted in the federal securities laws. Motion for Judgment at 25. Its purpose is "to eliminate serious abuses in a largely unregulated securities market." *Reves v. Ernst & Young*, 494 U.S. 56, 60 (1990) (citation omitted). As the SEC originally explained, the injunction and Civil Penalty advance the Act's fundamental purpose because they send a strong deterrent message to Ripple and others that abuses in the securities market "will not be tolerated." Motion for Judgment at 25–26. Second, the public interest is not small. As the SEC put it in March, "what Ripple considers damaging to its own financial interests—'full and fair disclosure of information to the public in the sales of securities'—Congress has made the tentpole of our markets." *Id.* at 25 (citation omitted) (quoting *Pinter*, 486 U.S. at 646).

Next, the parties emphasize that they are not asking to "vacate, amend, or modify the Summary Judgment Order" and that "dissolving the 'obey the law' injunction" would not alter Ripple's obligations under the Securities Act "because Ripple, like every other market participant, is obligated to follow the law." Mot. at 3; *see also* ECF No. 988 at 1. The fact that the parties do not ask to modify the Summary Judgment Order is irrelevant. The Order states what the law is; it is the injunction that prohibits Ripple from violating it. Indeed, if the Court should not be concerned about Ripple violating the law, why do the parties want to eliminate the injunction that tells Ripple, "Follow the law"? When the Court imposed the injunction, it did so because it found a "reasonable probability" that Ripple would continue violating federal securities laws. ECF No. 973 at 7. This has not changed, nor do the parties claim that it has.

The parties also cite a change in SEC policy as a justification for the Court to vacate the injunction and reduce the Civil Penalty. Mot. at 4. They state that the SEC has "launched a crypto task force dedicated to helping the SEC further develop the regulatory framework for crypto assets," and that, since then, "the SEC has dismissed by joint stipulation certain crypto asset-related enforcement actions in the exercise of its discretion and as a policy matter." *Id.* Citing four of these enforcement actions, the parties argue that "[t]ermination of the appeals by the SEC and Ripple in this case would be consistent with these dismissals by joint stipulation," but for that to occur, "dissolution of the injunction pursuant to the [Agreement] is necessary." *Id.*

The Court is not persuaded. For starters, none of the enforcement actions cited by the parties involved an injunction or a civil penalty. In each of those cases, the SEC dismissed its case *before* a court found a violation of federal securities laws. Moreover, dissolution of the injunction as a precondition to the termination of the parties' appeals is only necessary because the parties, in their Agreement, made it so. If the parties genuinely wish to end this litigation *today*, they are free to withdraw their appeals. Or, if the parties wish to make the Court's orders

4

go away, they may utilize the "primary route" that Congress has created for parties to "seek relief from the legal consequences of judicial judgments," which is to take an appeal. *U.S. Bancorp*, 513 U.S. at 27.  Neither option involves requiring this Court to absolve Ripple of its obligations under the law.  *Id.* at 26.

The Court respects the freedom of parties to amicably resolve their disputes.  It is also true that the SEC, like any other law enforcement agency, has discretion to change course after an enforcement action is initiated.  But the parties do not have the authority to agree not to be bound by a court's final judgment that a party violated an Act of Congress in such a manner that a permanent injunction and a civil penalty were necessary to prevent that party from violating the law again.  *See id.* at 26, 29.  For that, the parties must show exceptional circumstances that outweigh the public interest or the administration of justice.  *Major League Baseball*, 150 F.3d at 153.  They have not come close to doing so here.

Accordingly, if jurisdiction were restored to this Court, the Court would deny the parties' request to vacate the injunction and reduce the Civil Penalty.

## CONCLUSION

For the foregoing reasons, the parties' motion for an indicative ruling is DENIED.  The Clerk of Court is respectfully directed to terminate the motion at ECF No. 987.

SO ORDERED.

Dated: June 26, 2025
      New York, New York

                                                    _____
                                                              ANALISA TORRES
                                                         United States District Judge

# EXHIBIT E

1  number it was -- but in the November 2022 time period.

2  BY MR. WEINREB:

3      Q.  Okay.  Okay.  And is it fair to say that after

4  the November 2022 time period, again just to be perfectly

5  clear, up until he sent you an email regarding this

6  matter, you had no written or oral communications with

7  Mr. Wiener at all regarding Ms. Ko?

8      A.  Not that I recall.

9      Q.  Okay.  And up until the time Mr. Wiener was --

10 you learned from him that he was no longer representing

11 Ms. Ko, had you ever communicated a settlement offer on

12 behalf of Mr. Larsen to Ms. Ko?

13     A.  I had not communicated a settlement offer on

14 behalf of Mr. Larsen to Mr. Wiener or Ms. Ko.

15     Q.  It's fair to say that's true for the entire time

16 that Mr. Wiener was representing Ms. Ko?

17     A.  That is true.

18     Q.  And during that same time, the entire time

19 Mr. Wiener was representing Ms. Ko's did you ever

20 communicate to Mr. Wiener that Mr. Larsen was amenable

21 to pay any amount of money to Ms. Ko in settlement of

22 her sexual assault harassment claims?

23     A.  I did not.

24     Q.  Okay.  And during that same period of time, the

25 entire time Mr. Wiener was representing Ms. Ko, did you



1    ever communicate to Mr. Wiener on behalf of Mr. Larsen

2    that he in any way admitted to or agreed with any of the

3    claims she was making?

4        A.  I had always communicated that Mr. Larsen

5    vehemently denied all of the allegations.

6        Q.  Okay.  Again, during this entire period of time

7    that Mr. Wiener represented Ms. Ko, did he ever provide

8    you any kind of medical records or psychological records

9    or therapy notes regarding Ms. Ko of treatment she was

10   having?

11       A.  Subject to what we had talked about before where

12   there are references to that in the January 2021 letter

13   and the draft complaint of September '22, he did not.

14       Q.  Okay.  And going back to the letter which we

15   marked as Exhibit 2, I'm going to show it on the screen.

16   What specifically are you referring to this on page 2

17   where he says, Ms. Ko has been treated by therapists

18   for depressive symptoms, anxiety and shame that she has

19   suffered as a result of the January 25, 2018 incident?

20       A.  The paragraph at the top of page 2 of the January

21   7th letter is what I had been referring to.

22       Q.  Okay.  But he never provided you any backup

23   documentation or any other specifics other than what's in

24   that paragraph?

25       A.  Not that I recall.  He did not.



# EXHIBIT F



# Draft Complaint
1 message

**Seth Wiener** <sethwiener@yahoo.com>                                                    Fri, Sep 30, 2022 at 3:58 PM
To: Jeanne Fugate <jfugate@kslaw.com>

Dear Ms. Fugate,

Since I have not heard back from you about mediation, attached is a copy of the draft complaint that my client intends to file next
week.  I will be happy to hold off on filing if your client makes the requested $300,000 settlement payment or agrees to mediation
by the close of business on October 3, 2022.

Yours truly,
Seth W. Wiener


Law Offices of Seth W. Wiener
609 Karina Court
San Ramon, CA 94582
(925) 487-5607
www.sethwienerlaw.com

---

 **Complaint DRAFT.pdf**
675K

# EXHIBIT G

On Tuesday, September 20, 2022 at 03:44:09 PM PDT, Julia G Ko <jgk246@gmail.com> wrote:


Hi Seth,

I spoke with Ryan and Jim, and they mentioned that Rajiv et al are unwilling to go to mediation? Is this correct? And is it up to Rajiv what terms we go to mediation?

On Thu, Sep 15, 2022 at 5:14 PM Julia G Ko <jgk246@gmail.com> wrote:

> Yes that would be helpful. It would probably move things forward it Fugate and Rajiv communicate/collaborate.

> On Thu, Sep 15, 2022 at 5:02 PM Seth Wiener <sethwiener@yahoo.com> wrote:

>> Do you want me to inform Fugate about that? She claimed otherwise.
>>
>> Law Offices of Seth W. Wiener
>> 609 Karina Court
>> San Ramon, CA 94582
>> (925) 487-5607
>> www.sethwienerlaw.com
>>
>>
>> On Thursday, September 15, 2022 at 04:42:02 PM PDT, Julia G Ko <jgk246@gmail.com> wrote:
>>
>>
>> I spoke with Jim this morning. DLA is pretending that their client does not want to mediate. Probably for billing purposes.

>> On Thu, Sep 15, 2022 at 4:40 PM Seth Wiener <sethwiener@yahoo.com> wrote:

>>> Hi Julia,
>>>
>>> I look forward to receiving Charese's notes.
>>>
>>> Can you check with your commercial attorneys as to whether the other side is moving forward on mediation?
>>>
>>> Law Offices of Seth W. Wiener
>>> 609 Karina Court
>>> San Ramon, CA 94582
>>> (925) 487-5607
>>> www.sethwienerlaw.com
>>>
>>>
>>> On Thursday, September 15, 2022 at 04:37:19 PM PDT, Julia G Ko <jgk246@gmail.com> wrote:
>>>
>>>
>>> Hi Seth,

DLA is happy to delay mediation as much as possible, of course.

I met with Charese and she is very supportive of confronting the bullies on multiple levels, male entitlement and will provide her notes and summary. I have another session with her on the 20th and will send it to you.

Is the next step to schedule mediation after Charese sends you the doc?

Thank you.

On Thu, Sep 15, 2022 at 4:16 PM Seth Wiener <sethwiener@yahoo.com> wrote:

Hi Julia,

On September 15, 2022, I spoke with Chris Larsen's counsel, Jeanne Fugate. Following is a summary of our discussion and my thoughts and impressions thereof.

Larsen would like to resolve all matters simultaneously and is amenable to a global mediation. According to Fugate, the commercial attorneys are supposedly communicating about mediation.

Fugate requested against that we provide contemporaneous evidence of the incident, i.e., contemporaneous therapy notes, emails sent around the time of the incident, etc. I think that not providing such evidence weakens our claim.

Finally, Fugate noted that Larsen was unhappy that our settlement demand had increased from $250,000 to $300,000. I noted the increase was commensurate with inflation, but that we would negotiate in good faith.

Thanks,

Seth


Law Offices of Seth W. Wiener
609 Karina Court
San Ramon, CA 94582
(925) 487-5607
www.sethwienerlaw.com

 JK Notes Compilation .pdf
814.4kB

 JK 2022pdf.pdf
511kB

# EXHIBIT H





**EXHIBIT I**



**EXHIBIT J**

 Gmail

Julia G Ko <jgk246@gmail.com>

## Judicial Assignment - CGC-23-611166, Doe v. Larsen
2 messages

**Julia G. Ko** <jgk246@gmail.com>                                          Wed, Oct 15, 2025 at 6:21 PM
To: Calendar 302 <calendar302@sftc.org>

Dear Clerk of Department 302,

Please confirm the judicial assignment for the above referenced case.

As I understand it, Judge Joseph Quinn was presiding. Judge Samuel Feng took the hearing on 10/14.

Can you please confirm who is assigned to the case now?  Also please confirm who will preside over the bond
hearing on November 3, 2025?

Thank you,

Julia

---

**Calendar 302** <calendar302@sftc.org>                                     Thu, Oct 16, 2025 at 11:25 AM
To: "Julia G. Ko" <jgk246@gmail.com>, Calendar 302 <calendar302@sftc.org>

Good morning,

The above-mentioned case has not been assigned yet.  Judge Quinn presides over Law & Motion / Discovery,
Department 302.  However, Judge Samuel Feng is covering Department 302, for the week of October 13th through
October 17th, 2025, in Judge Quinn's absence.

Judge Quinn will be returning next week and should be hearing the bond issue on November 3, 2025.

Thank you,

Clerk

Dept. 302

# EXHIBIT K



Julia G Ko <jgk246@gmail.com>

# Confidential proposal for mediation

**Jeanne Fugate** <jfugate@kslaw.com>                                          Thu, Mar 27, 2025 at 11:44 AM
To: "Julia G. Ko" <jgk246@gmail.com>
Cc: Julia <juliako2014@gmail.com>, Kelly Perigoe <kperigoe@kslaw.com>, Hannah Nguyen <HNguyen@kslaw.com>

Dear Ms. Ko,

We are writing to follow up about the deposition notice that we previously served on you on March 10, 2025. You have represented in court filings, including in your recent ex parte application, that your address is 157 East 86th St, 4th Floor, New York, New York, 10028. Could you please let us know dates on which you will be available for your deposition in New York before the end of April?

We remain willing to meet and confer to determine a mutually agreeable location and date for your deposition. If you decline to do so, our clients intend to proceed with your deposition as noticed on April 15, 2025 and reserve our clients' rights to seek recourse from the court if you fail to appear.

[Quoted text hidden]



<span style="color:gray">Julia G Ko &lt;jgk246@gmail.com&gt;</span>

# Confidential proposal for mediation

**Jeanne Fugate** &lt;jfugate@kslaw.com&gt;                                          Mon, Mar 17, 2025 at 6:07 PM
To: "Julia G. Ko" &lt;jgk246@gmail.com&gt;
Cc: Julia &lt;juliako2014@gmail.com&gt;, Kelly Perigoe &lt;kperigoe@kslaw.com&gt;, Hannah Nguyen &lt;HNguyen@kslaw.com&gt;

Dear Ms. Ko,

We received the attached correspondence from you in a separate email thread, and we respond as follows:

In response to your question as to whether our clients will agree to "adjust the demurrer response date," we did not read your initial March 11 email to request a stipulation or extension. To the extent you are now seeking a stipulation to alter the demurrer briefing schedule, our clients decline to stipulate. Your deadline to oppose the demurrer has already passed.

<mark>Regarding your Notice of Deposition, our clients are entitled to an in-person deposition by law. Please reply letting us know your city and state of residence,</mark> and dates between April 15th and April 30th when you will be available in that city for a deposition.

Ripple's $635,000 judgment, which is the subject of Ripple's Cross-Complaint against you in this case, is a proper subject for discovery. Ripple is also entitled to discovery related to the $1,500 in sanctions the court ordered you to pay related to your failure to respond to Ripple's discovery requests.

Finally, our clients maintain the position, as previously articulated in the February 27, 2025, opposition to your ex parte motion for a continuance, that your claimed inability to obtain documents from Mr. Weberman does not alter your obligations to participate in this case and abide by local rules and procedures.

<span style="color:purple">Thank you.</span>

___

**Jeanne A. Fugate**
*Partner*

T: +1 213 218 4007  |  E: jfugate@kslaw.com  |  [Bio](#)  |  [vCard](#)

 Gmail

Julia G Ko <jgk246@gmail.com>

# Confidential proposal for mediation

**Julia G. Ko** <jgk246@gmail.com>                                    Mon, Mar 31, 2025 at 2:32 PM
To: Jeanne Fugate <jfugate@kslaw.com>
Cc: Julia <juliako2014@gmail.com>, Kelly Perigoe <kperigoe@kslaw.com>, Hannah Nguyen <HNguyen@kslaw.com>

Dear Ms. Fugate,

Thank you for your email regarding the deposition scheduling. I appreciate your willingness to meet and confer, and I want to move forward in a way that is minimally disruptive to all parties.

Due to pre-scheduled commitments—including my doctor's appointment, recovery time, and meetings with potential PhD advisors outside the United States—I am unavailable for a deposition in April. I can definitely accommodate a remote deposition on May 21, 2025 or May 28, 2025.

Please let me know if any of these dates work for you, or if you'd like to discuss alternatives. I'm confident we can find a solution that avoids unnecessary disputes while respecting both parties' schedules.

Thank you for your understanding. I look forward to your response.

[Quoted text hidden]

# EXHIBIT L

1  ever communicate to Mr. Wiener on behalf of Mr. Larsen

2  that he in any way admitted to or agreed with any of the

3  claims she was making?

4      A.  I had always communicated that Mr. Larsen

5  vehemently denied all of the allegations.

6      Q.  Okay.  Again, during this entire period of time

7  that Mr. Wiener represented Ms. Ko, did he ever provide

8  you any kind of medical records or psychological records

9  or therapy notes regarding Ms. Ko of treatment she was

10  having?

11     A.  Subject to what we had talked about before where

12  there are references to that in the January 2021 letter

13  and the draft complaint of September '22, he did not.

14     Q.  Okay.  And going back to the letter which we

15  marked as Exhibit 2, I'm going to show it on the screen.

16  What specifically are you referring to this on page 2

17  where he says, Ms. Ko has been treated by therapists

18  for depressive symptoms, anxiety and shame that she has

19  suffered as a result of the January 25, 2018 incident?

20     A.  The paragraph at the top of page 2 of the January

21  7th letter is what I had been referring to.

22     Q.  Okay.  But he never provided you any backup

23  documentation or any other specifics other than what's in

24  that paragraph?

25     A.  Not that I recall.  He did not.



# EXHIBIT M

| | | | |
|---|---|---|---|
| 2025-06-24 | NOTICE OF ENTRY OF ORDER/NOTICE OF RULING FILED DENYING CROSS DEFENDANT JANE DOE'S MOTION FOR LEAVE TO FILE LATE ANTI-SLAPP MOTION (TRANSACTION ID # 76525328) FILED BY DEFENDANT LARSEN, CHRISTIAN RIPPLE LABS INC. | View | |
| 2025-06-23 | NOTICE DESIGNATING RECORD ON APPEAL FILED BY APPELLANT DOE, JANE AN INDIVIDUAL | View | |
| 2025-06-20 | DECLARATION OF JEANNE A. FUGATE IN SUPPORT OF MOTION FOR ORDER DETERMINING THAT PLAINTIFF IS A VEXATIOUS LITIGANT (TRANSACTION ID # 76507070) FILED BY DEFENDANT LARSEN, CHRISTIAN RIPPLE LABS INC. | View | |
| 2025-06-20 | REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR ORDER DETERMINING THAT PLAINTIFF IS A VEXATIOUS LITIGANT (TRANSACTION ID # 76507070) FILED BY DEFENDANT LARSEN, CHRISTIAN RIPPLE LABS INC. | View | |
| 2025-06-20 | NOTICE OF MOTION AND MOTION FOR ORDER DETERMINING THAT PLAINTIFF IS A VEXATIOUS LITIGANT (TRANSACTION ID # 76507070) FILED BY DEFENDANT LARSEN, CHRISTIAN RIPPLE LABS INC. HEARING SET FOR JUL-25-2025 AT 09:00 AM IN DEPT 302 | View | $60.00 |
| 2025-06-20 | ORDER REGARDING PLAINTIFF JANE DOE'S MOTION FOR RECONSIDERATION | View | |
| 2025-06-20 | ORDER REGARDING RIPPLE LABS INC.'S MOTION TO DEEM REQUESTS FOR ADMISSION AS ADMITTED AND REQUEST FOR SANCTIONS | View | |
| 2025-06-20 | ORDER GRANTING RIPPLE LAS INC.'S MOTION TO COMPEL COMPLIANCE WITH COURT ORDER RE SPECIAL AND FORM INTERROGATORIES AND REQUESTS FOR PRODUCTION AND REQUEST FOR SANCTIONS | View | |
| 2025-06-20 | ORDER REGARDING CROSS-DEFENDANT JANE DOE'S NOTICE OF MOTION AND OPPOSITION TO DEEM REQUESTS FOR ADMISSION ADMITTED | View | |
| 2025-06-20 | ORDER DENYING CROSS-DEFENDANT JANE DOE'S MOTION FOR LEAVE TO FILE LATE ANTI-SLAPP MOTION | View | |
| 2025-06-20 | LAW AND MOTION, 302, 5 - PLAINTIFF JANE DOE'S MOTION FOR RECONSIDERATION OF THE ORDER SUSTAINING DEFENDANTS' DEMURRER TO HER FIRST AMENDED COMPLAINT IS OFF CALENDAR.(SEE MINI MINUTES/SIGNED ORDER FOR COMPLETE RULING). JUDGE: HAROLD E. KAHN; CLERK: M. MACADANGDANG; COURT REPORTER: RYAN WHEELER, CSR #13717, EMAIL: RYANWHEELER91@YAHOO.COM, (TEL:760-805-3974). REPORTED. (302/HEK) | | |
| 2025-06-20 | DISCOVERY, 302, 4 - DEFENDANT / CROSS-COMPLAINANT RIPPLE LABS INC.'S MOTION TO DEEM REQUESTS FOR ADMISSIONS AS ADMITTED AND REQUEST FOR MONETARY SANCTIONS IS DENIED. (SEE MINI MINUTES/SIGNED ORDER FOR COMPLETE RULING). JUDGE: HAROLD E. KAHN; CLERK: M. MACADANGDANG;COURT REPORTER: RYAN WHEELER, CSR #13717, EMAIL: RYANWHEELER91@YAHOO.COM, (TEL:760-805-3974). REPORTED. (302/HEK) | | |
| 2025-06-20 | DISCOVERY 302, 3 - DEFENDANT / CROSS-COMPLAINANT RIPPLE LABS, INC.'S MOTION TO COMPEL COMPLIANCE WITH COURT ORDER RE RESPONSES TO SPECIAL AND FORM INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS AND FOR MONETARY SANCTIONS IS GRANTED IN ITS ENTIRETY.(SEE MINI MINUTES/SIGNED ORDER FOR | | |

| | | |
|---|---|---|
| 2025-06-18 | CASE MANAGEMENT CONFERENCE OF JUL-02-2025 CONTINUED TO JUL-30-2025 AT 10:30 AM IN DEPARTMENT 610 FOR THE SUBMISSION OF CASE MANAGEMENT STATEMENTS. NOTICE SENT BY COURT. | View |
| 2025-06-18 | NOTICE OF JURISDICTIONAL OBJECTIONS AND PRESERVATION OF RIGHTS FILED BY PLAINTIFF DOE, JANE AN INDIVIDUAL | View |
| 2025-06-18 | NOTICE OF PRIVATE COURT REPORTER FILED BY PLAINTIFF DOE, JANE AN INDIVIDUAL | View |
| 2025-06-18 | PROOF OF SERVICE OF NOTICE OF APPEAL; NOTICE OF VIOLATION OF PROCEDURAL STAY; AND REQUEST FOR JUDICIAL ACKNOWLEDGEMENT AND ENFORCEMENT OF STAY FILED BY PLAINTIFF DOE, JANE AN INDIVIDUAL | View |
| 2025-06-12 | LAW AND MOTION 302, PLAINTIFF JANE DOE'S MOTION FOR RECONSIDERATION OF ORDER SUSTAINING DEMURRER WITHOUT LEAVE TO AMEND. CONTINUED TO JUNE 20, 2025, ON THE COURT'S MOTION. JUDGE: HAROLD E. KAHN; CLERK: M. MACADANGDANG; NOT REPORTED. (302/HEK) | |
| 2025-06-12 | MINI MINUTES FOR JUN-12-25 09:00 AM FOR DEPT 302 | |
| 2025-06-09 | NOTICE OF APPEAL FILED BY APPELLANT DOE, JANE AN INDIVIDUAL | View  $100.00 |
| 2025-06-09 | REQUEST FOR JUDICIAL ACKNOWLEDGEMENT AND ENFORCEMENT OF STAY FILED BY PLAINTIFF DOE, JANE AN INDIVIDUAL | View |
| 2025-06-09 | NOTICE OF VIOLATION OF PROCEDURAL STAY FILED BY PLAINTIFF DOE, JANE AN INDIVIDUAL | View |
| 2025-06-06 | DECLARATION OF JEANNE A. FUGATE IN SUPPORT OF CROSS-COMPLAINANT'S OPPOSITION TO CROSS-DEFENDANT'S MOTION TO FILE LATE ANTISLAPP CCP 473D (TRANSACTION ID # 76417327) FILED BY CROSS COMPLAINANT RIPPLE LABS INC. | View |
| 2025-06-06 | REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF CROSS-COMPLAINANT'S OPPOSITION TO CROSS-DEFENDANT'S MOTION TO FILE LATE ANTISLAPP CCP 473D (TRANSACTION ID # 76417327) FILED BY CROSS COMPLAINANT RIPPLE LABS INC. | View |
| 2025-06-06 | OPPOSITION TO CROSS-DEFENDANT JULIA G KO'S MOTION TO FILE LATE ANTI-SLAPP CCP 473D (TRANSACTION ID # 76417327) FILED BY CROSS COMPLAINANT RIPPLE LABS INC. | View |
| 2025-06-05 | DISCOVERY 302, 2 - DEFENDANTS CHRISTIAN LARSEN,AND RIPPLE LABS INC.'S MOTION TO DEEM REQUESTS FOR ADMISSION AS ADMITTED AND REQUEST FOR SANCTIONS. CONTINUED TO JUNE 20, 2025, ON THE COURT'S MOTION. JUDGE: JOSEPH M. QUINN; CLERK: M. MACADANGDANG; NOT REPORTED. (302/JMQ) | |
| 2025-06-05 | DISCOVERY 302, 1 - DEFENDANTS CHRISTIAN LARSEN,AND RIPPLE LABS INC.'S MOTION TO COMPEL COMPLIANCE WITH COURT ORDER RE RESPONSES TO SPECIAL AND FORM INTERROGATORIES AND REQUESTS FOR PRODUCTION AND | |

# EXHIBIT N

 **Gmail**

# SCRIPTS, HACKING, MALWARE AND ATEMPTED THEFT OF MY FILES
3 messages

---

**Jance Weberman** <Trialcounsel@janceweberman.com>         Fri, May 10, 2024 at 5:59 PM
To: Julia <jgk246@gmail.com>

Julia,

You were right—I just picked up a notice from NORTON—computer protection service—that someone sent me "a script" trying to obtain your files—I quickly deleted it—however, my computer IT person says they may try again-is this the problem you had ?

Fugate had one of her minions send me an email requesting the proofs of service for the Board of Directors who were served.

This was in response—I think to my- query -how can you take any action if the board of directors has been served—they would need to files a response ? So I will just wait—hopefully they will be served soon.

**Jance M. Weberman, Esq. - State Bar No. 152723**

**JANCE M. WEBERMAN, A PROFESSIONAL LAW CORPORATION**

**208 SOUTH HIGHLAND AVENUE**

**Los Angeles, California 90036**

**Telephone: (213) 386-9100**

**Facsimile: (213) 386-9166**

**Email: TRIALCOUNSEL@JANCEWEBERMAN.COM**

---

**Julia** <jgk246@gmail.com>         Fri, May 10, 2024 at 6:23 PM
To: Jance Weberman <Trialcounsel@janceweberman.com>

Yes. Best to keep files on another computer offline, not connected to the internet. They may try to dig around for dirt on you.

I keep everything offline.

Hopefully Julie serves the BOD soon.

[Quoted text hidden]

**Julia** <jgk246@gmail.com>                                        Fri, May 10, 2024 at 6:28 PM
To: Jance Weberman <Trialcounsel@janceweberman.com>

Btw, I wouldn't delay moving files or disconnecting from the internet. Larsen has a cleaner and professional hackers. I have a lot of proof of constant hacking/intimidation.

It's possibly actionable in court, or at least you can report it, make his harassments known on paper and not stay silent.

[Quoted text hidden]

# EXHIBIT O

Marnin Weinreb, Esq. – State Bar No. 161591
WEINREB LAW GROUP, LLP
6300 Wilshire Blvd., Suite 2100
Los Angeles, California 90048
Telephone:      (323) 688-1886
Facsimile:      (323) 843-2770
E-mail:         marnin@weinreblawgroup.com

Attorneys for Defendant,
Seth Wiener dba
Law Offices of Seth W. Wiener

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF CONTRA COSTA**

| | |
|---|---|
| JANE DOE, an individual, | Case No. C23-02249 |
| Plaintiff, | [Assigned to Hon. John P. Devine, Department 9] |
| vs. | |
| SETH WIENER, ESQ., LAW OFFICES OF SETH WIENER, and Does 1 through 10, inclusive | **DEFENDANT SETH WIENER'S NOTICE OF MOTION AND MOTION FOR AN ORDER REQUIRING PLAINTIFF TO FURNISH A SECURITY BOND PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 1030** |
| Defendant. | |

Date:
Time:
Dept.: 9

[*Filed Concurrently with Request for Judicial Notice; Declarations of Marnin Weinreb and Seth Wiener*

[First Amended Complaint filed: 10/23/2023]

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

　　　　**PLEASE TAKE NOTICE** that on _____ at _____ a.m., or as soon thereafter as

the matter may be heard in Department 9 of the above-entitled court, located at 725 Court Street,

Martinez, California 94553, Defendant, Seth Wiener ("Defendant"), will and hereby does move

this Court for an order requiring Plaintiff, Jane Doe ("Plaintiff"), to furnish a security bond in the

1

NOTICE OF MOTION AND MOTION FOR AN ORDER REQUIRING PLAINTIFF TO FURNISH A
SECURITY BOND PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 1030

amount of $25,000 pursuant to Code of Civil Procedure section 1030.

This Motion will be based upon this Notice of Motion; the attached Memorandum of Points and Authorities; the accompanying Request for Judicial Notice, served and filed herewith; the Declaration of Marnin Weinreb; the pleadings, records and files in this action; and upon such further oral and documentary evidence as may be presented to the Court at the hearing on this motion.

Dated: June 4, 2025          WEINREB LAW GROUP

By:_____
MARNIN WEINREB
Attorney for Defendant,
Seth Wiener dba
Law Offices of Seth Wiener

NOTICE OF MOTION AND MOTION FOR AN ORDER REQUIRING PLAINTIFF TO FURNISH A
SECURITY BOND PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 1030

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND ............................................................................. 2

III.  LEGAL ARGUMENT ....................................................................................... 8

    A.  Ordering Plaintiff to Post a Bond Is Warranted ..................................... 8

    B.  Plaintiff Resides In A Foreign State ........................................................ 9

    C.  Defendant Has More Than a Reasonable Possibility of Prevailing ........ 9

IV.  THE AMOUNT OF THE BOND SHOULD BE SET AT $25,000 ................. 15

V.  CONCLUSION ................................................................................................ 15

NOTICE OF MOTION AND MOTION FOR AN ORDER REQUIRING PLAINTIFF TO FURNISH A
SECURITY BOND PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 1030

**TABLE OF AUTHORITIES**

**State Cases**

*Ambriz v. Kelegian*
    (2007) 146 Cal.App.4th 1519 ................................................. 10

*Baltayan v. Estate of Getemyan*
    (2001) 90 Cal.App.4th 1427 ................................................. 9

*Barnard v. Langer*
    (2003) 109 Cal.App.4th 1453 ................................................. 10

*Filbin v. Fitzgerald*
    (2012) 211 Cal.App.4th 154 ................................................. 10

*Gutierrez v. Girardi*
    (2011) 194 Cal.App.4th 925 ................................................. 10

*Namikas v. Miller*
    (2014) 225 Cal.App.4th 1574 ................................................. 10

*Shannon v. Sims Service Center, Inc.*
    (1985) 164 Cal.App.3d 907 ................................................. 9

*Slovensky v. Friedman*
    (2006) 142 Cal.App.4th 1518 ................................................. 10

*Viner v. Sweet*
    (2003) 30 Cal.4th 1232 ................................................. 10

*Yao v. Superior Court*
    (2002) 104 Cal.App.4th 327 ................................................. 10

**State Statutes**

Code of Civil Procedure section 1030 ................................................. passim

Code of Civil Procedure section 1030(a) ................................................. 9

Code of Civil Procedure section 1030(c) ................................................. 15

Code of Civil Procedure section 1030(d), (g) ................................................. 15

Code of Civil Procedure section 1033.5 ................................................. 15

NOTICE OF MOTION AND MOTION FOR AN ORDER REQUIRING PLAINTIFF TO FURNISH A
SECURITY BOND PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 1030

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Defendant, Seth Wiener ("Defendant"), seeks an order requiring Plaintiff, Jane Doe ("Plaintiff"), a resident of the state of New York, to post a security bond pursuant to Code of Civil Procedure section 1030.  Defendant is entitled to the relief sought because:  (1) Plaintiff is a resident of a foreign state; and (2) Defendant has more than a reasonable possibility of prevailing in this action.

In January 2021, Plaintiff retained Defendant to represent her in bringing sexual assault and harassment claims against Christian Larsen (the "Underlying Representation"). Defendant, on behalf of Plaintiff, asserted Plaintiff's claims against Mr. Larsen in a January 7, 2021, demand letter. After Mr. Larsen filed his Complaint for Declaratory Relief ("Declaratory Relief Complaint") against Plaintiff in October 2022, seeking an adjudication that he did not sexually harass Plaintiff, Defendant determined that Plaintiff's claims against Mr. Larsen were not credible and that Plaintiff had no evidence to prove the claims of sexual assault against Mr. Larsen. As such, Defendant ended his representation of Plaintiff at that time. When Defendant's representation of Plaintiff ended, Plaintiff had more than enough time to file suit against Mr. Larsen, if she wished, before the tolling agreement Mr. Larsen had entered into with Plaintiff expired and the statute of limitations possibly expiring.

Well after Defendant's representation of Plaintiff ceased, Plaintiff filed this action in which she falsely alleges that Defendant:

- Failed to appropriately handle settlement discussions of her claims against Mr. Larsen, thereby causing the matter not to settle. Plaintiff believes that, but for Mr. Wiener's mishandling of the settlement discussions, the case could have settled for $250,000. However, **the undisputed evidence shows Mr. Larsen always disputed Plaintiff's claims and never offered any money in settlement**.

- Disclosed her personal psychological information to Mr. Larsen's counsel, thereby damaging her claims and causing Mr. Larsen not to settle with her, as well as damaging her reputation in the business world. However, **the undisputed evidence shows**

NOTICE OF MOTION AND MOTION FOR AN ORDER REQUIRING PLAINTIFF TO FURNISH A
SECURITY BOND PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 1030

1       **Defendant never disclosed Plaintiff's personal psychological information to**

2       **Mr. Larsen's counsel nor to anyone else, despite the fact that Plaintiff herself**

3       **authorized such disclosure**.

4       Section 1030 was enacted to prevent out-of-state residents from filing frivolous lawsuits

5 against California residents. Plaintiff's claim is not simply a frivolous claim, it is fraudulent.

6 Considering Plaintiff's residency in a foreign state and Defendant's more than reasonable

7 possibility of prevailing, Defendant seeks an order to ensure recovery for an award of attorney's

8 fees and costs pursuant to section 1030. Without the Court's assistance, Defendant would have no

9 recourse to recover costs from Plaintiff after obtaining a judgment in his favor.

10       Therefore, Defendant requests an Order requiring Plaintiff to post a security bond in the

11 amount of $25,000 to ensure that Defendant can collect his prevailing-party costs at trial.

12 **II.**    **FACTUAL BACKGROUND**

13       Plaintiff sent Defendant an email on January 6, 2021, with an overview of her potential

14 claims against Mr. Larsen and stated: "My therapist has been treating me over this incidence for a

15 while and can share her notes if needed." Plaintiff then emailed her therapy notes to Defendant.

16 [Declaration of Seth Wiener ("Wiener Decl.") ¶2, Exs. A & B] Thereafter, Plaintiff retained

17 Defendant to represent her, pre-litigation, with regard to her alleged claims of sexual battery and

18 assault against Mr. Larsen in the Underlying Representation. [Wiener Decl., ¶2, Ex. C]

19       Defendant's first course of action in representing Plaintiff was to send a demand letter to

20 Mr. Larsen, dated January 7, 2021, setting forth Plaintiff's claims of sexual assault and demanding

21 $250,000 in settlement, strictly based on the information Plaintiff had provided to him. [Wiener

22 Decl., ¶3, Ex. D] In response to that letter, Mr. Larsen's counsel, Jeanne Fugate of King &

23 Spalding, sent Defendant a January 14, 2021, letter stating: "Mr. Larsen categorically denies

24 [Plaintiff's] allegations, which she has raised for the first time almost three years after the alleged

25 incident occurred." [Wiener Decl., ¶3, Ex. E.] In Ms. Fugate's January, 14, 2021, letter, Mr.

26 Larsen agreed to enter into a Tolling Agreement through June 30, 2021. Defendant subsequently

27 spoke with Ms. Fugate and advised Plaintiff in a January 29, 2021, email that Mr. Larsen had

28 denied her allegations, was not amenable to a settlement, and had requested credible

contemporaneous evidence of the alleged incident. [Wiener Decl., ¶4, Ex. F]

In a January 30, 2021, email, Plaintiff instructed Defendant to provide Mr. Larsen's counsel with a declaration by Plaintiff asserting her claims of sexual assault against Mr. Larsen and increasing her demand to $280k or $300k. [Wiener Decl., ¶5, Ex. G] Though Mr. Larsen never offered anything in response to Plaintiff's initial demand, counsel for Mr. Larsen agreed to enter into a further tolling agreement to expire on December 31, 2021. [Wiener Dec., ¶6]

Although Mr. Larsen never offered any money to Plaintiff in settlement, Plaintiff sent Defendant an email on October 25, 2021, stating: "I'm also not going away for 250k considering everything in totality and what he will do to me." In that email exchange with Defendant, Plaintiff requested an extension of the initial tolling agreement, to which Defendant replied that a further extension was not a good strategy because it suggested a lack of seriousness about her pursuit of the case and risked the disappearance of witnesses. [Wiener Decl., ¶7, Ex. H] Nonetheless, Defendant requested an extension to the tolling agreement, and further extensions were entered into, with the final tolling agreement expiring on December 31, 2022. [Wiener Decl., ¶7, Exs. H & I]

On June 29, 2022, Plaintiff emailed Defendant stating she wanted to replace him with a larger firm and that she was not willing to settle for $200,000. [Wiener Decl., ¶8, Ex. J] Defendant replied that it was Plaintiff's right to terminate the attorney-client relationship. [Wiener Decl., ¶8, Ex. J]

In an email of September 15, 2022, Defendant advised Plaintiff that Mr. Larsen's counsel had requested contemporaneous evidence of the alleged sexual assault incident between Plaintiff and Mr. Larsen. In subsequent e-mails with Plaintiff on September, 29 and 30, 2022, *Plaintiff suggested* incorporating her therapy notes into the complaint that Defendant had proposed drafting for her. Defendant responded that he needed to evaluate the therapy notes before making that decision and did not want to divulge personal or sensitive matters. **Plaintiff responded that she was "ok" with disclosure of the notes.** [Wiener Decl., ¶9, Ex. K] Specifically, Plaintiff stated: "I have truly moved past sensitive matters, healed and no longer feel any shame. I'm ok with disclosure, if necessary." Plaintiff then sent her therapy notes to Defendant in an email of September 29, 2022. [Wiener Decl., ¶9, Ex. K]

Upon receipt of Plaintiff's therapy notes, Defendant advised her in a September 30, 2022,

email that he did not recommend producing the therapy notes for two reasons: (1) the therapy notes were not compelling evidence; and (2) the notes did not provide detail about the alleged January 2018 sexual assault. Defendant recommended drafting a complaint, reasoning that Mr. Larsen had neither responded to the January 2021 demand for $250,000, nor had he offered any money at all to Plaintiff in settlement. [Wiener Decl., ¶10, Ex. K]  Defendant subsequently sent Plaintiff a draft complaint to review on September 30, 2022, to which Plaintiff responded that she wanted Defendant to increase the $250,000 demand to $300,000 in the complaint. [Wiener Decl., ¶10, Ex. L]

On October 4, 2022, Defendant recommended filing the complaint against Mr. Larsen, stating: "My strong recommendation remains to file the lawsuit immediately and by no later than the end of October …"  Plaintiff never gave the approval and authorization for Defendant to file the complaint he had prepared on her behalf. [Wiener Decl., ¶12, Ex. M]  Rather, Plaintiff filed a lawsuit against Larsen well after Defendant's representation of her had ended, after the statute of limitations had expired, and after the complaint had been dismissed on Demurrer. [Request for Judicial Notice ("RFJN"), Ex. 3]

On October 3, 2022, Mr. Larsen filed a Declaratory Relief Complaint against Plaintiff. [RFJN, Ex. 1]  Mr. Larsen's Declaratory Relief Complaint contained information about Plaintiff which she had concealed from Defendant and also included emails that Plaintiff had sent to Mr. Larsen, which Plaintiff had never provided to Defendant. Further, the Declaratory Relief Complaint in the action *Christian Larsen vs. [Jane Doe]*, San Francisco Superior Court Case No. CGC-22-602138 (the "Larsen Action"), stated:

> 33. Mr. Larsen therefore asked [Plaintiff], through counsel [Mr. Wiener], whether there was any evidence, particularly contemporaneous evidence to support [Plaintiff's] claim. [Plaintiff], through counsel [Mr. Wiener], offered to provide an affidavit from [Plaintiff's] therapist, and acquaintances to whom she spoke about the incident. Mr. Larsen's counsel made repeated requests for such documentation through [Plaintiff's] counsel [Mr. Wiener], who continued to represent that such evidence existed and it would be produced, and that he understood that failure to produce such evidence could lead to the inference that it does not exist.
>
> 34. **To date, [Plaintiff] has not provided any evidence that she contemporaneously communicated her allegations to her therapist, acquaintances, or anyone else**.  [RFJN, Ex. 1. ¶¶ 33-34 (emphasis added)]

1    Based on the factual allegations in the Declaratory Relief Complaint and its attached

2    emails, which Plaintiff had sent to Mr. Larsen, Defendant decided to end his representation of

3    Plaintiff.  In an October 6, 2022, email, Defendant communicated to Plaintiff that Mr. Larsen

4    presented "extremely strong evidence" in his favor and that Plaintiff lacked any contemporaneous

5    evidence to the contrary or any proof whatsoever that the alleged sexual battery had occurred. He

6    also advised her that she was unlikely to prevail against Mr. Larsen and that Mr. Larsen could

7    bring a malicious prosecution claim against her. [Wiener Decl., ¶13, Ex. N]  Defendant, per

8    Plaintiff's instructions, did not accept service of the Declaratory Relief Complaint and advised

9    Plaintiff to immediately seek counsel because she had 30 days from the date of service of the

10   Declaratory Relief Complaint to respond.  [Wiener Decl., ¶13, Ex. N]  Defendant told Plaintiff in a

11   November 27, 2022, email that he had communicated to Mr. Larsen's attorneys that he had not

12   been retained to represent Plaintiff as to the Declaratory Relief Complaint. [Wiener Decl., ¶14, Ex. O]

13   Also on November 27, 2022, Defendant I reminded Plaintiff that her tolling agreement with Mr. Larsen

14   expired at the end of December 2022, that he was not representing her to prosecute her claims against

15   Mr. Larsen and she should immediately retainer other counsel if she had not done so already. [Wiener

16   Decl., ¶14, Ex. P]

17        On December 15, 2022, Plaintiff emailed Defendant that attorneys she named as "Jana and

18   Ryan," who were going to take over the handling of her claim against Mr. Larsen, had asked:

19   "what prompted Fugate to being amenable to a settlement from the initial ask of 250k to filing a

20   complaint after the 300k demand letter." Defendant replied: "I don't think Fugate was amenable to

21   a settlement for $250K, and don't think she is amenable to any settlement at this point." In her

22   reply in the December 15, 2022, email chain, Plaintiff acknowledged Larsen was never amenable

23   to settlement, stating: "**Yes, Fugate was not amenable to 250k, I understood it as less than 100k**

24   **and unknown where they are at now."** [Wiener Decl., ¶15, Ex. P]  **Then, in a December 19,**

25   **2022, e-mail to Defendant, Plaintiff acknowledged that neither Mr. Larsen nor his counsel**

26   **had ever expressed an interest in settling her sexual assault claims for $250,000, or for any**

27   **amount, when she acknowledged leaving a voicemail with Mr. Larsen's counsel asking if**

28   **Mr. Larsen was "willing to do a small settlement and pay for my therapy fees. In return, they**

**receive a declaration without a lot of commotion**." [Wiener Decl., ¶16, Ex. Q]

On October 31, 2023, Defendant's counsel in this action sent Plaintiff's counsel a letter demanding the dismissal of Plaintiff's baseless lawsuit against Defendant and provided all the pertinent facts, with documentation in support. [Weinreb Decl., ¶3, Ex. R]  Plaintiff refused to dismiss this action.

On December 29, 2024, Defendant's counsel took the deposition in this action of Mr. Larsen's counsel, Ms. Jeanne A. Fugate. Ms. Fugate testified that she had never received any information regarding Plaintiff's confidential, medical, or psychological treatment form Defendant.

> "Q. Okay. And up until this point in time of September 30th, 2022, did he [Mr. Wiener] ever communicate in any fashion, oral or written, any information regarding [Plaintiff's] psychological treatment and/or therapy treatment or medical treatment?
>
> A. Not that I recall.
>
> <div align="center">***</div>
>
> A. I had not communicated a settlement offer on behalf of Mr. Larsen to Mr. Wiener or [Plaintiff].
>
> Q. It's fair to say that's true for the entire time  that Mr. Wiener was representing [Plaintiff]?
>
> A. That is true."

[Weinreb Decl., ¶5, Ex. S at pp. 31& 37 of Fugate deposition.]

In addition to the Complaint Ms. Fugate filed on behalf of Mr. Larsen, Ms. Fugate filed a Declaration in support of Mr. Larsen's Opposition to Plaintiff's Motion to Set Aside Default Judgment in that action in which she again confirmed Mr. Wiener never provided her with any of Plaintiff's medical or psychological records, stating:

> 3. From January 7, 2021 to September 30, 2022, I exchanged correspondence with Mr. Wiener in connection with this matter. Despite Mr. Wiener claiming he could offer corroboration of the incident [Plaintiff] alleges occurred, including records supporting [Plaintiff's] claims that she underwent therapy after the incident, [Plaintiff] has never produced any such contemporaneous document or other evidence. [RFJN, Ex. 2, ¶ 3]

Further, at her deposition, Ms. Fugate confirmed that Mr. Larsen never offered any money in settlement of Plaintiff's claims.

"A. I never communicated to Mr. Wiener that Mr. Larsen had agreed to pay 250,000 to [Plaintiff].

Q. Did you ever communicate to Mr. Wiener that Mr. Larsen had any counteroffer, settlement offer to the $250,000 demand?

A. I don't recall ever telling Mr. Wiener that Mr. Larsen had any counteroffer.

Q. Okay. And when you say that you don't recall, is that true throughout your entire representation of Mr. Larsen during the time Mr. Wiener represented [Plaintiff]?

A. Yes, it is to the best of my recollection.

* * *

Q. Throughout the entire time of your representation of Mr. Larsen while Mr. Wiener was representing [Plaintiff], you're not aware of -- you never communicated a monetary settlement offer on behalf of Mr. Larsen to Mr. Wiener?

A. During the time period you stated, I never communicated any settlement offer to Mr. Wiener on behalf of Mr. Larsen.

* * *

Q. Okay. And up until the time Mr. Wiener was -- you learned from him that he was no longer representing [Plaintiff], had you ever communicated a settlement offer on behalf of Mr. Larsen to [Plaintiff]?

A. I had not communicated a settlement offer on behalf of Mr. Larsen to Mr. Wiener or [Plaintiff].

Q. It's fair to say that's true for the entire time that Mr. Wiener was representing [Plaintiff]?

A.· That is true.

Q. And during that same time, the entire time Mr. Wiener was representing [Plaintiff]'s did you ever communicate to Mr. Wiener that Mr. Larsen was amenable to pay any amount of money to [Plaintiff] in settlement of her sexual assault harassment claims?

A.· I did not.

Q. Okay. And during that same period of time, the entire time Mr. Wiener was representing [Plaintiff], did you ever communicate to Mr. Wiener on behalf of Mr. Larsen that he in any way admitted to or agreed with any of the claims she was making?

A. I had always communicated that Mr. Larsen vehemently denied all of the allegations."
[Weinreb Decl., ¶5, Ex. S at pp. 14-16, 37-38 of Fugate deposition]

1    Despite all the evidence to the contrary, Plaintiff filed this lawsuit falsely claiming that

2  Defendant:

3        • Negotiated a $250,000 settlement Plaintiff did not accept on his advice and instead

4            demanded an increase of the demand and then wrongfully disclosed documentation

5            of Plaintiff's psychological damages [FAC ¶ 8-9].

6        • Employed a strategy that "backfired," causing Mr. Larsen to use Plaintiff's private

7            psychological information against her and refusing to settle, ending all negotiations.

8            [FAC ¶9 & 11].

9        • Did not give her advice with regard to Mr. Larsen's Declaratory Relief Complaint.

10           [FAC ¶13-14].

11    Plaintiff has admitted in this action, as well as her lawsuit against Mr. Larsen, that she does

12  not reside in California, but resides in New York. [Weinreb Decl., ¶ 6, Ex. T (pp. 12-13 of

13  Plaintiff's deposition); RFJN, Exs. 4 & 5]

14  **III.    LEGAL ARGUMENT**

15       **A.    Ordering Plaintiff to Post a Bond Is Warranted**

16    Ordering Plaintiff to post a bond is warranted in this case. Code of Civil Procedure section

17  1030 permits the defendant to apply to the court for an order requiring the plaintiff to file an

18  undertaking to secure an award of costs and attorney's fees that may be awarded in the action when

19  (i) the plaintiff lives outside of California and (ii) defendant has more than a reasonable possibility

20  of prevailing in the lawsuit. Section 1030 provides in pertinent part:

21         (a)  When the plaintiff in an action or special proceeding resides out of the state, or
           is a foreign corporation, the defendant may at any time apply to the court by noticed
22         motion for an order requiring the plaintiff to file an undertaking to secure an award
           of costs and attorney's fees which may be awarded in the action or special
23         proceeding. For the purposes of this section, "attorney's fees" means reasonable
           attorney's fees a party may be authorized to recover by a statute apart from this
24         section or by contract.

25         (b)  The motion shall be made on the grounds that the plaintiff resides out of the
           state or is a foreign corporation and that there is a reasonable possibility that the
26         moving defendant will obtain judgment in the action or special proceeding. The
           motion shall be accompanied by an affidavit in support of the grounds for the
27         motion and by a memorandum of points and authorities. The affidavit shall set forth
           the nature and amount of the costs and attorney's fees the defendant has incurred
28

                                                 8

and expects to incur by the conclusion of the action or special proceeding.

(c) If the court, after hearing, determines that the grounds for the motion have been established, the court shall order that the plaintiff file the undertaking in an amount specified in the court's order as security for costs and attorney's fees.

The purpose of Section 1030 is to enable a defendant sued by an out-of-state plaintiff to secure costs in light of the difficulty of enforcing a judgment for costs against a person who is not otherwise subject to the court's jurisdiction. (*Baltayan v. Estate of Getemyan* (2001) 90 Cal.App.4th 1427, 1445-1446; *Matak v. Paoli & Purdy* (2022) Cal. Super. LEXIS 72756.) Here, the Court must grant the Motion because: (1) Plaintiff resides in a foreign state; and (2) Defendant has more than a reasonable possibility of obtaining judgment in this action.

**B.      Plaintiff Resides In A Foreign State**

Here, there is no dispute that the prong of Section 1030 is met -- that Plaintiff lives out of state. When Plaintiff's remote deposition was taken on September 24, 2024, from the State of New York, she testified under oath that she had resided "for several years" on the "Upper East Side" of the City of New York in the State of New York. [Weinreb Decl. ¶6, Ex. T (pp. 12-13 of Plaintiff's deposition).]

In fact, Plaintiff's counsel has confirmed to this Court that Plaintiff resides in New York, as she provided Plaintiff's last known address in New York in her proposed Order Granting Attorney's Motion To Be Relieved As Counsel lodged with this Court on January 21, 2025. [RFJN, Ex. 4] And Plaintiff herself has filed pleadings in pro per in her lawsuit against Christian Larsen, San Francisco Superior Court Case No. CGC-23-611166, including an Ex Parte Application filed on May 28, 2025, listing her residence as 157 East 86th Street, 4th Floor, New York, New York, 10028. [RFJN, Ex. 5] Thus, Plaintiff is a resident of a foreign state within the meaning of Section 1030(a).

**C.      Defendant Has More Than a Reasonable Possibility of Prevailing**

The second prong of Section 1030 -- that a defendant has a "reasonable possibility" of obtaining judgment in the matter --  is a relatively low threshold, as a defendant "is not required to show that there [is] no possibility that [the plaintiff] could win at trial, but only that it [is] reasonably possible that [the defendant] will win." (*Baltayan v. Estate of Getemyan, supra*, 90 Cal.App.4th at p. 1432.) The "reasonable possibility" standard requires only that the defendant

NOTICE OF MOTION AND MOTION FOR AN ORDER REQUIRING PLAINTIFF TO FURNISH A SECURITY BOND PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 1030

present sufficient evidence to support in his or her favor (a lesser standard than that of summary judgment). (*Shannon v. Sims Service Center, Inc.* (1985) 164 Cal.App.3d 907, 914.) Section 1030 "protects California residents by requiring the out-of-state plaintiff to post a security bond to ensure payment of costs and attorney fees (if recoverable) in the likely event that the plaintiff's action is defeated." (*Yao v. Superior Court, supra*, at pp. 333-334.) Here, the likely outcome is that Plaintiff's lawsuit is defeated because she lacks facts and evidence to prove her claims of professional negligence and breach of contract.

### 1. *Plaintiff Cannot Meet the Elements to Prove Legal Malpractice*

"The elements of a cause of action for legal malpractice are: (1) the attorney-client relationship or other basis for duty; (2) a negligent act or omission; (3) *causation*; and (4) *damages*." (*Slovensky v. Friedman* (2006) 142 Cal.App.4th 1518, 1528 [citing *Kurinii v. Hanna & Morton* (1997) 55 Cal.App.4th 853],) In any professional negligence case against a litigation attorney, a determination of the merits of the underlying lawsuit must be made in order to adjudicate the elements of causation and damages. (Gutierrez v. Girardi, supra, at p. 934.) The "but for" test generally requires a plaintiff to prove she would have obtained a better result, judgment, or settlement in the underlying matter had it not been for the attorney's negligence. (Viner v. Sweet, supra, at p. 1241.) Proving "but for" causation generally requires use of the "case-within-a-case" method, with the plaintiff having to "retry" the underlying case to prove that the outcome would have been more favorable had it not been for the attorney's error. ((*See Ambriz v. Kelegian* (2007) 146 Cal.App.4th 1519, 1531)

A plaintiff alleging malpractice must prove damages to a legal certainty, not to a mere probability. (*Barnard v. Langer* (2003) 109 Cal.App.4th 1453, 1461-1462). Thus, a plaintiff who alleges an inadequate settlement in the underlying action must prove that, if not for the malpractice, she would certainly have received more money in settlement or at trial. (*Id.* at p. 1463) "The requirement that a plaintiff need prove damages to a 'legal certainty' is difficult to meet in any case, but it is particularly so in "settle and sue" cases, which are inherently speculative." (*Namikas v. Miller, supra,* at p. 1582) Having to prove that a plaintiff "would *certainly* have received more in settlement or at trial" is a particularly difficult burden. (*Filbin v. Fitzgerald, supra,* at p. 166)

NOTICE OF MOTION AND MOTION FOR AN ORDER REQUIRING PLAINTIFF TO FURNISH A
SECURITY BOND PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 1030

Here, the evidence is undisputed that Plaintiff cannot demonstrate that she would have received more money in settlement or at trial as: (1) Larsen vehemently denied her claims and never offered any money in settlement; and (2) the San Francisco Superior Court granted Larsen's Demurrer to Plaintiff's Complaint asserting claims of sexual harassment. [RFJN, Ex. 3]

**2. _There is No Evidence Defendant Committed Any Negligent Acts or Omissions_**

The _undisputed_ facts and evidence show that Defendant acted properly during the Underlying Representation and did not commit any malpractice. Defendant appropriately handled settlement discussions and never disclosed Plaintiff's personal psychological information to Mr. Larsen's counsel.

- Mr. Larsen categorically denied Plaintiff's allegations of sexual assault, was not amenable to any settlement, and never offered Plaintiff any money in settlement of her claims. [Wiener Decl., ¶¶ 3, 4, 15 & 16, Exs. E, F, P, Q; Weinreb Decl., ¶ 5, Ex. T at pp. 14-18, 25, 37-38 of Fugate deposition]

- It was Plaintiff who wanted to increase her demand from $250,000 to $280k or $300k, and stated she was "not going away for 250k considering everything in totality and what he will do to me." [Wiener Decl., ¶ 7, Ex. H] Plaintiff further stated in an email to Defendant: "I'm not willing to settle for 200k and at the point of no longer caring if this is put out into the world." [Wiener Decl., ¶ 8, Ex. J]

- It was Plaintiff, not Defendant, who wanted to release her psychological/therapy notes to Mr. Larsen. [Wiener Decl., ¶9, Ex. K]

- Despite Plaintiff's willingness to have Defendant provide her psychological/therapy notes to Larsen's counsel, Defendant never did. Defendant never provided any of Plaintiff's psychological/therapy notes to Mr. Larsen's counsel or anyone else. [Wiener Decl., 17; Weinreb Decl., ¶ 5, Ex. S at pp. 23-24, 31 ,38-41 of Fugate deposition]

Plaintiff agreed to Defendant's preparing a draft complaint, but she never gave Defendant the approval and authorization to file it. [Wiener Decl., ¶11, Ex. M; Weinreb Decl., ¶ 6, Ex. T at pp. 123-124 of Plaintiff's deposition]

### 3. *Plaintiff Lacks Any Facts or Evidence to Prove Her Claims*

Plaintiff cannot prove that she would have obtained a better result from the Underlying Representation had it not been for Defendant's alleged negligence. While it is true that Defendant initially sent a demand letter to Mr. Larsen setting forth Plaintiff's claims of sexual assault and demanding $250,000 in settlement, **at no time did Mr. Larsen or his counsel ever agree to pay $250,000 or even consider paying any amount in settlement**. Defendant sent Plaintiff a January 29, 2021, email stating: "Larsen adamantly denies that he engaged in any improper physical conduct toward you" and "Larsen is not amenable to a settlement at this time, but Fugate will push him toward settlement if we can provide credible evidence of the incident." In response, Plaintiff advised Defendant she wanted to increase her demand to $300,000. [Wiener Decl., ¶5, Ex. G] In short, **Plaintiff could not have recovered $250,000 or any amount in settlement from Mr. Larsen, a fact she admitted to when Defendant's representation ended, when she stated in an email to Defendant: "Yes, Fugate was not amenable to 250k, I understood it as less than 100k and unknown where they are at now."** [Wiener Decl., ¶ 15, Ex. P]

At her deposition, Plaintiff repeatedly admitted she had no evidence to prove that Mr. Larsen ever intended to settle for $250,000 and, in fact, admitted that no written communication to her from Defendant had ever stated that Mr. Larsen had offered her even a single penny:

Q: [A]t some point after the phone call with Mrs. Fugate and initial email [did] Mr. Wiener put in writing to you that Mr. Larsen was going to pay you $250,000 in settlement?

\* \* \*

A: No, he did not.

\* \* \*

Q: [W]as there any writing from Mr. Wiener where he communicated to you, yes or no, where he communicated that Mr. Larsen will write you a check for 250 and your case is settled?

A: In explicit terms, no.

\* \* \*

Q: Was there any offer of any amount made by Mr. Larsen communicated to you in writing by Mr. Wiener in June 2022 that he was going to pay anything?

A: Given that there is a pause, no.

\* \* \*

Q: Isn't it true that Mr. Larsen had never offered you a single dime?

12

NOTICE OF MOTION AND MOTION FOR AN ORDER REQUIRING PLAINTIFF TO FURNISH A SECURITY BOND PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 1030

A: He did not offer one penny in writing.

*  *  *

Q: So is it that accurate, that you knew that they were not amenable to settlement of the 250 range?

A: . . . Yeah, I understood they were not amenable to anything.

[Weinreb Decl., ¶ 6, Ex. T at pp. 31, 51, 54, 78, 141 of Plaintiff's deposition]

Moreover, Defendant never provided Mr. Larsen or his attorney with any of the therapy notes Plaintiff sent him, despite Plaintiff giving the green light to do so. [Wiener Decl., ¶ 17]  It was Plaintiff, not Defendant, who wanted to release her therapy notes to Mr. Larsen and his counsel during the Underlying Representation. In response to Plaintiff's suggestion of incorporating the notes into the complaint, Defendant stated: "I would like to see the notes before making that decision, as I don't want to include the notes if they divulge personal or sensitive matters." _Plaintiff responded: "I have truly moved past sensitive matters, healed and no longer feel any shame. I'm ok with disclosure, if necessary."_ [Wiener Decl., ¶9, Ex. K.] Defendant then told Plaintiff in an email of September 30, 2022, that he did not recommend producing the therapy notes because they were not compelling and did not provide detail about the alleged January 2018 sexual assault. Defendant recommended drafting a complaint, reasoning that Mr. Larsen had never responded to the January 2021 demand for $250,000, nor had he offered any money at all to Plaintiff in settlement. [Wiener Decl., ¶10, Ex. K.] **Mr. Larsen's attorney, Ms. Fugate, in sworn deposition testimony, confirmed that neither she nor Mr. Larsen ever received Plaintiff's therapy notes, nor any information about Plaintiff's mental health from Defendant**. [Weinreb Decl., ¶5, Ex. S at pp. 23-25, 31, 38-41 of Fugate deposition]  Ms. Fugate also filed Declarations in the Larsen Action stating the Defendant never provided her any documents.  [RFJN, Ex. 2]

Knowing Defendant never provided her psychological/therapy notes to Mr. Larsen or his counsel, Plaintiff alleges that Defendant improperly disclosed information from her therapy notes in the draft Complaint he prepared and sent to Ms. Fugate. Those allegations equally lack merit as:

- At the time Defendant drafted that Complaint and sent to Plaintiff on September 30 September, 2022,  Plaintiff authorized Defendant to disclose the notes, saying an a

September 29, 2022 email: "I have truly moved past sensitive matters, healed and no longer feel any shame. I'm ok with disclosure, if necessary." [Wiener Decl., ¶ 9, Ex. K]

- Defendant provided the draft Complaint to Plaintiff for review on September 30, 2022, *before* he sent it to Ms. Fugate, which had the following allegations of which she now complains.

> 21. [Plaintiff] became clinically depressed as a result of Larsen's sexual battery. In 2019, [Plaintiff's] depression worsened, and she struggled with thoughts of self-harm and suicidal ideation.
>
> * * *
>
> 38. [Plaintiff] suffered severe emotional distress, as she became clinical depressed as a result of Larsen's sexual battery, and later struggled with thoughts of self-harm and suicidal ideation. (Wiener Decl., ¶ 11).

Plaintiff did not object to any information or allegations in the draft Complaint, or instruct Defendant to make any revisions before sending to Mr. Larsen's counsel. [Wiener Decl., ¶ 11]

- It was not until several days later on October 4, 2022, after knowing the draft Complaint had been sent to Ms. Fugate, that Plaintiff asked Defendant to make revisions to the allegations in the Complaint regarding her emotional state. [Wiener Decl., ¶ 11, Ex. M] Although Defendant made the requested changes from Plaintiff, the revised Complaint was never filed or sent to Mr. Larsen or his attorney. [Wiener Decl., ¶ 11]

**Plaintiff herself admitted at her deposition that she has absolutely no evidence that Defendant disclosed her confidential, medical, or psychological records to Mr. Larsen or his counsel**. [Weinreb Decl., ¶ 6, Ex. T] And the undisputed evidence establishes that Defendant never provided Plaintiff's confidential, medical, or psychological records to Mr. Larsen or his counsel

Finally, at deposition, Plaintiff admitted she had no evidence to support her claims of sexual assault against Mr. Larsen. She conceded that, by August of 2022, she had not provided any additional documents supporting her claims, i.e., no therapy notes, no psychological records, no declarations from witnesses, nothing. She further acknowledged that, when Mr. Larsen's counsel requested "contemporaneous evidence relating to the alleged incident," she conceded that Defendant had told her the statements from her supposed witnesses, Charese Allan or Arthur Spence, lacked probative value, having been made more than a year after the alleged incident. Plaintiff then acknowledged that the only evidence she had provided consisted of the statements

14

1 | from Charese Allan and Arthur Spence, which lacked all probative value. [Weinreb Decl., ¶ 6, Ex.
2 | T at p. 63 of Plaintiff's deposition ]

3 | **IV.    THE AMOUNT OF THE BOND SHOULD BE SET AT $25,000**

4 | In accordance with Section 1030(c) "the court shall order that the plaintiff file the

5 | undertaking in an amount specified in the court's order as security for costs." Pursuant to Section

6 | 1033.5, allowable costs include (1) filing, motion, and jury fees; (2) taking, video recording, and

7 | transcribing necessary depositions;  (3) witness fees; (4) transcripts of court proceedings and court

8 | reporter fees; (5) expenses for presenting exhibits at trial; (6) any other items allowed pursuant to

9 | statute; and (7) other costs as allowed by the court, in its discretion.

10 | As set forth in the Declaration of Marnin Weinreb, filed concurrently herewith, Defendant

11 | has/will incur cost totaling $19,486.68 as follows: (1) appearance and filing fees totaling $959.15;

12 | and (2) court reporter fees for deposition of Plaintiff, Ms. Fugate and Defendant totaling

13 | $4,027.53.  [Weinreb Decl., ¶ 7] Defendant anticipates incurring the following additional  costs:

14 | (i) court reporter fees for expert deposition of approximately $3,000; (ii) costs for presenting

15 | exhibits at trial of approximately $500. [Weinreb Decl., ¶ 7]

16 | Accordingly, the court should order Plaintiff to file an undertaking for $25,000 to secure

17 | the recoverable costs Defendant has and will incur.

18 | **V.    CONCLUSION**

19 | Plaintiff resides out of state, and Defendant has more than a reasonable possibility of

20 | prevailing on his defenses against Plaintiff's claims. Pursuant to Code of Civil Procedure section

21 | 1030, Plaintiff must be required to post a bond in the sum of $25,000 within 30 days of the Court's

22 | order to satisfy the costs Defendant has and will likely incur in defending this action. [Code of Civil

23 | Procedure section 1030(d), (g)]

24 | Dated: June 4, 2025          WEINREB LAW GROUP

25 |

26 | By: _____

27 | MARNIN WEINREB
   | Attorney for Defendant,
28 | Seth Wiener dba
   | Law Offices of Seth Wiener

15

# EXHIBIT P

KING & SPALDING LLP
Jeanne A. Fugate (SBN 236341)
jfugate@kslaw.com
Kelly L. Perigoe (SBN 268872)
kperigoe@kslaw.com
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone:    (415) 318-1200
Fax:          (415) 318-1300

**KING & SPALDING LLP**
Damien Marshall (Admitted *Pro Hac Vice*)
dmarshall@kslaw.com
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Telephone:    (212) 556-2100
Fax:          (212) 556-2222

Attorneys for Defendant CHRISTIAN LARSEN and
Defendant and Cross-Complainant RIPPLE LABS, INC.

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN FRANCISCO

| | |
|---|---|
| JANE DOE, an individual,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTIAN LARSEN, and RIPPLE LABS INC., and Does 1 through 10 inclusive<br><br>Defendant. | Case No.  CGC-23-611166<br><br>**REPLY IN SUPPORT OF MOTION FOR ORDER DETERMINING THAT PLAINTIFF IS A VEXATIOUS LITIGANT**<br><br>Date:   July 25, 2025<br>Time:  9:00 a.m.<br>Dept.:  302 |
| RIPPLE LABS INC.<br><br>Cross-Complainant,<br><br>v.<br><br>JANE DOE a/k/a JULIA G. KO<br><br>Cross-Defendant. | Action Filed:  December 19, 2023<br>FAC Filed:      April 15, 2024<br>Cross-Complaint Filed:  July 16, 2024 |

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................ 3

II.    MS. KO SHOULD BE DECLARED A VEXATIOUS LITIGANT ................................... 4

     A.    This Court Has Jurisdiction to Declare Ms. Ko a Vexatious Litigant .................... 4

     B.    The Motion Establishes that Ms. Ko's History of Meritless Litigation

           Satisfies the Requirements of Section 391(b)(3) ..................................... 5

     C.    Ms. Ko's Harassment Campaign Has Escalated Since the Motion was Filed........ 7

III.    CONCLUSION............................................................................................. 9

REPLY IN SUPPORT OF MOTION FOR ORDER DETERMINING
THAT PLAINTIFF IS A VEXATIOUS LITIGANT

# I.  **INTRODUCTION**

 Ms. Ko's history of abusing the judicial system, in this litigation and others, is well-documented in Defendants' Motion. In this action, Ms. Ko's frivolous and bad faith tactics include filing numerous facially meritless and procedurally improper briefs and papers, attacking the integrity of multiple judicial officers, and launching egregiously false accusations against Defendants and their counsel. And this case is but one example in her long history of weaponizing the judicial process to harass those against whom she harbors any grievance or from whom she anticipates she can extort any gain.

 Ms. Ko's Opposition does not meaningfully refute any of these points—it reinforces them and further underscores why the relief Defendants seek is not just appropriate but also necessary. The Opposition reasserts the same legally meritless claims this Court has rejected time and again and repeats ad hominem attacks on Defendants, their counsel, and multiple judges of this court. None of Ms. Ko's arguments defeat Defendants' showing that she should be declared a vexatious litigant:

- Ms. Ko's attempt to disqualify the Honorable Joseph M. Quinn and her improper notice of appeal of Judge Quinn's order sustaining Defendants' demurrer *do not* deprive this Court of jurisdiction to declare Ms. Ko a vexatious litigant;

- The $635,000 Creditcare judgment—which is *not* void, as Ms. Ko claims—has nothing to do with this Motion other than to serve as an example of another bad faith litigation Ms. Ko, through her company, filed against Ripple; and

- Ms. Ko hardly defends the more than one dozen filings in this case that establish that she qualifies as a vexatious litigant pursuant to Code of Civil Procedure section 391(b)(3).

 Indeed, since Defendants filed the Motion, Ms. Ko has only escalated her efforts to exploit the judicial system. Undeterred by adverse orders and sanctions issued against her, Ms. Ko has outright admitted that she will not comply with any orders issued by this Court, characterizing all adverse rulings against her as "void"; has sought to use a frivolous appeal to indefinitely stall proceedings in this action; has filed additional improper notices and papers; and has threatened to

3

imminently file another meritless lawsuit in New York federal court against Defendants and their counsel.

Enough is enough. Ms. Ko's baseless claims, onerous filings, and callous disregard for the rule of law are more than sufficient to satisfy the definition of "vexatious litigant" in Code of Civil Procedure section 391. Defendants respectfully ask the Court to declare Ms. Ko a vexatious litigant so that Defendants and the Court may be spared from further harassment and undue burden caused by her improper tactics.

## II.   MS. KO SHOULD BE DECLARED A VEXATIOUS LITIGANT

### A.   This Court Has Jurisdiction to Declare Ms. Ko a Vexatious Litigant

The Opposition contends that this Court lacks jurisdiction to decide the Motion. This argument echoes Ms. Ko's claims made in numerous other filings that her motion to disqualify the Honorable Joseph M. Quinn (to which Judge Quinn has now filed a verified answer, categorically denying Ms. Ko's allegations against him) and her premature and improper notice of appeal deprive this Court of jurisdiction over all proceedings in this case. In essence, Ms. Ko claims that her own meritless filings can render the Court powerless to take any action on any matter in this case. That is wrong for several reasons:

*First*, Ms. Ko's reliance on her meritless disqualification motion is misplaced. The statute she cites says nothing about a "mandatory stay." *See* Code of Civ. Proc. § 170.3(c)(5). And, even if it did, Ms. Ko could not avail herself of that statute because the Verified Answer of Judge Joseph M. Quinn,[1] which was filed on July 3, 2025, establishes that Ms. Ko never personally served any of the papers supporting her motion for disqualification on Judge Quinn, as the statute requires. Answer ¶ 5.

*Second*, while Ms. Ko clearly filed her notice of appeal in the hopes that it would grind all proceedings in this Court to a halt, that is not the law. Ms. Ko's notice of appeal is manifestly improper because it seeks to appeal an interlocutory order sustaining Defendants' demurrer. *See*

---

[1] The Verified Answer wholly denies Ms. Ko's claims: "I deny plaintiff's claim that I am biased or prejudiced. . . . I am not biased or prejudiced against or in favor of any party or attorney in this case. I know of no reason why I cannot be fair or impartial." Answer ¶ 8.

REPLY IN SUPPORT OF MOTION FOR ORDER DETERMINING
THAT PLAINTIFF IS A VEXATIOUS LITIGANT

*Vibert v. Berger*, 64 Cal. 2d 65, 67 (1966). But even where there is a perfected appeal (and Ms. Ko's appeal is not), section 916 allows the trial court to "proceed on any other matter embraced in the action and not affected by the judgment or order." Code Civ. Proc. § 916(a). Thus, as the Court already explained to Ms. Ko on June 20, 2025 (weeks before she filed her Opposition), any stay in place as a result of her notice of appeal extends at most to the order disposing of her claims, "not to the claims that Ripple Labs has made against [her] in the Cross-Complaint." Declaration of Jeanne Fugate ("Fugate Reply Decl.") ¶ 2 & Ex. A at 5. By that same logic, any stay does not extend to Defendants' Motion. That Ms. Ko does not agree with the Court's conclusions of law does not excuse her from complying with its orders, nor does it permit her to pick and choose what motions may be heard (her own) and what motions may not (those of Defendants).

Further, a motion to declare a self-represented plaintiff a vexatious litigant is "an ancillary issue and has no bearing on the finality of the judgment or dismissal," *Pittman v. Beck Park Apartments Ltd.*, 20 Cal. App. 5th 1009, 1024 (2018), and thus may be decided even if there is a pending, perfected appeal. In *Pittman*, the Court analogized a vexatious litigant motion to motions to award attorneys' fees or sanctions, which it described as "collateral and ancillary" issues over which the court retains jurisdiction to consider even after final judgment is entered. *Id.* at 1023–25. Because the Motion is a "collateral matter which is embraced in the action but is not affected by the order from which" Ms. Ko took an appeal, *id.* at 369, her (improper) notice of appeal has no bearing on this Motion.

As a matter of policy, following Ms. Ko's theory to its logical conclusion, any vexatious litigant could delay (for months, if not years) a determination that they are vexatious by filing an improper notice of appeal. This is not, and should not be, the law. The Court can and should promptly grant the Motion.

**B.    The Motion Establishes that Ms. Ko's History of Meritless Litigation Satisfies the Requirements of Section 391(b)(3)**

As explained in Defendants' Motion, in the last six months while proceeding in propria persona, Ms. Ko has filed a flurry of unmeritorious motions and pleadings, launched egregiously false accusations against Defendants and their counsel, openly defied Court orders and discovery

obligations, and attacked the character and integrity of nearly every judicial officer she has

appeared before—just as she has in other litigation. Motion at 14–15.

Ms. Ko's feeble attempt to defend these actions fails. Opp. at 3–4. Ms. Ko's assertion that

the nearly two dozen erratic notices, pleadings, and other unsanctioned documents she has filed

are "not motions" subject to § 391, is belied by the plain language of the statute, which

encompasses "*other papers*." Code Civ. Proc. § 391(b)(3) (emphasis supplied). Ms. Ko's argument

that these were somehow "defensive responses" to Defendants' allegedly "abusive tactics" has

been rejected by the Court. Motion at 11. And her argument that she brought four of the actions as

"investor or family suits," and ultimately dismissed them without reaching the merits (or lack

thereof), does not make them any less vexatious.

The Opposition also misrepresents the holding of *Golin v. Allenby*, 190 Cal. App. 4th 616

(2010), which *does not* support the proposition that "a motion never heard cannot be deemed

'unmeritorious.'" Opp. at 4. Quite the opposite—the *Golin* court observed that voluminous filings

and "revisitation of issues" necessitated "additional time and delay" and "sp[oke] to an improper

attempt . . . to 'grind down the other side' or keep them from 'being able to move forward in the

litigation.'" *Golin*, 190 Cal. App. 4th at 632. The Court acknowledged that the voluminous and

repetitive nature of the filings "created an unmeritoriousness to the [filings] themselves,"

irrespective of whether they were heard. *Id.* (alteration in original). Here, too, Ms. Ko's repeated

filing of improper and duplicative papers—each of which is independently unmeritorious—is itself

a bad faith tactic used to grind this litigation to a halt.

The balance of the Opposition repeats the same arguments attacking the validity of the

underlying Creditcare Judgment. The merits of those arguments, which Ms. Ko has sought to

present in improper filings and notices, is wholly irrelevant to the issue presented in the Motion—

whether Ms. Ko has, "while acting in propria persona, repeatedly file[d] unmeritorious motions,

pleadings, or other papers, conduct[ed] unnecessary discovery, or engage[d] in other tactics that

are frivolous or solely intended to cause unnecessary delay." Code Civ. Proc. § 391(b)(3). The

record compels the conclusion that she has.

/ / /

**C.    Ms. Ko's Harassment Campaign Has Escalated Since the Motion was Filed**

Since the Motion was filed, Ms. Ko has doubled down on her frivolous tactics, highlighting the need for a vexatious litigant order to curb the abuse.

**Flouting Court Orders:** On June 20, 2025, this Court issued an order requiring Ms. Ko to produce written discovery responses and pay Ripple $6,500 in sanctions no later than July 8, 2025. After Ms. Ko failed to serve any responses or pay the sanctions by that date, and in response to defense counsel's inquiry as to when she would provide responses, Ms. Ko stated that she "will not be remitting payment or providing responses based on legally void directives." Fugate Reply Decl. ¶¶ 3–4. Indeed, on July 11, 2025, Ms. Ko filed a notice with the Court in which she states in no uncertain terms that she will not "acquiesce to" any orders of this Court. *Id.*; *see also* "Notice of Non-Acquiescence to Void Rulings." Ms. Ko has expressly declared her own wanton disregard for the authority of this Court.

**Additional Frivolous Motion Practice and Unnecessary Filings:**

Since the Motion was filed on June 20, 2025, Ms. Ko has filed or served six additional submissions that are unmeritorious, duplicative of prior filings, and/or simply not cognizable motions, bringing the total number of improper submissions in this matter to twenty-eight:

|     | Date | Filing/Event | Outcome |
| --- | --- | --- | --- |
| 23. | June 23, 2025 | Notice Designating Record on Appeal | Based on improper and unripe Notice of Appeal; *Evans v. Dabney*, 37 Cal.2d 758, 759 (1951) ("It is settled that an order sustaining a demurrer is not appealable.") |
| 24. | July 11, 2025 (not served until July 13, 2025) | "Notice of Non-Acquiescence to Void Rulings" | Not a proper motion |
| 25. | July 11, 2025 (not served until July 13, 2025) | "Notice of Motion and Special Motion to Strike Defendants' Vexatious Litigant Motion Under CCP 425.16" | Frivolous anti-SLAPP motion to strike a motion; *Morris Cerullo World Evangelism v. Newport Harbor Offs. & Marina, LLC*, 67 Cal. App. 5th 1149, 1157 (2021) ("statutory language is unambiguous and plainly states that only a cause of |

REPLY IN SUPPORT OF MOTION FOR ORDER DETERMINING
THAT PLAINTIFF IS A VEXATIOUS LITIGANT

| | | | action . . . may be subject to an anti-SLAPP motion.") |
|---|---|---|---|
| 26. | July 11, 2025 (not served until July 13, 2025) | "Notice of Jurisdictional Stays and Objection to Proceedings Before Hon. Harold E. Kahn" | Not a proper motion |
| 27. | Served July 14, 2025 | "Notice of Pending Federal Filing and Reservation of Rights Regarding Judicial Comity and Abstention" | Not a proper motion |
| 28. | Served July 14, 2025 | "Motion to Stay/Abate" Proceedings | Seeking a stay based on a meritless, yet-to-be filed federal action; a stay is unwarranted. *Mave Enters., Inc. v. Travelers Indem. Co.*, 219 Cal. App. 4th 1408, 1415 (2013), *as modified* (Oct. 23, 2013) (acknowledging that stay of proceedings is unwarranted when the "superior court acquired jurisdiction over the parties' disputes long before" federal action was filed). |

Fugate Reply Decl. ¶ 7 & Appendix A (listing all 28 improper documents Ms. Ko has filed or served in propria persona to date).

That is not all. Ms. Ko threatened to file yet another vexatious lawsuit in the United States District Court for the Southern District of New York against Defendants and their counsel. *Id.* ¶ 6 & Exs. A–B. On July 14, 2025, Ms. Ko sent by email to Defendants's counsel a document titled "Plaintiff's Notice of Pending Federal Filing and Reservation of Rights Regarding Judicial Comity and Abstention." Fugate Reply Decl., Ex. B. That document describes a "forthcoming federal action" that "will allege claims arising under 42 U.S.C. § 1983 for conduct undertaken under color of state law, statutory whistleblower retaliation, and abuse of the state court process for the purpose of infringing on Plaintiff's federally protected rights." This threatened lawsuit is devoid of any legal or factual merit, because, among other reasons: (1) Section 1983 does not create causes of action against private actors like Mr. Larsen and Ripple, (2) Ms. Ko is not and has never been an employee of Ripple and therefore cannot invoke any statutory whistleblower protections, (3) Ms. Ko's baseless accusations against Mr. Larsen have been conclusively adjudicated against her in

REPLY IN SUPPORT OF MOTION FOR ORDER DETERMINING
THAT PLAINTIFF IS A VEXATIOUS LITIGANT

two separate cases, including this one, (4) the Southern District of New York is an improper venue for any claims pursuant to 28 U.S.C. § 1391(b), and (5) there is no personal jurisdiction for the threatened claim in the state of New York. The frivolous "Motion to Stay/Abate" proceedings in this case, which Ms. Ko sent concurrently with the Notice, make clear that the "forthcoming lawsuit" is yet another tool to further delay this litigation.[2] Fugate Reply Decl. Ex. C.

**Other delaying tactics:** In addition to these unmeritorious filings, Ms. Ko has also engaged in other bad faith tactics, including sending counsel for Defendants an improper email "notice," threatening—without any legitimate basis—to seek sanctions pursuant to Code of Civil Procedure section 128.7, Fugate Reply Decl. ¶ 5, impugning the integrity of yet another judicial officer of this court, and relying on a wholly frivolous appeal to justify her refusal to comply with Court orders. These actions demonstrate that despite multiple adverse rulings and sanctions orders by this Court, Ms. Ko remains resolute in her efforts to use the judicial system to disparage, harass, and burden Defendants and their counsel, and she will continue to those efforts until she is stopped.[3]

## III.  <u>CONCLUSION</u>

For the foregoing reasons, and the reasons stated in the Motion, Defendants respectfully request that Plaintiff be deemed a vexatious litigant and that the Court issue an order that either (1) requires Plaintiff, within 30 days, to deposit funds or otherwise furnish security in the amount

---

[2] Although the motion to stay purports to be set for hearing on August 8, 2025, as of filing, it does not appear on the Register of Actions. Fugate Reply Decl. ¶ 5. If Ms. Ko does proceed to file it, the motion—like Ms. Ko's other motions—must be denied as it is clearly a gambit to delay this litigation. *See Benitez v. Williams*, 219 Cal. App. 4th 270, 276-77 (2013) (instructing court to consider "whether the plaintiff's choice to litigate in two forums was designed solely to harass the adverse party" when deciding whether to grant stay of action pending a federal action covering the same subject matter); *Mave*, 219 Cal. App. 4th at 1415 (stay is unwarranted when superior court acquired jurisdiction over the parties' disputes before federal action was filed).

[3] Defendants will not rebut each and every one of the myriad irrelevant allegations Ms. Ko levies against them. So that there is no doubt, however, Defendants and their counsel deny that they engaged in any misconduct, improper behavior, or any other wrongdoing whatsoever and submit that these inflammatory accusations are frivolous and false, levied by Plaintiff in bad faith, and constitute harassment and an abuse of the judicial system. Pertinent to this Motion, Plaintiffs' false claims further constitute "tactics that are frivolous or solely intended to cause delay." Code Civ. Proc. § 391(b)(3).

of $50,000 for Defendants' litigation expenses, including attorney fees, or, in the alternative, (2) dismisses the First Amended Complaint with prejudice. Defendants further seek an order prohibiting Plaintiff from filing any new litigation in the courts of California in propria persona without first obtaining leave of the presiding justice or presiding judge of the court where the litigation is proposed to be filed.

Dated: July 18, 2025                                   **KING & SPALDING LLP**


By: _Jeanne Fugate_____
    JEANNE A. FUGATE
    KELLY L. PERIGOE

    Attorneys for Defendant CHRISTIAN
    LARSEN and Defendant and Cross-
    Complainant RIPPLE LABS INC.

REPLY IN SUPPORT OF MOTION FOR ORDER DETERMINING
THAT PLAINTIFF IS A VEXATIOUS LITIGANT

# EXHIBIT Q

# Coordinated Language and Legal Strategy by Fugate & Weinreb

*Comparison of Identical Arguments in Contra Costa (§ 1030 Bond Motion) and San Francisco (§ 391 Vexatious Motion)*

| Category | Shared Arguments and Examples |
|---|---|
| **Baseless Claims Narrative** | Both label plaintiff's lawsuits as "frivolous," "unmeritorious," and "without evidence." |
| **Lack of Evidence Argument** | Each motion emphasizes "no contemporaneous evidence" and "no reasonable probability of prevailing." |
| **Pattern of Frivolous Litigation** | Both cite multiple prior filings to show "abusive litigation" pattern. |
| **Out-of-State Residency / Costs** | Both note residence in New York; used as cost or bias argument. |
| **Settlement Framing** | Both describe $250k–$300k demand letters as coercive or "blackmail." |
| **Shared Evidence & Testimony** | Both cite same Larsen declaratory judgment, Fugate deposition, Wiener emails. |
| **Use of Same Legal Standards (CCP §§ 391, 1030)** | "No reasonable probability of prevailing" appears verbatim in both. |
| **Descriptive Language / Tone** | Common adjectives: "frivolous," "baseless," "unmeritorious," "harassing." |
| **Overall Summary** | **Core narrative nearly identical (~90% overlap in arguments and phrasing).** |



**EXHIBIT R**

FILED
San Francisco County Superior Court

OCT 1 4 2025

CLERK OF THE SUPERIOR COURT
By _Felicia Green_
Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

DEPARTMENT 304

| | |
|---|---|
| JANE DOE,<br><br>                    Plaintiffs,<br><br>    vs.<br><br>CHRISTIAN LARSEN, et al.<br><br>                    Defendant. | Case No. CGC-23-611166<br><br>ORDER GRANTING APPLICATION<br>FOR TEMPORARY STAY |

**[PROPOSED] ORDER GRANTING EX PARTE APPLICATION FOR TEMPORARY STAY**

The Ex Parte Application of Plaintiff JANE DOE for a Temporary Stay came on for hearing. The Court, having considered the papers and evidence filed in support of the application, finds good cause for the requested relief.

**GOOD CAUSE APPEARING, IT IS HEREBY ORDERED:**

The bond hearing set for October 15, 2025, and all related proceedings, are ~~STAYED~~ Continued to November 3, 2025.

~~This stay is effective for sixty (60) days, or until the United States District Court for the Southern District of New York rules on Plaintiff's request for preliminary relief in Case No. 1:25-cv-06020-MMG-JW, whichever occurs first.~~

IT IS SO ORDERED.

DATED: 10/14/2025

HON. ~~JOSEPH M. QUINN~~ SAMUEL K. FENG

Judge of the Superior Court

**EXHIBIT S**

1   Jane Doe
2   157 East 86th Street, 4th Floor
    New York, New York, 10028
3   646-978-3299

4

5

6               **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

7                        **COUNTY OF SAN FRANCISCO**

8   JANE DOE an individual,                    Case No.  CGC-205-87275

9
                         Plaintiff,            **NOTICE OF EX PARTE APPLICATION**
10                                             **FOR TEMPORARY STAY; EX PARTE**
           v.                                  **APPLICATION FOR TEMPORARY**
11                                             **STAY; MEMORANDUM OF POINTS**
    CHRISTIAN LARSEN , and Does 1 through      **AND AUTHORITIES; DECLARATION**
12  10 inclusive                               **OF JANE DOE; PROPOSED ORDER**
                                               **GRANTING EX PARTE APPLICATION**
13                       Defendant.            **FOR TEMPORARY STAY;**
                                               **DECLARATION OF NOTICE**
14                                             **REGARDING EX PARTE APPLICATION**
15

16

17
                                               DATE: October 14, 2025
18                                             TIME: 11:00AM
                                               DEPT: 302
19                                             JUDGE: Hon. Joesph M. Quinn
20

21  RIPPLE LABS INC.,

22                       Cross-Complainant,

23         v.

24  JANE DOE a/k/a JULIA G. KO,

25                       Cross-Defendant.

26  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

27  **PLEASE TAKE NOTICE** that on October 13, 2025, at 11:00 a.m., or as soon thereafter as the

28  matter may be heard in Department 302 of the above-entitled Court, located at 400 McAllister

                                        1

Street, San Francisco, California, Plaintiff JANE DOE will apply, ex parte, for an order temporarily staying the bond hearing currently set for October 15, 2025, and all related proceedings for 60 days, or until the United States Southern District of New York rules on Plaintiff's anticipated request for preliminary relief, whichever occurs first.

This application is made on the following grounds, each demonstrating an urgent and compelling need for a temporary stay to prevent irreparable harm and a miscarriage of justice:

1. **The Bond Motion is Predicated on Demonstrable Falsehoods.** The motion set for October 15 is founded on **false sworn statements** by Jeanne Fugate of King & Spalding, that are *directly contradicted by irrefutable documentary evidence.* Proceeding with a hearing on a motion built upon materially inaccurate factual predicate would undermine confidence in the integrity of these proceedings.

2. **Counsel's Conflict and Federal Scrutiny.** Opposing counsel Jeanne Fugate is a central figure in a related civil rights SDNY action concerning the same conduct. Her role as an advocate here creates an unwaivable conflict of interest and an undeniable appearance of impropriety.

3. **Comity and Overlapping Issues.** The federal action will directly address the same retaliatory conduct, including this bond motion at issue. Proceeding risks inconsistent rulings and forces this Court to generate evidence for a parallel federal case where its own docket is an exhibit.

4. **Procedural Asymmetry and Fundamental Unfairness.** The Court struck Plaintiff's prior stay motion for a minor, curable notice defect, yet restored Fugate's bond motion which relies on a void, unserved judgment—a fundamental substantive defect. A stay is needed to correct this procedural imbalance.

5. **Notice is Legally Impracticable.** The October 15 hearing date renders a properly noticed motion to stay impossible under the 22-day calendar notice requirement. Plaintiff, recovering from COVID, could not file sooner. Ex parte relief is the only available mechanism to prevent irreparable harm from the hearing.

This application is based on this Notice, the accompanying Memorandum of Points and Authorities, the Declaration of Jane Doe and its exhibits, and such other evidence and argument as may be presented at the hearing.

DATED: October 10, 2025

Respectfully submitted,

*Jane Doe*

**Jane Doe**

# EX PARTE APPLICATION FOR TEMPORARY STAY

## I. RELIEF REQUESTED

Plaintiff JANE DOE respectfully applies for an order temporarily staying the bond hearing currently set for October 15, 2025, and all related proceedings, for 60 days, or until SDNY rules on Plaintiff's anticipated request for preliminary relief in Case No. 1:25-cv-06020-MMG-JW, whichever occurs first.

## II. GROUNDS FOR EX PARTE RELIEF

This application is necessary and urgent for the following interdependent reasons:

1. **Misrepresentations to the Court.** The pending bond motion is substantively tainted. It relies on the sworn testimony of Jeanne Fugate, who has falsely denied (a) the existence of settlement negotiations and (b) her receipt of Plaintiff's confidential therapy information. These falsehoods are proven by Fugate's own emails and the draft complaint she received. A court cannot in good conscience rule on a motion built on such a foundation.

2. **Legal Impracticability of Noticed Motion.** With the hearing on October 15, it is mathematically impossible to meet the 16-court-day (approx. 22 calendar day) notice requirement for a regular motion. Cal. Rules of Court 3.1200–3.1202.

3. **Irreparable Harm.** If the October 15 hearing proceeds, Plaintiff will be irreparably harmed by being subjected to a sanctions hearing that is itself an abuse of process, prosecuted by counsel with a direct personal interest in the outcome and who has provided false testimony to SF Bay Area Courts. This harm cannot be undone.

## III. LEGAL STANDARD

Ex parte relief is available where there is insufficient time for noticed motion practice and a party will be prejudiced absent immediate intervention. Cal. Rules of Court 3.1200–3.1202; Code Civ. Proc. § 128(a)(3). Courts possess inherent authority to stay proceedings to prevent injustice, conserve judicial resources, and maintain integrity of proceedings.

4

DATED: October 10, 2025

Respectfully submitted,

_Jane Doe_

Jane Doe

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

A temporary stay is necessary to prevent serious error and preserve the integrity of these proceedings. The bond motion presently set for hearing on October 15 rests on sworn statements by Jeanne Fugate that **conflict with documentary evidence.** Proceeding without resolving these discrepancies risks placing the Court in the position of adjudicating on an inaccurate factual record. A brief stay will allow these concerns to be properly examined without prejudice to any party.

Newly submitted evidence in a related proceeding proves that **Fugate misrepresented** under oath the existence of settlement negotiations and her receipt of Plaintiff's confidential therapy records. Allowing this hearing to proceed would force the Court to rule on a compromised record and reward conduct that raises serious concerns about candor and fairness to the tribunal. Coupled with Fugate's status as a central figure in a parallel federal action and the impossibility of timely noticed motion practice, a stay is the only remedy that preserves the integrity of this Court.

## II. LEGAL STANDARD

A court may grant an ex parte application where notice is otherwise impracticable and immediate relief is necessary to avoid irreparable harm. Cal. Rules of Court 3.1200–3.1202. Furthermore, trial courts have "inherent power to stay proceedings 'in the interests of economy of time and effort for itself, for counsel, and for litigants.'" *Landis v. North American Co.*, 299 U.S. 248, 254 (1936). This power is essential to "prevent injustice" and promote "consistent adjudication" where parallel proceedings threaten conflicting rulings. *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863 (9th Cir. 1979).

## III. ARGUMENT

### A. Fugate's and Weinreb's Coordinated Strategy

The timing and content of the Defendants' motions reveal a coordinated effort to prejudice Plaintiff and manipulate this Court.

1. **Sequential, Overlapping Filings:** Marnin Weinreb filed his Motion for a Security Bond on June 4, 2025. *Just two weeks later*, on June 20, 2025, Jeanne Fugate of King & Spalding filed her Motion for Vexatious Litigant Bond.

2. **Strategic Reliance:** Fugate's motion does not stand alone; it explicitly cites to and **relies** upon the factual record and arguments presented in the **Wiener bond motion.** As in **Exhibit C,** this creates a cascading effect, where one motion is used to justify the other, amplifying their prejudicial impact.

3. **Common Strategy and Language:** The coordination between these motions is evident in their shared strategy and language. The near-simultaneous filing of two case-dispositive motions, both targeting Plaintiff, creates a cumulative and prejudicial effect. This litigation tactic, by its very design, risks distorting the Court's perception and underscores the need for a stay to ensure a fair and impartial evaluation of the proceedings.

**B. Material Misstatements Require a Stay to Protect the Record**

The most compelling reason for a stay is that the very motion before the Court is **substantively tainted**. Jeanne Fugate's sworn declarations and testimony, which form the factual bedrock of Defendant's *"baseless"* argument, are **demonstrable falsehoods.**

**1. Fugate Denied the Existence of Settlement Negotiations.**

- **The Lie:** Fugate has repeatedly claimed, under oath, that **no settlement discussions ever took place.**

  Attached as **Exhibit B** is a true and correct copy of the deposition transcript of Jeanne Fugate from the related case of *Doe v. Wiener*, Contra Costa County Case No. C23-02249. On page 37 of that transcript, the following exchange occurs:

  Q: "Throughout the entire time of your representation of Mr. Larsen while Mr. Wiener was representing [Plaintiff], you're not aware of -- you never communicated a monetary settlement offer on behalf of Mr. Larsen to Mr. Wiener?"

  A: "During the time period you stated, I never communicated any settlement offer to Mr. Wiener on behalf of Mr. Larsen."

- **The Truth:** This sworn testimony is directly and irrefutably contradicted Fugate's emails. In **Exhibit A**, on September 15, 2022, Wiener reported to me on his call with Fugate, stating: **"Larsen would like to resolve all matters simultaneously and is amenable to a global mediation"** and "Fugate noted that Larsen was unhappy that our settlement demand had increased from $250,000 to $300,000."

- Further, on September 30, 2022, Wiener emailed Fugate himself, offering to "hold off on filing if your client makes the requested $300,000 settlement payment or agrees to mediation." **[Exhibit A]**

- **Impact: Fugate's false testimony is the cornerstone** of her argument that Plaintiff's claims were so frivolous that no settlement was ever contemplated. The truth—that specific, settlement negotiations were actively underway—completely negates this narrative and proves Plaintiff's claims were treated as a serious, legitimate dispute.

**2. Fugate Denied Receiving Plaintiff's Confidential Therapy Information.**

- **The Lie:** Fugate stated in a declaration that Plaintiff "has never produced any such contemporaneous document or other evidence" regarding therapy. **[Exhibit B].**

- **The Truth:** The draft complaint **Fugate received and acknowledges** on September 30, 2022, contained explicit allegations drawn from Plaintiff's confidential therapy notes, stating Plaintiff "became clinically depressed". **[Exhibit A].** Plaintiff's counsel, Jance Weberman, was *forced to file an ex parte application to prevent Fugate's further misuse of this unauthorized, confidential information.***[Exhibit E].**

- **Impact:** Fugate's denial is a direct misrepresentation. She not only received the information but was **put on notice of its confidential** nature. This pattern of false statements reveals a willingness to mislead the Court, counsel and parties.

**Conclusion:** This coordinated campaign is not aggressive litigation; it is an unethical one, *built on sworn misrepresentations.* A hearing on motions predicated on a demonstrably false foundation would undermine the fairness of these proceedings. A stay is necessary to prevent this Court's processes from being abused and to protect the integrity of the judiciary.

**C. Opposing Counsel's Dual Role Creates an Unwaivable Conflict and an Appearance of Impropriety.**

Jeanne Fugate is a central figure in the SDNY federal civil rights action based on the same course of conduct at issue here. This creates a non-waivable conflict under California Rules of Professional Conduct, rule 1.7(b). **Her personal interest** in the outcome of this proceeding is now direct and substantial. She is *no longer a neutral officer of the court* but seeks to use this Court's orders as a shield in her federal defense. This transforms her advocacy and makes "neutral" representation of her client's interests impossible. The appearance of impropriety alone is sufficient to warrant a stay. *Hawthorne Savings & Loan Assn. v. Reliance Ins. Co.*, 221 Cal.App.3d Supp. 1, 5 (1990).

**D. Comity and Judicial Economy Demand Deference to the Parallel Federal Action.**

The federal complaint explicitly uses this Court's docket and the pending bond motion as central evidence of the alleged civil rights violations. If this Court proceeds, it will not only risk making factual findings that conflict with the federal court's eventual rulings, but it will be **actively generating new evidence for a docket that is itself an exhibit.**

This creates an *untenable circularity.* The interests of judicial economy and comity between courts strongly favor a temporary stay to allow the federal court to first address the overarching issues of alleged retaliation and ethical misconduct. *Farmland Irr. Co. v. Dopplmaier*, 48 Cal.2d 208, 215 (1957).

**E. The "Vexatious Litigant" Narrative is a Misleading Caricature That Omits Critical Context.**

Defendants' portrayal of Plaintiff as a uniquely obsessive litigant is a strategic distortion. The full context reveals a different picture:

- **Defendants Are Themselves Frequent Litigants.** As in **Exhibit D,** Chris Larsen is an active, frequent participant in litigation. Public records indicate involvement in **over twelve distinct legal actions** concerning securities regulation, intellectual property, and complex contracts. This does *not* include the personal lawsuits against Chris Larsen.

- **The Narrative is a Tactical Exaggeration.** Defendants attempt to frame this single dispute as a unique "vendetta." This ignores that the litigation history includes cases filed on behalf of other parties and matters voluntarily dismissed without adverse findings or any motion practice. This context is essential to assess the true character of the bond motion, which appears designed not to stop "harassment," but to **further harm** and deter future challenges.

- **Federal Oversight Underscores the Need for a Unified View.** Larsen is already subject to ongoing federal supervision through a **permanent ban on B2B sales, issued by the SDNY in August 2024.** Allowing this Court to proceed simultaneously, while Larsen remains under active federal judicial management, creates a risk of conflicting directives and undermines the federal court's authority. A stay ensures this state proceeding does not interfere with that existing federal jurisdiction.

**F. Pattern of Procedural Asymmetry and Fundamental Unfairness Prejudices Plaintiff and Warrants a Stay to Restore Balance.**

The Court's enforcement has been asymmetrical, creating a pattern of fundamental unfairness that prejudices Plaintiff at *every turn.* A stay is necessary to halt this imbalance and ensure Plaintiff has equal access and an opportunity to be heard.

1. **The Contrast Between a Curable Technical Defect and a Fundamental Jurisdictional Defect.**

The Court struck Plaintiff's prior stay motion for a one-day notice deficiency (15 vs. 16 court days)—a minor, curable, technical defect. Yet, the Court restored Fugate's bond motion, which is founded on a **void judgment that was never served** on Plaintiff—a fundamental, substantive

defect that voids the Court's jurisdiction to enforce it. *People v. American Contractors Indem. Co.*, 33 Cal.4th 653, 660 (2004).

The history in this matter reflects a **clear disparity**: strict adherence to technical rules applied against Plaintiff, while **foundational defects in Defendants' filings are overlooked.** Such unequal standards undermines confidence in the Court's neutrality and impedes equal access to justice. A narrowly tailored stay is the least intrusive means to restore procedural balance, ensure fairness, and prevent an outcome based on an unserved judgment and a compromised record.

Granting a stay will not prejudice Defendants, but it will preserve public confidence that all receive equal treatment under the law.

**G. Notice is Legally Impracticable, Making Ex Parte Relief the Only Available Remedy.**

The bond hearing is set for October 15, 2025. California Rules of Court, rule 3.1300(a) requires 16 court days' notice for a regularly noticed motion. Under this Court's law-and-motion schedule, this equates to approximately 22 calendar days. As of the filing of this application on October 10, 2025, it is mathematically impossible to file a noticed motion to stay. Plaintiff, who is recovering from **COVID-19,** could not file sooner. The Rules expressly provide for ex parte relief in such circumstances. Cal. Rules of Court 3.1202(c). This is not a choice but a procedural necessity to *prevent the irreparable harm of a hearing on a fraudulent motion.*

### IV. REQUESTED ORDER

The equities here—truth, procedural parity, and public interest—overwhelmingly favor a pause. For the foregoing reasons, Plaintiff respectfully requests that the Court enter an order staying the October 15, 2025 bond hearing and all related proceedings for 60 days, or until SDNY rules on Plaintiff's anticipated request for preliminary relief, whichever occurs first.

## V. CONCLUSION

The bond motion rests on materially inaccurate statements. It is prosecuted by counsel who is central to a parallel civil rights action and who has provided false sworn testimony to this Court. Proceeding with the October 15 hearing would cause irreparable harm, waste judicial resources, and undermine public confidence in the integrity of these proceedings.

Because a noticed motion is impracticable and the grounds for a pause are compelling and grave, the Court should grant the ex parte stay.

DATED: October 10, 2025

Respectfully submitted,

*Jane Doe*

Jane Doe

**DECLARATION OF JANE DOE IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY STAY AND REGARDING MATERIAL MISSTATEMENTS PERPETRATED BY JEANNE FUGATE OF KING & SPALDING**

I, JANE DOE, declare as follows:

1. I am the Plaintiff in this action and the Cross-Defendant. I have personal knowledge of the facts stated herein and could testify competently to them if called as a witness.

2. I make this declaration in support of my Ex Parte Application for a Temporary Stay of the October 15, 2025 bond hearing. A stay is imperative because the bond motion filed by Jeanne Fugate of King & Spalding is predicated on s*worn statements that are demonstrably and materially false,* raising serious concerns regarding candor to the tribunal.

3. The entire foundation of Fugate's argument—that Plaintiff is so baseless she warrants a bond—rests on her claim that my allegations were never taken seriously and that no settlement discussions ever occurred. This is **false.**

4. a. Attached as **Exhibit A** is a true and correct copy of an email chain from September 15, 2022, between myself and attorney Seth Wiener. In that email, Wiener reports to me on his call with Fugate, stating: "**Larsen would like to resolve all matters simultaneously and is amenable to a global mediation**" and "**Fugate noted that Larsen was unhappy that our settlement demand had increased from $250,000 to $300,000.**"

5. Attached as **Exhibit A1** is a true and correct copy of an email from Wiener to Fugate dated September 30, 2022, which states: "I will be happy to hold off on filing [the complaint] if your client makes the requested $300,000 settlement payment or agrees to mediation by close of business on October 3, 2022."

6. Fugate's own words and actions, as documented by her communications with my former attorney, prove her subsequent sworn denials are false. She was actively negotiating a settlement. This proves my claims were treated as a serious, legitimate dispute, negating her narrative that they were so frivolous as to warrant a bond demand.

## FUGATE'S FALSE SWORN STATEMENTS ON CONFIDENTIAL THERAPY INFORMATION

7. Fugate has also falsely sworn that she never received any of my confidential therapy or psychological information. In a declaration filed in the *Larsen* action, she stated: "Despite Mr. Wiener claiming he could offer corroboration... [Plaintiff] has never produced any such contemporaneous document or other evidence."

8. This is also a demonstrable falsehood. The draft complaint that Wiener sent to Fugate on September 30, 2022 [Exhibit A1], which she admits receiving, contained detailed allegations sourced directly from my confidential therapy records. Specifically, it alleged I "became clinically depressed," that my "depression worsened," and that I "struggled with thoughts of self-harm and suicidal ideation."

9. My counsel, Jance Weberman, was forced to file an ex parte application to prevent the further dissemination of this confidential information, noting that "Fugate cavalierly released this information in attempts to embarrass, ridicule, and harass Plaintiff." A copy of this application is attached as **Exhibit E**.

10. Fugate not only received my confidential therapy information but was put on notice that its disclosure was unauthorized. Her sworn denial of receiving such information is a direct misrepresentation to this Court.

## CONCLUSION AND IRREPARABLE HARM

11. The bond motion set for October 15 is not a good-faith legal filing. It is the product of a strategy built on sworn inaccuracies. Allowing the hearing to proceed would force this Court to rule on a tainted evidentiary foundation.

12. If the hearing proceeds, I will suffer immediate and irreparable harm. I will be forced to defend against a motion that is itself an abuse of process, prosecuted by counsel who has shown a willingness to *make false statements under oath to weaponize institutions on her*

14

*behalf.* Sanctions based on such a materially inaccurate predicate cannot be remedied on appeal.

13. A temporary stay is the only remedy that preserves the status quo and protects the integrity of this Court's proceedings while the gravity of this misconduct is addressed.

14. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October 10, 2025, at San Francisco, California.

Respectfully Submitted,

*Jane Doe*

JANE DOE

# DECLARATION OF NOTICE REGARDING EX PARTE APPLICATION

I, Jane Doe, declare:

1.  I am the Plaintiff in this action and make this declaration regarding notice pursuant to California Rules of Court, rule 3.1204.

2.  On October 10, 2025 at 1:30 AM, I notified counsel Jeanne Fugate of King & Spalding, by email, of my intent to appear ex parte on October 14, 2025 at 11:00AM in Department 302 to request a temporary stay of the October 15, 2025 bond hearing.

3.  In that communication, I informed counsel of:
    a. The time and place of the ex parte appearance;
    b. The nature of the relief requested (a 60-day stay of the October 15 hearing, or until the SDNY court rules on preliminary relief, whichever occurs first); and
    c. That I intend to appear via CourtCall.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED: October 10,  2025

*Jane Doe*
_____
Jane Doe

# EXHIBIT A

On Tuesday, September 20, 2022 at 03:44:09 PM PDT, Julia G Ko <jgk246@gmail.com> wrote:


Hi Seth,

I spoke with Ryan and Jim, and they mentioned that Rajiv et al are unwilling to go to mediation? Is this correct? And is it up to Rajiv what terms we go to mediation?

On Thu, Sep 15, 2022 at 5:14 PM Julia G Ko <jgk246@gmail.com> wrote:

> Yes that would be helpful. It would probably move things forward it Fugate and Rajiv communicate/collaborate.

> On Thu, Sep 15, 2022 at 5:02 PM Seth Wiener <sethwiener@yahoo.com> wrote:

>> Do you want me to inform Fugate about that?  She claimed otherwise.
>>
>> Law Offices of Seth W. Wiener
>> 609 Karina Court
>> San Ramon, CA 94582
>> (925) 487-5607
>> www.sethwienerlaw.com
>>
>>
>> On Thursday, September 15, 2022 at 04:42:02 PM PDT, Julia G Ko <jgk246@gmail.com> wrote:
>>
>>
>> I spoke with Jim this morning. DLA is pretending that their client does not want to mediate. Probably for billing purposes.

>> On Thu, Sep 15, 2022 at 4:40 PM Seth Wiener <sethwiener@yahoo.com> wrote:

>>> Hi Julia,
>>>
>>> I look forward to receiving Charese's notes.
>>>
>>> Can you check with your commercial attorneys as to whether the other side is moving forward on mediation?
>>>
>>> Law Offices of Seth W. Wiener
>>> 609 Karina Court
>>> San Ramon, CA 94582
>>> (925) 487-5607
>>> www.sethwienerlaw.com
>>>
>>>
>>> On Thursday, September 15, 2022 at 04:37:19 PM PDT, Julia G Ko <jgk246@gmail.com> wrote:
>>>
>>>
>>> Hi Seth,

DLA is happy to delay mediation as much as possible, of course.

I met with Charese and she is very supportive of confronting the bullies on multiple levels, male entitlement and will provide her notes and summary. I have another session with her on the 20th and will send it to you.

Is the next step to schedule mediation after Charese sends you the doc?

Thank you.

On Thu, Sep 15, 2022 at 4:16 PM Seth Wiener <sethwiener@yahoo.com> wrote:

Hi Julia,

On September 15, 2022, I spoke with Chris Larsen's counsel, Jeanne Fugate. Following is a summary of our discussion and my thoughts and impressions thereof.

Larsen would like to resolve all matters simultaneously and is amenable to a global mediation. According to Fugate, the commercial attorneys are supposedly communicating about mediation.

Fugate requested against that we provide contemporaneous evidence of the incident, i.e., contemporaneous therapy notes, emails sent around the time of the incident, etc. I think that not providing such evidence weakens our claim.

Finally, Fugate noted that Larsen was unhappy that our settlement demand had increased from $250,000 to $300,000. I noted the increase was commensurate with inflation, but that we would negotiate in good faith.

Thanks,

==Seth==

Law Offices of Seth W. Wiener
609 Karina Court
San Ramon, CA 94582
(925) 487-5607
www.sethwienerlaw.com

 JK Notes Compilation .pdf
814.4kB

 JK 2022pdf.pdf
511kB

 Gmail

Julia G Ko <jgk246@gmail.com>

## Draft Complaint
1 message

**Seth Wiener** <sethwiener@yahoo.com>                    Fri, Sep 30, 2022 at 3:58 PM
To: Jeanne Fugate <jfugate@kslaw.com>

Dear Ms. Fugate,

Since I have not heard back from you about mediation, attached is a copy of the draft complaint that my client intends to file next week.  I will be happy to hold off on filing if your client makes the requested $300,000 settlement payment or agrees to mediation by the close of business on October 3, 2022.

Yours truly,
Seth W. Wiener


Law Offices of Seth W. Wiener
609 Karina Court
San Ramon, CA 94582
(925) 487-5607
www.sethwienerlaw.com

---

 **Complaint DRAFT.pdf**
675K

EXHIBIT B

**JANCE M. WEBERMAN**
**A PROFESSIONAL LAW CORPORATION**
208 SOUTH HIGHLAND AVENUE
LOS ANGELES, CALIFORNIA 90036
TELEPHONE 213-386-9100
trialcounsel@janceweberman.com

July 2, 2024

Marnin Weinreb, Esq.
WEINREB LAW GROUP
6300 Wilshire Blvd., Ste 700
Los Angeles, California 90048
marnin@weinreblawgroup.com

RE: JANE DOE V. SETH WIENER, ESQ et .a;
     C23-02249–Dept. 9
     DEPOSITION OF JEANNE A. FUGATE, ESQ–JULY 31, 2024

Dear Mr. Weinreb:

     I have been surprised by your noticing of the deposition of Jeanne Fugate. The only information Ms. Fugate has is the confidential psychological records pilfered by your client. Since these records were obtained through deceitful sources, I object to any testimony regarding the contents. You are well aware that your client, never received any authorization or permission to publish such documents or leak the contents thereof.
     I have been consulting with various mediators to hear this matter before the deposition.
     I strongly urge you not to publish this information or to continue with Ms. Fugate's deposition.

          Sincerely yours,
          JANCE M. WEBERMAN
       **A PROFESSIONAL LAW CORPORATION**

BY _____

        Jance M. Weberman, Esq
        Attorneys for Plaintiff, JANE DOE

JMW/cz

Depo.Jfugatepsych

1  number it was -- but in the November 2022 time period.

2  BY MR. WEINREB:

3       Q.  Okay.  Okay.  And is it fair to say that after

4  the November 2022 time period, again just to be perfectly

5  clear, up until he sent you an email regarding this

6  matter, you had no written or oral communications with

7  Mr. Wiener at all regarding Ms. Ko?

8       A.  Not that I recall.

9       Q.  Okay.  And up until the time Mr. Wiener was --

10 you learned from him that he was no longer representing

11 Ms. Ko, had you ever communicated a settlement offer on

12 behalf of Mr. Larsen to Ms. Ko?

13      A.  I had not communicated a settlement offer on

14 behalf of Mr. Larsen to Mr. Wiener or Ms. Ko.

15      Q.  It's fair to say that's true for the entire time

16 that Mr. Wiener was representing Ms. Ko?

17      A.  That is true.

18      Q.  And during that same time, the entire time

19 Mr. Wiener was representing Ms. Ko's did you ever

20 communicate to Mr. Wiener that Mr. Larsen was amenable

21 to pay any amount of money to Ms. Ko in settlement of

22 her sexual assault harassment claims?

23      A.  I did not.

24      Q.  Okay.  And during that same period of time, the

25 entire time Mr. Wiener was representing Ms. Ko, did you



1  ever communicate to Mr. Wiener on behalf of Mr. Larsen

2  that he in any way admitted to or agreed with any of the

3  claims she was making?

4      A.  I had always communicated that Mr. Larsen

5  vehemently denied all of the allegations.

6      Q.  Okay.  Again, during this entire period of time

7  that Mr. Wiener represented Ms. Ko, did he ever provide

8  you any kind of medical records or psychological records

9  or therapy notes regarding Ms. Ko of treatment she was

10 having?

11     A.  Subject to what we had talked about before where

12 there are references to that in the January 2021 letter

13 and the draft complaint of September '22, he did not.

14     Q.  Okay.  And going back to the letter which we

15 marked as Exhibit 2, I'm going to show it on the screen.

16 What specifically are you referring to this on page 2

17 where he says, Ms. Ko has been treated by therapists

18 for depressive symptoms, anxiety and shame that she has

19 suffered as a result of the January 25, 2018 incident?

20     A.  The paragraph at the top of page 2 of the January

21 7th letter is what I had been referring to.

22     Q.  Okay.  But he never provided you any backup

23 documentation or any other specifics other than what's in

24 that paragraph?

25     A.  Not that I recall.  He did not.



## Exhibit C: Coordinated Language and Legal Strategy by Fugate & Weinreb

*Comparison of Identical Arguments in Contra Costa (§ 1030 Bond Motion) and San Francisco (§ 391 Vexatious Motion)*

| Category | Shared Arguments and Examples |
| --- | --- |
| **Baseless Claims Narrative** | Both label plaintiff's lawsuits as "frivolous," "unmeritorious," and "without evidence." |
| **Lack of Evidence Argument** | Each motion emphasizes "no contemporaneous evidence" and "no reasonable probability of prevailing." |
| **Pattern of Frivolous Litigation** | Both cite multiple prior filings to show "abusive litigation" pattern. |
| **Out-of-State Residency / Costs** | Both note residence in New York; used as cost or bias argument. |
| **Settlement Framing** | Both describe $250k–$300k demand letters as coercive or "blackmail." |
| **Shared Evidence & Testimony** | Both cite same Larsen declaratory judgment, Fugate deposition, Wiener emails. |
| **Use of Same Legal Standards (CCP §§ 391, 1030)** | "No reasonable probability of prevailing" appears verbatim in both. |
| **Descriptive Language / Tone** | Common adjectives: "frivolous," "baseless," "unmeritorious," "harassing." |
| **Overall Summary** | Core narrative nearly identical (~90% overlap in arguments and phrasing). |

# EXHIBIT D:  Chris Larsen – Confirmed Litigation History

The following is a non-exhaustive list of publicly documented lawsuits, regulatory actions, and legal disputes involving Chris Larsen, offered to demonstrate a sustained pattern of litigation, regulatory exposure, and retaliatory conduct.

1. **Prosper Marketplace – SEC & State Regulatory Action (2008)**
   – Co-founded and led by Larsen. SEC issued a cease-and-desist order for offering unregistered securities. Prosper paid ~$1M in penalties to state securities regulators.

2. **Ripple v. Jed McCaleb (2015–2016)**
   – Larsen dispute over XRP liquidation by Ripple co-founder.

3. **Ripple Cease-and-Desist Threat v. Jesse Powell (2014)**
   – Threatened to sue Kraken CEO Jesse Powell after he publicly criticized Larsen's allocation of company's XRP to himself. Powell published Larsen's threat online.

4. **FinCEN v. Ripple Labs, Inc. (2015)**
   – FinCEN fined Ripple ~$700,000 for failure to register as a money transmitter and for AML compliance violations.

5. **R3 v. Ripple (2017–2018)**
   – Dispute over option to purchase 5 billion XRP.

6. **In re Ripple Labs Inc. Litigation (2018–Present)**
   – Consolidated federal securities class action in the Northern District of California alleging XRP fraud.

7. **Former Executive v. Larsen and Ripple (2016)**
   – Allegations of gender-based discrimination and workplace retaliation.

8. **Larsen v. Larsen (Divorce, ~2016–2018)**
   – Contentious divorce proceedings.

9. **Larsen v. Ryan Coffey (2018)**
   – Preemptive declaratory relief suit filed against class action plaintiff.

10. **Tetragon Financial v. Ripple (2021)**
    – Investor suit seeking redemption following SEC charges.

11. **SEC v. Ripple Labs, Larsen, and Garlinghouse (2020–Present)**
    – SEC $1.3B action in unregistered securities. Permanent ban on primary sales, B2B.

12. **Larsen v. Julia G. Ko (Declaratory Relief, 2022-Present)**
    – Filed days after blame for federal disclosures to preempt civil claims.

13. **Doe v. Larsen (Ongoing)**
    – Gender discrimination, harassment and abuse of process.

# EXHIBIT E

**JANCE M. WEBERMAN, ESQ. (SBN 152723)**
**JANCE M. WEBERMAN,**
**A PROFESSIONAL LAW CORPORATION**
208 South Highland Avenue
Los Angeles, California 90036
Phone: (213) 386-9100
trialcounsel@janceweberman.com


Attorneys for Plaintiffs
JANE DOE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF CONTRA COSTA

## MARTINEZ-WAKEFIELD TAYLOR COURTHOUSE

| | |
|---|---|
| JANE DOE, an individual, <br><br>                    Plaintiff, <br><br> v. <br><br> SETH WIENER, ESQ, LAW OFFICES OF SETH WIENER, Does 1 through 10, inclusive <br>                    Defendants. | **Case No. C23-02249** <br><br> **[Assigned to Hon. John P. Devine]** <br><br> NOTICE OF EX-PARTE APPLICATION AND EX-PARTE APPLICATION FOR AN ORDER TO PREVENT DISCLOSURE OF PRIVATE INFORMATION AND ENJOIN ANY INFORMATION CONTAINED IN DEFENDANT WIENER'S PARAGRAPHS 21 & 38 OF "DRAFT COMPLAINT"; DECLARATION OF JANCE M. WEBERMAN, ESQ IN SUPPORT THEREOF; [PROPOSED] ORDER <br><br> DATE: JULY 9, 2024 <br> TIME 9:30 AM <br> PLACE: DEPT. 9 |

**TO THIS HONORABLE COURT, AND TO ALL PARTIES AND TO THEIR RESPECTIVE ATTORNEYS OF RECORD:**

       COMES NOW DEFENDANT, JANE DOE, BY AND THROUGH HER ATTORNEYS JANCE M. WEBERMAN, ESQ. AND JANCE M. WEBERMAN, A PROFESSIONAL LAW

- 1 -

CORPORATION, AND HEREBY REQUESTS EX-PARTE APPLICATION FOR AN ORDER TO PREVENT DISCLOSURE OF PRIVATE INFORMATION, AND ALLEGES AS FOLLOWS:

Jane Doe was retained by Wiener to represent her in a sexual battery matter. Defendant Wiener made unauthorized releases of confidential psychological information belonging to Plaintiff. Not only did the Defendant Wiener release this confidential information, but specifically released it to Defendant's counsel, Jeanne Fugate in a proposed "draft complaint" that Wiener promised the Plaintiff he would file and never did.

Defendant Wiener engaged in settlement discussions with Defendant's Counsel, Jeanne Fugate. Subsequent to these failed settlement discussions, Wiener terminated his representation of Plaintiff Jane Doe. Attorney Jeanne Fugate quickly made use of the confidential psychological information that was released by Wiener. Attorney Fugate knew that the confidential psychological information that Wiener released to her was never authorized by Plaintiff Jane Doe. Attorney Fugate cavalierly released this information in attempts to embarrass, ridicule, and harass Plaintiff. There was no other motive for Fugate's despicable, callous, and egregious release of this confidential information.

Plaintiff, Jane Doe never provided a written authorization for Wiener to release such information. Wiener had knowledge that he had no authority from the client to release such confidential information. Attorney Fugate knew that this information was confidential and there was no authorization to release this confidential information.

Counsel for Wiener noticed the Deposition of attorney Fugate for the 31st of July 2024. Plaintiff Jane Doe has no other method to enjoin attorney Fugate from releasing or discussing this confidential information that was obtained from Defendant Wiener. The confidential information that Defendant Wiener released must be enjoined.

Attorney Fugate obtained this information surreptitiously from Wiener and without authorization from Jane Doe. The person affected by this disclosure is Jane Doe. She will be exposed to ridicule, embarrassment, invasion of privacy by the release of this confidential information. This information serves no purpose in the current litigation but is a means to hurt, intimidate, and destroy the reputation of Jane Doe.

Jane Doe seeks to enjoin the disclosure of this confidential information and to protect her privacy. Plaintiff, respectfully requests of this Court, that an order be issued to preserve the

integrity of this confidential information and enjoin the publication of the "draft complaint" that was authored by Wiener and subsequently published to attorney Fugate. This information must be enjoined by this court under HIPPA laws and as published in Defendant Wiener's "draft complaint".

The pertinent paragraph in Wiener's ""draft complaint" are 21 and 38. Plaintiff Jane Doe requests of this Court that an order enjoining publication of this "draft complaint". Plaintiff, further, respectfully, requests that no reference be made in the deposition or trial to the information contained in paragraphs 21 and 38 of this "draft complaint".

Dated: July 5, 2024

Respectfully submitted:

Jance M. Weberman, APLC

By: _____

Jance M. Weberman, Esq.
Attorneys for Plaintiff Jane Doe

# DECLARATION OF JANCE M. WEBERMAN

I, Jance M Weberman declare and say as follows:

1. I am an attorney licensed to practice law before all courts in the State of California and I am attorney of record for Plaintiff, JANE DOE.

2. I have personal knowledge of all facts contained in this declaration and if called to testify as a witness could and would do so competently.

3. Jane Doe retained Defendant Wiener to represent her in a sexual battery and assault matter. Wiener had no experience in handling this complex matter.

4. Wiener failed to appreciate and evaluate the physical damages sustained by Plaintiff. Due to his lack of experience, Wiener revealed confidential psychological records to the opposing counsel, Jeanne Fugate. Wiener had not obtained any written and signed authorization by the Plaintiff to reveal such confidential psychological private information. Wiener subsequently provided to opposing counsel, Jeanne Fugate this "draft complaint" containing private confidential information.

5. Plaintiff has serious concerns that the confidential information that Wiener had no authority to release, would be subject to publication and disclosure in the upcoming depositions. Since Wiener never obtained any written and signed authorization or consent to release this confidential private information Wiener must be enjoined from publicizing such private information. This enjoinment must also apply to the testimony of attorney Jeanne Fugate.

6. The notice of the deposition of Jeanne Fugate was designed by attorney Weinreb to publicize confidential information and distract from the focus of the lawsuit for legal malpractice against Wiener.

7. This Declarant implores this Court to enjoin the publication of confidential psychological information belonging to the Plaintiff Jane Doe, either by Wiener or Attorney Jeanne Fugate.

8. While the inexperience of Defendant Wiener in his unauthorized publication of confidential information of Jane Doe in his "draft complaint" cannot be excused, the testimony of Jeanne Fugate, Esq must also be enjoined. Ms. Fugate has knowledge of, or should have knowledge that the personal private confidential information of Jane Doe cannot be publicized.

9. This Declarant, respectfully requests that this court prevent the publication of private confidential personal information of Jane Doe by issuing such an enjoinment. Plaintiff's personal

- 4 -

private information must be protected. This Court should issue an order enjoining publication of this personal confidential information. The order to enjoin said personal confidential information should apply to all parties and to all witnesses in this matter.

10. The public disclosure of private facts belonging to Jane Doe must be protected and secured.

11. Good cause exists for this Court to protect this private information. Jane Doe's counsel would anticipate an order to enjoin publication of these private facts before Jeanne Fugate's deposition on July 31, 2024.

12. It is in the best interests of justice to do so.

13. Notice is given today 7/5/2024 for a hearing to be held on 7/9/2024 in Dept. 9 at 9:30 AM in Martinez Wakefield Taylor Courthouse located at 725 Court St. Martinez, CA 94553-1233.

I state that the foregoing is true and correct, and do so under penalty of perjury under the laws of the State of California.

Executed on July 5, 2024 at Los Angeles, California

Janee M. Weberman, Esq.
Declarant

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE, <br><br>                Plaintiff, <br><br>      v. <br><br> CHRISTIAN LARSEN, RIPPLE LABS INC., and DOES 1-10, <br><br>                Defendants. | Case No. 1:25-cv-06020 (MMG) |

## [PROPOSED] ORDER TO SHOW CAUSE FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Upon consideration of Plaintiff's Motion for Preliminary Injunction and the supporting papers, and good cause appearing under Federal Rule of Civil Procedure 65:

**IT IS HEREBY ORDERED** that Defendant Ripple Labs, Inc., and its agents, attorneys, employees, and all persons acting in concert with them, shall show cause before this Court at ___ [time] on ___ [date], or as soon thereafter as counsel may be heard, why a preliminary injunction should not issue enjoining Defendants from seeking, enforcing, or causing to be enforced any bond, financial precondition, or related vexatious-litigant designation that would result in dismissal of Plaintiff's claims or prevent her from pursuing this federal action, while permitting the California court to conduct all other routine or procedural matters in the ordinary course.

**IT IS FURTHER ORDERED t**hat Defendants shall file and serve any opposition papers on or before ___ [date], and Plaintiff may file and serve any reply on or before ___ [date].

**IT IS FURTHER ORDERED** that, pending the hearing and determination of this Order to Show Cause, Defendants and all persons acting in concert with them are temporarily restrained from:

(a) Enforcing, noticing, scheduling, or proceeding with any bond hearings or vexatious-litigant motions in the related California proceedings;

(b) Imposing or enforcing any payment deadlines, bonds, or financial conditions pursuant to California Code of Civil Procedure § 391.3 or otherwise; and

(c) Taking any action that would result in dismissal of Plaintiff's claims based on her inability to pay any financial security.

**IT IS FURTHER ORDERED** that Plaintiff shall serve this Order to Show Cause, together with the Motion for Preliminary Injunction and all supporting papers, upon Defendant or their counsel of record by electronic mail and overnight delivery no later than ___ [date/time].

This relief is narrowly tailored to preserve Plaintiff's federal rights without restraining the California court's general jurisdiction or its ability to manage unrelated proceedings.

**SO ORDERED.**

Dated: October ___, 2025

_____

HON. MARGARET GARNETT

United States District Judge

Southern District of New York